# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION

SUSAN HOGARTH,

    *Plaintiff,*

v.

KAREN BRINSON BELL, *et al.*,

    *Defendants.*

Case No.: 5:24-cv-00481

Hon. Louise W. Flanagan

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION AND SUMMARY OF THE CASE ....................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

    A.    Susan Hogarth Takes Ballot Selfies to Share Her Political Beliefs. .................. 3

    B.    North Carolina Law Bans Ballot Selfies. ............................................................. 5

    C.    The State Board Warns the Public Not to Take Ballot Selfies and
           Investigates Individuals Who Take and Share Ballot Selfies. ........................... 5

    D.    Hogarth Challenges North Carolina's Ballot Selfie Ban. ................................... 7

ARGUMENT ..................................................................................................................... 8

    I.    Ballot Selfies Are Political Speech that Enjoy the Utmost First Amendment
        Protection. ................................................................................................................. 8

    II.    Hogarth Is Likely to Succeed on the Merits Because the Ballot Photography
        Provisions Fail Strict Scrutiny As Applied to Ballot Selfies. .................................... 11

        A.    The Ballot Photography Provisions are "presumptively
            unconstitutional" content-based restrictions. .................................................... 11

        B.    North Carolina does not have a compelling government interest in
            banning ballot selfies. ....................................................................................... 13

        C.    The Ballot Photography Provisions are not narrowly tailored in their
            prohibition of ballot selfies. ............................................................................... 17

    III.    Hogarth Is Likely to Succeed on the Merits Because the Voting Enclosure
        Provision Is an Unreasonable Restriction on Speech in a Public Forum. ............... 20

    IV.    Hogarth Satisfies the Remaining Requirements for a Preliminary Injunction. ...... 23

        A.    Hogarth will continue to suffer irreparable harm absent a preliminary
            injunction because North Carolina's ballot selfie ban burdens her First
            Amendment rights. ............................................................................................. 23

        B.    North Carolina's violation of Hogarth's right to speak politically
            through ballot selfies tilts the balance of equities and the public interest
            in her favor. ....................................................................................................... 24

C.  The Court should waive the bond requirement because Hogarth seeks
only to protect her First Amendment rights. .......................................................26

CONCLUSION.................................................................................................................26

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) .................................................................................. 9, 10

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) .................................... 17

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ............................................. 17, 18

*Brooklyn Branch of NAACP v. Kosinski*, No. 21 CIV. 7667 (KPF), 2024 WL 2846687 (S.D.N.Y. May 30, 2024) .................................... 18

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ............................................. 18

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ................... 24, 25

*City of Laude v. Gilleo*, 512 U.S. 43 (1994) ............................................. 14

*Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370 (N.D. Ga. 2021) . 9, 12, 19

*Counterman v. Colorado*, 600 U.S. 66 (2023) ............................................. 20

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................... 24

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ......................... 8

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ........................ 8, 25

*Hassay v. Mayor*, 955 F. Supp. 2d 505 (D. Md. 2013) .................................... 26

*Hill v. Williams*, No. 16-CV-02627-CMA, 2016 WL 8667798 (D. Colo. Nov. 4, 2016) .......................................................... 12, 14, 24

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) ........... 26

*Ind. Civil Liberties Union Found., Inc. v. Ind. Sec'y of State,* 229 F. Supp. 3d 817 (S.D. Ind. 2017) ................................................ *passim*

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ................................................................. 25

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ............................ 24, 25

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................... 18

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ................................................................. 26

*Meyer v. Grant*, 486 U.S. 414 (1988) .......................................................................... 9

*Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018) ................................. 2, 11, 21, 22

*Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*,
    991 F.2d 154 (4th Cir. 1993) ................................................................................. 22

*N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) .............................. 24

*N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) ................................. 14

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d
    570 (4th Cir. 2010) ............................................................................................... 23

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th
    Cir. 2003) ............................................................................................................. 25

*PETA v. N.C Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023).......................... 9

*Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194 (4th Cir. 2024) ........................... 25

*Planned Parenthood S. Atl. v. Stein*, 680 F. Supp. 3d 595 (M.D.N.C. 2023) .......... 26

*PSINet, Inc. v. Chapman,* 362 F.3d 227 (4th Cir. 2004) ............................................ 19

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ...................................................................... 25

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................. 2, 11, 13

*Rideout v. Gardner*, 123 F. Supp. 3d 218 (D.N.H. 2015) ................................. 9, 12, 13

*Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016).................................................. *passim*

*Rogers v. Madison County Clerk*, No. 2016-SC-3147, 2017 WL 3475008
    (Ill.Cir.Ct. July 20, 2017 ................................................................................ 15, 19

*Ross v. Early*, 746 F.3d 546 (4th Cir. 2014) ............................................................... 13

*Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115 (1989)..................................... 17

*Schneider v. New Jersey*, 308 U.S. 147 (1939) ........................................................... 18

*Silberberg v. Bd. of Elections*, 272 F. Supp. 3d 454 (S.D.N.Y. 2017) .............. 9, 12, 16

*Soderberg v. Carrion*, 645 F. Supp. 3d 460 (D. Md. 2022) ........................................ 18

*Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622 (1994) ..................................................... 13

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) .................................. 17

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) .................. 18

*Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) ..................................... *passim*

*White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179
    (4th Cir. 2022) ............................................................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................... 8, 24, 25

*Wisconsin v. Paul H. Buzzell,* No. 2022-cv-000361 (Wis. Ct. App. Nov. 27,
    2023)............................................................................................................. 15

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d
    292 (4th Cir. 2009) ........................................................................................ 8

**Statutes:**

18 U.S.C. § 597 .......................................................................................................... 20

Ala. Code § 17-9-50.1 (2019)..................................................................................... 15

Ariz. Rev. Stat. § 16-1018(4) (2018) .......................................................................... 15

Cal. Elec. Code § 14291 (2016) .................................................................................. 15

Colo. Rev. Stat. § 1-13-712 (2017) ............................................................................. 15

Haw. Rev. Stat. § 11-121 (2016) ................................................................................. 15

Iowa Code § 49.88 (2017) ........................................................................................... 15

N.C. Gen Stat. § 163-275(2) ....................................................................................... 20

N.C. Gen. Stat. § 163-165.1(e).......................................................................... 5, 13, 19

N.C. Gen. Stat. § 163-166.3(b)............................................................................... 5

N.C. Gen. Stat. § 163-166.3(c) ......................................................................... 5, 12, 19

N.C. Gen. Stat. § 163-273(a)(1) ....................................................................... 5, 13, 19

N.C. Gen. Stat. § 163-274(b)(1) ....................................................................... 5, 13, 19

N.M. Stat. § 1-12-59 (2019) ....................................................................................... 15

Neb. Rev. Stat. § 32-1527 (2016)................................................................... 15

Okla. Stat. tit. 26 § 7-109 (2019)................................................................... 15

Utah Code § 20A-3a-504 (2015) .................................................................... 15

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION AND SUMMARY OF THE CASE

Voting and political expression are cherished American freedoms. But North Carolina is among the minority of states that make it a crime to do both at the same time—at least insofar as it criminalizes taking and sharing "ballot selfies" that voters use to celebrate their votes and their participation in our democratic process. Instead of applauding citizens showing their pride through the uniquely expressive taking and sharing of photographs of themselves with (or of) their completed ballots, North Carolina threatens prosecution. In the last decade, the State Board of Elections has investigated dozens of North Carolina voters for no more than taking a picture commemorating their participation in elections. That must end.

Plaintiff Susan Hogarth received a letter from the North Carolina State Board of Elections threatening prosecution in March 2024, after she took a ballot selfie and posted it on social media. Hogarth took the selfie to show pride in supporting her preferred candidates, to increase awareness of the third-party candidates she supports, and to oppose North Carolina's ballot selfie ban:



1

The First Amendment squarely protects Hogarth's ballot selfie. The First Circuit, in striking down New Hampshire's ballot selfie ban, explained that these photos have "special communicative value" that receives First Amendment protection. *Rideout v. Gardner*, 838 F.3d 65, 75 (1st Cir. 2016). Absent a compelling interest, the government cannot broadly restrict this form of speech, because "a picture is worth a thousand words." *Id.* at 76.

But in North Carolina's misguided view the picture is worth jailtime. The State reinforces its view through four statutory provisions that outlaw taking, sharing, or possessing a photograph of a completed ballot. The provisions are content based, applying only to photos with an image of a completed ballot, making the provisions "presumptively unconstitutional." *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A fifth provision prohibits taking photographs of voters in the polling place—including of oneself—without permission from county election officials, and in operation thus also bans ballot selfies. North Carolina law allows its election officials to withhold permission for any reason, or none at all. This lack of "objective, workable standard[s]" limiting county officials' discretion to deny a polling-place ballot selfie violates the First Amendment. *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 21 (2018).

Because Hogarth refuses to take down her ballot selfie and plans to continue to take ballot selfies in November and future elections, she risks criminal investigation, prosecution, fines, and jail time. Many other North Carolinians face the same choice of risking jail time or self-censoring. The First Amendment prohibits the government from putting them to this kind of choice, whether it relates to voting, political expression, or

doing both at the same time. Hogarth and other voters have a right to take and share ballot selfies to express their political beliefs, free from fear that North Carolina will jail them for doing so.

## STATEMENT OF FACTS

### A.    Susan Hogarth Takes Ballot Selfies to Share Her Political Beliefs.

Susan Hogarth is a resident and registered voter in Wake County, North Carolina. (Verified Compl. ¶ 9.) On March 5, 2024, she went to her polling place to vote in the North Carolina primary election. (*Id.* ¶ 53.) From the time she arrived until the time she left, the polling place was virtually empty. (*Id.* ¶¶ 54, 61.)

After she filled out her ballot, she took about 45 seconds to photograph herself in the voting booth with her completed ballot and a "no photos" sign affixed to the voting booth. (*Id.* ¶¶ 57–59.) Hogarth then exited the polling place and just minutes later posted her ballot selfie to X.[1] (*Id.* ¶¶ 60–66.) Her post included a caption endorsing the candidates she had voted for and protesting that "Laws against #ballotselfie are bullshit." (*Id.* ¶¶ 66–70.)

With that one photo, Hogarth promoted her favored candidates, spread awareness that voters can and do vote for third-party candidates, helped encourage others to vote, expressed her belief in participating in the electoral process, and voiced disagreement with North Carolina's ballot selfie ban. (*Id.* ¶ 134.)

Two weeks later, Hogarth received a letter from the North Carolina State Board of Elections dated March 13, 2024, threatening criminal prosecution for her ballot selfie.

---

[1] "X" is the name of the social network formerly known as "Twitter."

(Verified Compl. ¶ 72; Steinbaugh Decl. ¶ 2 and Ex. A.) In the letter, State Board Investigator Danielle Brinton warned Hogarth four times that taking and sharing ballot selfies is illegal in North Carolina. (Verified Compl. ¶¶ 72–73; Steinbaugh Decl. ¶ 2 and Ex. A.) Investigator Brinton wrote that she had a duty to investigate Hogarth's ballot selfie as a "violation[] of election laws," (Verified Compl. ¶¶ 72, 80; Steinbaugh Decl. ¶ 2 and Ex. A.) and then threatened Hogarth with a "Class 1 Misdemeanor" and demanded she "take down the post." (Verified Compl. ¶¶ 72, 81, 83; Steinbaugh Decl. ¶ 2 and Ex. A.)

Hogarth's March 5, 2024 ballot selfie post remains public on X today and she does not intend to take it down. (Verified Compl. ¶ 105–106.) To date, the post has been viewed 2,896 times, "liked" by 87 X users, and reposted or quoted by 23 users. (*Id.* ¶ 71.) This was not Hogarth's first time taking and sharing a ballot selfie, and it will not be her last. (*Id.* ¶¶ 49–50, 107–13.) Hogarth intends to vote in future elections, either in person or absentee, and to take and share ballot selfies whenever she does. (*Id.* ¶¶ 107–13.)

This November, Hogarth will have an additional reason to express her pride in her vote—she'll be voting for herself. On Tuesday, November 5, 2024, Hogarth will appear on the ballot as the Libertarian Party candidate for state senate in North Carolina Senate District 13. (*Id.* ¶¶ 116–117.) She intends to vote in person and, when she does, to take a photo of herself in the voting booth, holding up her completed ballot, just as she has in the past. (*Id.* ¶¶ 118–122.) Then, just as on March 5, 2024, Hogarth plans to share her ballot selfie on social media. (*Id.* ¶ 123.)

**B.      North Carolina Law Bans Ballot Selfies.**

Five provisions of North Carolina law ban different aspects of taking and sharing ballot selfies. Four provisions ban taking or sharing photographs of a completed ballot (the "Ballot Photography Provisions")—without exception for voters photographing their own ballots. N.C. Gen. Stat. § 163-166.3(c) prohibits photographing a completed ballot anywhere, whether in-person or absentee. N.C. Gen. Stat. § 163-273(a)(1) makes it a Class 2 misdemeanor for a voter to show their own completed ballot to anyone else, including photographic copies. N.C. Gen. Stat. § 163-165.1(e) makes it a Class 1 misdemeanor for anyone with access to an electronic record of a voter's completed ballot to disclose how they voted. And N.C. Gen. Stat. § 163-274(b)(1) specifies, in a list of elections law crimes, that it is a Class 1 misdemeanor to disclose how a voter voted— even one's own vote—in violation of § 163-165.1(e).

A fifth statutory provision (the "Voting Enclosure Provision") requires a county election official to give permission before any individual may photograph any voter in the voting enclosure—the room at the polling place where voting occurs—even of oneself. N.C. Gen. Stat. § 163-166.3(b). The only exception is for photographs of a candidate, requiring only that the candidate grant permission. *See* N.C. Gen. Stat. § 163-166.3(b). The Voting Enclosure Provision makes no exception for ballot selfies.

**C.      The State Board Warns the Public Not to Take Ballot Selfies and Investigates Individuals Who Take and Share Ballot Selfies.**

The State Board of Elections regularly publicizes North Carolina's ballot selfie ban and enforces state election laws against those who take them. Every election season the State Board issues public statements warning voters not to take ballot selfies.

(Verified Compl. ¶¶ 86–89; Steinbaugh Decl. ¶¶ 6–9 and Exs. D, E, F, G.) The State Board and the County Board websites underscore that taking a photo of a completed ballot is illegal. (Verified Compl. ¶¶ 88–89, 98–99; Steinbaugh Decl. ¶¶ 10–13, 21–24 and Exs. H, I, J, P, Q, R.)

The State Board does so despite knowing ballot selfies are expressive. As Executive Director Brinson Bell explained in a press release before the March 2020 primary election: "We understand wanting to photograph yourself voting, especially with the popularity of selfies . . . However, there are legal ways to display your voting pride, such as wearing your 'I Voted' sticker or taking a picture outside of the precinct." (Verified Compl. ¶ 85; Steinbaugh Decl. ¶ 7 and Ex. E.) But this knowledge has not prevented the State Board from investigating and threatening criminal prosecution for ballot selfies intended to express that same pride. (Verified Compl. ¶¶ 72–83, 90–97; Steinbaugh Decl. ¶¶ 4, 17 and Exs. C, M at PI. Ex. M. 015, 019.)

The State Board routinely investigates reports of ballot selfies, including reports from the Board of Elections of Wake County, where Hogarth lives and votes. State Board investigators independently scour social media to identify North Carolina voters who have taken and shared ballot selfies online. (Verified Compl. ¶¶ 9, 90–97, 101–103, 107; Steinbaugh Decl. ¶ 4 and Ex. C.) They also investigate reports from individuals who see ballot selfies on social media and from county election officials. (Verified Compl. ¶¶ 95, 100–104; Steinbaugh Decl. ¶ 4 and Ex. C.)

The State Board has received and investigated nearly 50 reports of voters photographing completed ballots since March 2016. (Verified Compl. ¶ 91; Steinbaugh

Decl. ¶¶ 4, 19 and Exs. B, N.) Internal reports even describe investigations of voters sharing photos of their completed *absentee* ballots. (Steinbaugh Decl. ¶ 4 and Exs. C at PI Ex. C. at 011, 013, 015–17.) Since 2020, the State Board has referred two "photographing voted ballot" cases for prosecution, most recently in November 2023. (Steinbaugh Decl. ¶ 17 and Ex. M at PI Ex. M. 015, 019.)

The State Board tells the public that it enforces the ban on ballot selfies because they facilitate illegal vote-buying schemes. (Steinbaugh Decl ¶¶ 6–8 and Exs. D, E, F.) But since 2015, it has referred only four "vote buying" allegations to prosecutors. (Steinbaugh Decl. ¶ 17 and Ex. M at PI Ex. M. 001, 013.)

The State Board's routine warnings and investigations chill voters protected expression and make clear to voters that, if they want to express their voting pride, they'll have to do it in one of the milquetoast ways the state prefers—or resort to civil disobedience and risk criminal prosecution by sharing a ballot selfie.

**D.  Hogarth Challenges North Carolina's Ballot Selfie Ban.**

On August 21, 2024, Hogarth filed her Verified Complaint seeking declaratory and injunctive relief against State Board and County Board officials, as well as the Wake County District Attorney and the North Carolina Attorney General. (Verified Compl. ¶¶ 11–23, 124–134.) Hogarth challenges the Ballot Photography Provisions as applied to ballot selfies, as content-based restrictions on core political expression that violate her First Amendment rights. (Count One, Verified Compl ¶¶ 135–69.) She also challenges the Voting Enclosure Provision as applied to ballot selfies, as an arbitrary and unreasonable regulation of protected speech in a public forum, in violation of the First Amendment. (Count Two, Verified Compl. ¶¶ 170–187.) Count Three challenges

the constitutionality of the State Board's March 13, 2024 letter threatening Hogarth with criminal prosecution for taking and sharing her ballot selfie. (Count Three, Verified Compl. ¶¶ 188–204.) This motion seeks a preliminary injunction to ensure that Hogarth can engage in protected political speech in the upcoming election.

## ARGUMENT

The Court should preliminarily enjoin the Ballot Photography Provisions, Voting Enclosure Provision, and their enforcement against Hogarth because she is likely to succeed in showing they are unconstitutional as applied to ballot selfies, she will suffer irreparable harm to her First Amendment rights absent an injunction, and the balance of equities favors the relief, which would serve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). In fact, preliminary injunctions advancing First Amendment rights typically resolve based on likelihood of success on the merits, because the other factors are "inseparably linked" to it. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002). And here, North Carolina impermissibly prohibits protected political speech—the creation and sharing of ballot selfies—without justification.

## I. Ballot Selfies Are Political Speech that Enjoy the Utmost First Amendment Protection.

The State's ban on taking and sharing ballot selfies violates core First Amendment principles by unjustifiably banning political speech. The creation and dissemination of political speech, notably, lies at "the heart of the First Amendment's protection." *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776–77 (1978)

(holding speech regarding ballot referendum "is the type of speech indispensable to decisionmaking in a democracy" and protected). First Amendment protections are accordingly at their "zenith" as applied to political speech. *Wash. Post v. McManus*, 944 F.3d 506, 513–14 (4th Cir. 2019) (quoting *Meyer v. Grant*, 486 U.S. 414, 425 (1988)). Moreover, the First Amendment "has its fullest and most urgent application" to expression related to "campaign[s] for political office." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).

The First Amendment also protects the "creation of information" just "as much . . . as its dissemination." *PETA v. N.C Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023). This includes taking and sharing photographs. *Id.* In *PETA*, the Fourth Circuit invalidated a North Carolina law that criminalized taking undercover slaughterhouse videos to expose animal cruelty because "the right to publish a recording would be 'largely ineffective, if the antecedent act of *making* the recording is wholly unprotected.'" *Id.* at 829, 841 (emphasis in original).

These principles make it unsurprising that every court that has considered challenges to ballot selfie bans, including the First Circuit, has recognized they are protected expression. *See Rideout*, 838 F.3d at 75.[2] They allow voters to communicate

---

[2] *See also Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 (N.D. Ga. 2021) (noting that the "right to photograph or videotape is protected by the First Amendment" and holding that a ballot selfie ban that "prohibits any photography or recording of any voted ballot in public and nonpublic forums alike" violates the First Amendment); *Silberberg v. Bd. of Elections*, 272 F. Supp. 3d 454, 475 (S.D.N.Y. 2017) (explaining that New York's ballot selfie ban "prohibit[s] individuals from using the medium of a marked ballot for expressive conduct"); *Ind. Civil Liberties Union Found., Inc. v. Ind. Sec'y of State,* 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017) (holding Indiana's ballot selfie ban "embodies a content-based restriction on speech that cannot survive strict or intermediate scrutiny"); *Rideout v. Gardner*, 123 F. Supp. 3d 218, 229 (D.N.H. 2015) (*Rideout II*) (noting that New Hampshire's ban "deprive[d] voters of one of their most powerful means of letting the world know how they voted"), *aff'd*, 838 F.3d 65 (1st Cir. 2016).

political messages in a unique, concise, and visually compelling way. As the First Circuit explained, ballot selfies allow voters to "both express support for a candidate and communicate that the voter has in fact given his or her vote to that candidate." *Id*. They therefore have a "special communicative value" because, when it comes to expressing who or what you voted for, "a picture is worth a thousand words." *Id.* at 76.

Hogarth's ballot selfie is no exception. Her March 5, 2024 post communicated multiple political messages, including campaign-related speech, where the First Amendment "has its fullest and most urgent application." *Bennett*, 564 U.S. at 734. Specifically, her ballot selfie:

- Drew attention to down-ballot or third-party candidates;
- Encouraged potential voters to vote;
- Invited voters to consider voting for a third-party candidate;
- Challenged the idea that voters should vote for only major party candidates;
- Expressed her pride in having participated in the electoral process and voted for third-party candidates;
- Commemorated her vote for candidates that she endorses and supports; and
- Contested North Carolina's laws banning ballot selfies.

(Verified Compl ¶¶ 51, 134.) This is all political speech—related not only to candidates and campaigns but to participation in the political process itself—and therefore receives maximum constitutional protection. *McManus*, 944 F.3d at 513–14. Hogarth's ballot selfie is imbued with "special communicative value" because she "express[ed] support for [] candidate[s] and communicate[d]" that she voted for them. *Rideout*, 838 F.3d at 75. The First Amendment thus guards against restrictions on political speech like the Ballot Photography Provisions, Voting Enclosure Provision, and the State Board's March 13, 2024 letter threatening Hogarth with prosecution for her

ballot selfie.

## II. Hogarth Is Likely to Succeed on the Merits Because the Ballot Photography Provisions Fail Strict Scrutiny As Applied to Ballot Selfies.

The Ballot Photography Provisions are "presumptively unconstitutional," *Reed*, 576 U.S. at 163, because they operate—including by outlawing taking or sharing ballot selfies—based solely on the photographs' content: whether a photograph contains an image of a completed ballot. Content-based speech restrictions are subject to strict scrutiny, prohibiting the State from imposing them unless they are narrowly tailored to further a compelling governmental interest. *Rideout*, 838 F.3d at 75. But North Carolina cannot demonstrate a compelling interest in banning ballot selfies, and even if it could, the Ballot Photography Provisions are not narrowly tailored to accomplish any purported state interest in that context. Therefore, as applied to ballot selfies, the Ballot Photography Provisions and the State Board's enforcement of any of them against Hogarth violate the First Amendment.

### A. The Ballot Photography Provisions are "presumptively unconstitutional" content-based restrictions.

The Ballot Photography Provisions are content-based restrictions on speech because they apply only to photos that contain an image of a completed ballot. Such laws targeting a category of speech "because of the topic discussed or the idea or message expressed" are "presumptively unconstitutional." *Reed*, 576 U.S. at 163.[3] A content-

---

[3] The Voting Enclosure Provision is likewise content based. However, because it restricts photography only in the voting enclosure, it is analyzed separately below and assumed for the sake of argument that it is a restriction of speech in a non-public forum, where content-based restrictions are permitted so long as they are viewpoint neutral and reasonable in light of the purpose of the forum. *See Mansky*, 585 U.S. at 13. The Voting Enclosure Provision is, at least, unreasonable and thus unconstitutional as applied to ballot selfies. *See infra* Section III.

based law is particularly pernicious because it "lends itself to use" for "invidious, thought-control purposes." *Id.* at 167.

Every court to take up the question has held ballot selfie bans are content based.[4] The Southern District of Indiana held the state's ballot selfie ban was content based because "[a] voter remains free . . . to take photographs of anything and everything other than her ballot" and "[n]ot until after her photographs are examined as to their content will the government know whether" the photograph is illegal. *Ind. Civil Liberties Union Found., Inc.*, 229 F. Supp. 3d at 823. The District of New Hampshire similarly held ballot selfie bans are content based because they restrict only "images of marked ballots that are intended to disclose how a voter has voted. Images of unmarked ballots . . . may be shared with others without restriction." *Rideout II*, 123 F. Supp. at 229; *see also Coal. for Good Governance*, 558 F. Supp. 3d at 1386 (holding Georgia's ballot-selfie restrictions were content based because they "regulate what type of ballot information a person may record").[5]

North Carolina's Ballot Photography Provisions similarly prohibit only taking or sharing photos of a completed ballot and are thus content based. For example, N.C. Gen. Stat. § 163-166.3(c) prohibits taking a photograph only if it is of a "voted ballot." N.C.

---

[4] The First Circuit and the District of Colorado both determined the ballot selfie laws they reviewed would have failed at least intermediate scrutiny, and therefore they decided to forgo ruling on whether the laws were content based. *Rideout*, 838 F.3d at 72; *Hill v. Williams*, No. 16-CV-02627-CMA, 2016 WL 8667798, at *9 (D. Colo. Nov. 4, 2016).

[5] The Southern District of New York likewise held that New York's ban on sharing ballot selfies was content based because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Silberberg*, 272 F. Supp. 3d at 474. The court ultimately upheld New York's ballot selfie ban because of the state's unique history, up to the present, of vote buying and voter intimidation, reasons inapplicable to this case. *See infra* Section II.B.

12

Gen. Stat. § 163-273(a)(1) criminalizes allowing "any person" to see the contents of a completed ballot. And N.C. Gen. Stat. §§ 163-165.1(e) and 163-274(b)(1) criminalize those possessing "electronic records of individual voted ballots" if they disclose "how an individual has voted."[6] To know whether Hogarth's or another voter's ballot selfies are illegal, State officials must "examin[e] . . . their content." *Ind. Civil Liberties Union Found.*, 229 F. Supp. 3d at 823. The Ballot Photography Provisions are therefore content based and subject to strict scrutiny. *See Reed*, 576 U.S. at 173 (applying strict scrutiny to content-based ordinance).

## B. North Carolina does not have a compelling government interest in banning ballot selfies.

The Ballot Photography Provisions fail strict scrutiny as applied to ballot selfies because they do not further a "compelling state interest." *Reed*, 576 U.S. at 163. This is a "stringent standard." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018); *see also McManus*, 944 F.3d at 520 (describing strict scrutiny as "in practice, [] virtually impossible to satisfy"). Demonstrating a compelling interest requires states to identify a need that is more than merely "abstract," and to then "make some evidentiary showing that the recited harms are real, not merely conjectural." *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014) (requiring this even under intermediate scrutiny). States must therefore do more than "posit the existence of the disease sought to be cured," *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 664 (1994), as the mere possibility [of] . . . misconduct is not a sufficient reason to regulate large quantities of political

---

[6] The Ballot Photography Provisions extend far outside the polling place. For instance, they apply to a ballot selfie with an absentee ballot taken in the comfort of one's own home or shared "far away from the polling place." *Rideout II*, 123 F. Supp. 3d at 230.

expression." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 304 (4th Cir. 2008). Instead, the government must "meaningfully demonstrate that a given law is impelled by the facts on the ground" by producing some evidence that the harm it has identified actually exists. *McManus*, 944 F.3d at 521.

Federal courts have repeatedly held ballot selfie prohibitions likely unconstitutional because states failed to demonstrate a compelling or even important government interest to justify the ban. In *Rideout*, the First Circuit explained that even though "[d]igital photography, the internet, and social media" had been "ubiquitous for several election cycles" New Hampshire provided "no evidence" ballot selfies had "the effect of furthering vote buying or voter intimidation." 838 F.3d at 73. New Hampshire's law therefore failed both intermediate and strict scrutiny.[7]

The Southern District of Indiana likewise noted that even though "a large percentage of Americans own and use smartphones to take and share digital images," the state failed "to produce a single instance of their having been used to facilitate vote buying or voter coercion." *Ind. Civil Liberties Union Found.*, 229 F. Supp. 3d at 824. And in *Hill v. Williams*, the District of Colorado enjoined the state's ballot selfie ban because, in part, Colorado's expert witness conceded that "vote buying and voter intimidation largely disappeared during the twentieth century and there is currently no record of extensive vote buying." 2016 WL 8667798, at *10.

---

[7] The Ballot Photography Provisions here would likewise fail intermediate scrutiny for all the same reasons they fail strict scrutiny, *see infra* Part II.B., Part II.C., and also because they impermissibly "foreclose an entire" "important and distinct medium of expression." *City of Laude v. Gilleo*, 512 U.S. 43, 55 (1994) (striking down a ban on yard signs and noting that laws banning whole mediums of expression pose a "readily apparent" danger to free speech and risk suppressing too much speech "by eliminating a common means of speaking").

It is the state's burden to prove a compelling interest exists to justify applying the Ballot Photography Provisions to ballot selfies. North Carolina cannot show a compelling interest in prohibiting ballot selfies. Notably, ballot selfies are currently legal in thirty-one states (about double the amount in 2016 when *Rideout* was decided).[8] By 2020, fifteen states had either passed laws permitting ballot selfies[9] or had their bans struck down in court,[10] leading to tens of millions voting in states where ballot selfies had been affirmatively legalized by the time of the general election.[11] And in challenges to ballot selfie bans across the country, no state has produced even a single real-world example of a ballot selfie used in a vote-buying scheme.

North Carolina can fare no better. The State Board, like defendants in other ballot selfie litigations, has publicly speculated that the photos "could be used as proof of a vote for a candidate in a vote-buying scheme." (Steinbaugh Decl. ¶¶ 6–8, and Exs. C–E.) But vote buying is nearly (if not entirely) non-existent: The State Board's own records show it has referred only four *allegations* of vote-buying incidents to prosecutors

---

[8] Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Utah, Vermont, Virginia, Washington, Wisconsin, and Wyoming.

[9] *See* Ala. Code § 17-9-50.1 (2019); Ariz. Rev. Stat. § 16-1018(4) (2018); Cal. Elec. Code § 14291 (2016); Colo. Rev. Stat. § 1-13-712 (2017); Haw. Rev. Stat. § 11-121 (2016); Iowa Code § 49.88 (2017); Neb. Rev. Stat. § 32-1527 (2016); N.M. Stat. § 1-12-59 (2019); Okla. Stat. tit. 26 § 7-109 (2019); and Utah Code § 20A-3a-504 (2015).

[10] *See Supra* n. 2. *See also Rogers v. Madison County Clerk*, No. 2016-SC-3147, 2017 WL 3475008, at *2 (Ill.Cir.Ct. July 20, 2017 (striking down an Illinois ballot selfie law); *Wisconsin v. Paul H. Buzzell*, No. 2022-cv-000361 (Wis. Ct. App. Nov. 27, 2023) (dismissing criminal charges and declaring that a law prohibiting ballot selfies was unconstitutional).

[11] The total number of 2020 voters in Alabama, Arizona, California, Colorado, Georgia, Hawaii, Iowa, Illinois, Indiana, Nebraska, New Hampshire, New Mexico, Oklahoma, Utah, and Wisconsin is over 50 million. *See* Federal Elections Commission, Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives at 7. (Oct. 2022) (showing how many people voted in each state in the 2020 presidential election).

in the last decade, and none since 2018. (Steinbaugh Decl. ¶ 17 and Ex. M at PI Ex. M. 001, 013.) In the same time, the State Board referred two standalone "photographing voted ballot" allegations for prosecution. (Steinbaugh Decl. ¶ 17 and Ex. M at PI Ex. M. 015, 019.) Further undermining any claim that ballot selfies are used in vote buying is the acknowledgement of the State Board's Executive Director, Defendant Brinson Bell, that voters take ballot selfies to "show your voting pride" and "the desire to photograph yourself voting," not for any nefarious purpose. (Steinbaugh Decl. ¶ 6 and Ex. D.)

The only decision to the contrary, *Silberberg v. Board of Elections of New York*, is inapplicable here. 272 F. Supp. 3d at 471, 481. The Southern District of New York upheld the state's ballot selfie ban because New York has an extensive history, up to the present, of vote buying and voter intimidation. But still, New York did not point to a single instance where ballot selfies had been used as part of a vote-buying scheme. The evidence in *Silberberg* therefore fell short of the Fourth Circuit's requirement that states show their speech restrictions are "impelled by the facts on the ground"—that the harm identified actually exists and is not merely "hypothetical[]." *McManus*, 944 F.3d at 521–22.

Absent evidence linking ballot selfies to voter fraud and given the state and national evidence to the contrary, North Carolina is unlikely to carry its burden to produce sufficient evidence, if any, supporting its publicly stated interest. And the ultimate failure to do so means North Carolina cannot demonstrate a compelling interest in banning ballot selfies.

## C. The Ballot Photography Provisions are not narrowly tailored in their prohibition of ballot selfies.

Even assuming prevention of vote-buying can present a compelling justification for North Carolina's ballot selfie ban, the Ballot Photography Provisions are not narrowly tailored to that interest. Narrow tailoring requires that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). The State bears the burden of proving that "a plausible, less restrictive alternative . . . will be ineffective to achieve its goals." *Id.* at 816. In *Playboy Entertainment*, the Supreme Court held a law requiring cable channels to either limit the broadcast hours of adult content or to scramble it was not narrowly tailored because the government failed to show that a plausible alternative—blocking the content in individual households upon request—would be ineffective. *Id.* at 825–26*; see also Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989) (invalidating ban on "dial-a-porn" services because the government failed to prove more-limited screening requirements would not prevent inappropriate access).

The Supreme Court has time and again held that criminal laws precisely targeting unlawful conduct are less restrictive alternatives to those that seek to achieve a governmental interest by instead, or also, suppressing protected expression. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002); *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980); *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940); *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939). This is the "normal method of deterring unlawful conduct," rather

than punishing "speech by a law-abiding possessor of information." *Bartnicki*, 532 U.S. at 529. A law "is not the least restrictive means of achieving the state's goal if the only conduct it legitimately proscribes is already criminalized by other state laws." *Brooklyn Branch of NAACP v. Kosinski*, No. 21 CIV. 7667 (KPF), 2024 WL 2846687, at *16 (S.D.N.Y. May 30, 2024) (citing *McCullen v. Coakley*, 573 U.S. 464, 490–92 (2014)).

In *Village of Schaumburg*, the Supreme Court invalidated a ban on charitable solicitation because the government's "interest in preventing fraud" could be "better served by measures less intrusive," like using "penal laws" to punish fraud directly. 444 U.S. at 637. Likewise, the Fourth Circuit in *McManus* held a disclosure requirement aimed at preventing election fraud through compelled speech was "duplicative" of existing criminal laws and that the state could "expand its existing campaign finance laws" rather than further regulating protected speech. 944 F.3d at 523 & n. 5; *see also Soderberg v. Carrion*, 645 F. Supp. 3d 460 (D. Md. 2022) (invalidating ban on broadcasting court proceedings and dismissing concerns over altered recordings or doctored images because those could be deterred by criminal law targeted to alterations and doctoring).

Similar application of strict scrutiny's narrow tailoring requirement underlies determinations by federal courts in Indiana and Georgia that ballot selfie bans could not survive constitutional review. Indiana's ban on taking and sharing pictures of completed ballots was not narrowly tailored because it "dr[ew] into its ambit voters who may choose to take photos for entirely legitimate and legally innocuous reasons," and the state provided no evidence that laws targeting only ballot selfies used in vote-buying

schemes would be "much more difficult to enforce." *Ind. Civil Liberties Union Found., Inc.,* 229 F. Supp. 3d at 826–27. Likewise*,* Georgia's ban, even assuming a compelling interest, restricted more speech than necessary—particularly when compared with an Alabama statute that prohibited ballot photography only in the voting booth and made an allowance for photos of a voter's own ballot. *Coal. for Good Governance,* 558 F.Supp.3d at 1386; *see also Rogers*, No. 2016-SC-3147, 2017 WL 3475008, at *2 (Ill.Cir. Ct. July 20, 2017) (invalidating Illinois ballot selfie ban as not narrowly tailored).

Application of North Carolina's Ballot Photography Provisions likewise curtails more protected speech than necessary to prevent vote-buying schemes. The laws wholly suppress constitutionally protected ballot selfies that have no relationship to vote buying (or any other impermissible activity), and in doing so force innocent voters to "self-censor or risk prosecution," a choice the Fourth Circuit has held the First Amendment prohibits. *PSINet, Inc. v. Chapman,* 362 F.3d 227, 235 (4th Cir. 2004). The reach of the Ballot Photography Provisions is particularly stark. N.C. Gen. Stat. § 163-166.3(c) prohibits photographing a completed ballot anytime, anywhere, for any purpose. Section 163-273(a)(1) bans sharing a ballot selfie with anyone *in perpetuity*, even long after the election ends, and/or the candidates on that ballot no longer hold or seek office. And sections 163-165.1(e) and 163-274(b)(1) bar telling anyone truthful information about how you voted, just because you possess a ballot selfie. All these provisions—individually, and in combination—sweep far broader than necessary to achieve any purported interest in preventing vote buying.

It is thus hardly surprising that North Carolina has less restrictive alternatives

at its disposal to prevent vote buying (or similar malfeasance) without censoring ballot selfies. Vote buying and selling is a Class 1 felony in North Carolina, punishable by up to 10 months in prison. N.C. Gen Stat. § 163-275(2). Federal law also punishes buying or selling votes, with up to two years in prison. 18 U.S.C. § 597. These alternatives should be more than sufficient to deter unlawful conduct without banning First Amendment-protected speech. *See Rideout*, 838 F.3d at 74 (holding New Hampshire failed to prove "other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified").

And if the existing laws are somehow inadequate, North Carolina could enact a law that criminalizes ballot selfies taken with a corrupt or illicit purpose to facilitate vote buying, rather than its current blanket ban. That would be consistent with the Supreme Court's recent reinforcement that proof of a "culpable mental state" is constitutionally necessary to ensure "strategic protection" and "breathing room" for First Amendment-protected speech. *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Because North Carolina's Ballot Photography Provisions are not narrowly tailored to preventing vote-buying schemes, they cannot satisfy strict scrutiny.

### III. Hogarth Is Likely to Succeed on the Merits Because the Voting Enclosure Provision Is an Unreasonable Restriction on Speech in a Public Forum.

The Voting Enclosure Provision similarly violates the First Amendment as applied to ballot selfies because it gives election officials unbridled veto power over political expression. The provision requires a county official's approval for anyone who wants to photograph a voter, including themselves, in the room where voting takes place, without any standards to guide officials or prevent them from arbitrarily

censoring speech. Assuming for the sake of argument that North Carolina voting enclosures are nonpublic fora,[12] any regulation of speech there must nonetheless be "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13, 23 (2018) (holding polling places in Minnesota were nonpublic fora but nevertheless invalidating a standardless ban on "political" apparel worn at polling sites as incapable of reasoned application).

In the Fourth Circuit, regulations of protected expression in a nonpublic forum can be unreasonable in at least two ways, and the Voting Enclosure Provision is unreasonable as to both. First, as the Supreme Court held in *Mansky*, even in a nonpublic forum where the government may impose content-based regulations, it must still provide an "objective, workable standard," 585 U.S. at 21, or "some sensible basis for distinguishing what [speech] may come in from what must stay out." *Id.* at 16. That is why, in *Mansky*, Minnesota's ban on "political" apparel in the polling place was unconstitutionally unreasonable, because that bare descriptor was not an "objective, workable standard" for polling place officials. *Id.* at 13, 16–17. Granting officials that kind of subjective, "arbitrary discretion" to determine what apparel to allow violated the First Amendment, because speech restrictions must be "capable of reasoned application." *Id.* at 23.

The Voting Enclosure Provision fails the *Mansky* test because it is not capable of reasoned application and therefore gives election officials arbitrary discretion to grant

---

[12] Hogarth reserves the right to argue both that her polling place is a designated public forum where the Voting Enclosure Provision is a content-based restriction on speech that fails strict scrutiny, *see supra* Section II), and that Defendants apply the Voting Enclosure Provision in a viewpoint discriminatory manner that is unconstitutional in any forum.

or deny permission to photograph voters. The provision requires elections officials to grant permission before a voter can photograph themselves in the voting enclosure. But nothing in its language, or anything else in North Carolina law, provides any standards to guide or otherwise limit officials in deciding when or whether to permit or prohibit speech. Even broader than Minnesota's meager guidance that its law restricted "political" apparel, North Carolina fails to provide *any* guidance to limit officials' discretion to censor voters under the Voting Enclosure Provision. *As Mansky* explained, such restrictions violate the First Amendment.

The second way regulations of protected expression in a nonpublic forum can be unreasonable in the Fourth Circuit arises under its own longstanding (pre- and post-*Mansky*) balancing test that accords "special solicitude" to First Amendment activity. *Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). Under that test, the government must do more than "establish that the regulation is rationally related to a legitimate governmental objective," *id.*, but rather must show "more than a rational basis for the rule" under a test that is "akin to . . . intermediate scrutiny." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 198 (4th Cir. 2022). In such cases, when the "degree and character of the impairment of protected expression involved" outweighs the "validity of any asserted justification for the impairment," speech restrictions in a nonpublic forum cannot survive First Amendment scrutiny. *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 577 (4th Cir. 2010) (quoting *Multimedia Publ'g Co. of S.C.*, 991 F.2d at 159).

For example, in *News & Observer*, the Court held Raleigh-Durham International Airport's total ban on newspaper racks inside terminals was unreasonable because it "significantly restricted" expression and the government failed to provide sufficient evidence for its asserted interests in aesthetics, loss of revenue, avoiding congestion in the terminal corridor, and security risk to justify the ban. *Id.* at 578–81. Weighing the restrictions on a free press against the lacking validity of the airport's justifications, the Court struck down the ban as unreasonable. *Id.* at 581.

The Voting Enclosure Provision also lacks a legitimate basis for requiring permission from an election official to take a picture of oneself in a polling place—or for exempting candidates from the restriction. It thus significantly "impair[s] . . . protected expression," *Id.* at 577, by forcing every non-candidate voter who wants to take a ballot selfie to seek permission from an election official who can deny a request for any reason or for no reason at all. The Voting Enclosure Provision accordingly cannot survive the Fourth Circuit's tests and is unconstitutional.

## IV. Hogarth Satisfies the Remaining Requirements for a Preliminary Injunction.

### A. Hogarth will continue to suffer irreparable harm absent a preliminary injunction because North Carolina's ballot selfie ban burdens her First Amendment rights.

North Carolina's prohibition on and criminalization of ballot selfies causes and will continue to cause Hogarth irreparable harm, which the Supreme Court has squarely held "unquestionably" arises from "loss of First Amendment freedoms, for even minimal periods." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Hogarth's likelihood of success on the merits satisfies this element of the *Winter* test because irreparable harm

is "inseparably linked to the likelihood of success on the merits of [a] plaintiff's First Amendment claim." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190 (4th Cir. 2013). As explained *supra* in Sections I, II, and III, because North Carolina's provisions banning ballot selfies unconstitutionally restrict Hogarth's First Amendment freedoms to express political beliefs through taking and sharing ballot selfies, she also demonstrates irreparable harm.

Hogarth also faces irreparable harm from the ongoing threat of criminal prosecution if she refuses to take down her March 5, 2024 ballot selfie. In light of the March 13, 2024 letter, (Ex. A. to Verified Compl.; Steinbaugh Decl. ¶ 2 and Ex. A,) there is a "credible threat of prosecution," *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999), that cannot "be remedied absent an injunction." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). With regard to the upcoming election on November 5, 2024, North Carolina's laws force her to either violate the law and risk criminal prosecution or forgo her First Amendment-protected speech. North Carolina has thus placed a "sword of Damocles" over her head, *Hill*, 2016 WL 8667798, at *5, which cannot "be remedied absent an injunction." *Legend Night Club*, 637 F.3d at 302.

### B. North Carolina's violation of Hogarth's right to speak politically through ballot selfies tilts the balance of equities and the public interest in her favor.

The balance of equities tips decidedly in favor of an injunction and granting one is in the public interest[13] because, as with irreparable harm, when there is "a likely First Amendment violation," a plaintiff also satisfies both these factors. *Centro Tepeyac*, 722

---

[13] Because the government is a party, the Court may "jointly consider[] the third and fourth *Winter* factors." *Centro Tepeyac*, 722 F.3d at 191.

F.3d at 191. This is because it is "surely" the case that "upholding constitutional rights serves the public interest," and that is particularly so in "protecting the core First Amendment right of political expression." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)*; accord Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

On the other side of the scale, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola*, 303 F.3d at 521. Hogarth's interest in being free to take ballot selfies without threat of prosecution therefore "easily outweighs whatever burden the injunction may impose." *Legend Night Club*, 637 F.3d at 302.

A preliminary injunction in this case would not violate the "the *Purcell* principle, which cautions courts against enjoining state election laws in the period close to an election." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)). *Purcell* does not apply here because the injunction Hogarth seeks would not disrupt the election by imposing "significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). Unlike the relief sought in *Pierce*, this challenge would not have a "domino effect" of requiring redrawing congressional maps, printing new ballots, or delay of an election. 97 F.4th at 228. Hogarth seeks only narrow relief that would require that Defendants simply cease enforcing North Carolina's Ballot Photography Provisions and Voting Enclosure Provision against ballot selfies.

**C.** **The Court should waive the bond requirement because Hogarth seeks only to protect her First Amendment rights.**

Hogarth respectfully requests that the Court exercise its discretion to set the amount of a bond or waive the security requirement altogether under Federal Rule of Civil Procedure 65(c) by not requiring one here. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n. 3. (4th Cir. 1999) (setting Rule 65(c) bond at zero where no evidence of harm). Where, as here, defendants "face little to no harm by being prohibited from enforcing a statute that is likely to be found unconstitutional," courts should dispense with the bond requirement, or at most require a nominal bond. *Planned Parenthood S. Atl. v. Stein*, 680 F. Supp. 3d 595, 600 (M.D.N.C. 2023) (waiving the bond in a First Amendment case); *Hassay v. Mayor*, 955 F. Supp. 2d 505, 527 (D. Md. 2013) (requiring a nominal bond of one dollar in a First Amendment case). No bond is necessary here to protect the state from any potential impediment, and the Court should not order one.

## CONCLUSION

North Carolina's ballot selfie ban prohibits and criminalizes Hogarth's political expression of recording herself participating in our country's core democratic function. The state cannot justify such a significant restriction of her First Amendment freedoms, especially where it does not serve a compelling interest and there are more narrowly tailored alternatives to serve any governmental concern. For these reasons, this Court should grant Plaintiff's Motion for Preliminary Injunction.

Dated: August 27, 2024.

Respectfully submitted,

/s/ James M. Dedman IV
JAMES M. DEDMAN IV
   (NC Bar # 37415)
GALLIVAN WHITE & BOYD P.A.
6805 Carnegie Blvd, Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

ERIC SPENGLER
   (NC Bar # 47165)
SPENGLER + AGANS PLLC
352 N. Caswell Rd.
Charlotte, NC 28204
(704) 999-8733
eric@sab.law

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN*
   (Pa. Bar No. 328570)
DANIEL M. ORTNER**
   (Ca. Bar No. 329866)
JAMES M. DIAZ**
   (Vt. Bar. No. 5014)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@thefire.org
daniel.ortner@thefire.org
jay.diaz@thefire.org

*Special Appearance pursuant to Local
Rule 83.1(e)

**Special Appearance pursuant to Local
Rule 83.1(e) Forthcoming

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.2(f)(3), I hereby certify this brief contains 7,607 words, as calculated by Microsoft Word version 16.88, and therefore falls within the L.R. 7.2(f)(3)(A) word limit of 8,400 words for a memorandum filed in support of a motion.

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

I, Jeffrey D. Zeman, hereby certify that on August 27, 2024, I submitted the foregoing to the Clerk of the Court via the District Court's CM/ECF system, and this document, along with any declarations and exhibits hereto, will be served personally on all Defendants with the Summons & Complaint.

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION