IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:24-cv-481-FL

|  |  |  |
|---|---|---|
| SUSAN JANE HOGARTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **STATE DEFENDANTS' RESPONSE** |
| v. | ) | **TO PLAINTIFF'S MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION** |
| KAREN BRINSON BELL, in her official | ) | |
| capacity as Executive Director of the North | ) | |
| Carolina State Board of Elections, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants, Karen Brinson Bell, Executive Director of the North Carolina State Board of Elections, the members of the State Board, and Josh Stein, North Carolina Attorney General, all named in their official capacities only ("State Defendants"), hereby respond to Plaintiff's Motion for Preliminary Injunction. [D.E. 9, 11].

## NATURE OF THE CASE

After deliberately violating North Carolina election laws during the primary election cycle earlier this year, Plaintiff now challenges five longstanding provisions of North Carolina law designed to protect the privacy of the voter and to prevent voter intimidation and vote buying. In Plaintiff's view, those laws infringe on her free-speech rights by prohibiting her from disseminating a photograph of her voted ballot. [D.E. 2].

Plaintiff is both wrong on the merits and too late in seeking her injunction before the November 2024 general election. The laws that Plaintiff challenges have been part of the North Carolina General Statutes for decades, with the oldest having been enacted in 1929. She violated those laws months ago, during the March 2024 primary, and in that same month, she was warned of the potential consequences. Yet she chose to wait until the eve of the 2024 general election to

file suit, asking for preliminary injunctive relief that will not come until North Carolinians are already voting. For this reason alone, the Court should deny this motion. *See N.C. A. Philip Randolph Inst., et al., v. N.C. State Bd. of Elections, et al.,* 2020 U.S. Dist. LEXIS 205692, at *25 (M.D.N.C. Nov. 4, 2020) (Webster, M.J.) (concluding there was a lack of irreparable harm to support issuing a preliminary injunction, where the plaintiffs "delayed filing this action and request for injunctive relief until September 24, 2020, mere weeks before the North Carolina voter registration deadlines and the 2020 election" and the election passed), *adopted by*, 2021 U.S. Dist. LEXIS 8209 (M.D.N.C. Jan. 15, 2021) (Biggs, J.); *Purcell v. Gonzalez*, 549 U.S. 1, 4-6 (2006) (per curiam) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

This Court could also deny Plaintiff's motion on the merits. The alleged restrictions on Plaintiff's speech result from laws that apply in a nonpublic forum. They are reasonable and viewpoint neutral and are therefore constitutional. Although strict scrutiny does not apply, even if it did, the state interests are compelling, and the laws narrowly tailored. Finally, Plaintiff has no likelihood of success against the Attorney General of North Carolina, given he lacks any meaningful connection to the harms that Plaintiff alleges. For all those reasons, this Court should deny Plaintiff's motion for a preliminary injunction.

<u>**STATEMENT OF THE FACTS**</u>[1]

**A.      Statutes in Question.**

      **1.      Ballot Photography Provisions**

Plaintiff challenges five interrelated North Carolina statutes, all of which are designed to protect the privacy of the ballot, prevent voter intimidation, and discourage vote-buying schemes, and all of which have existed for decades or longer. Section 163-273(a)(1), enacted in 1929, makes it a misdemeanor for a voter to allow their own voted ballot to be seen by another person. N.C.G.S. § 163-273(a)(1); 1929 Chap. 164, § 29.[2] Section 163-165.1(e), enacted in 2002, declares voted ballots to be confidential and prohibits access to voted ballots, other than by elections officials performing their duties or by order of a court or board of elections. N.C.G.S. § 163-165.1(e); 2002 N.C. Sess. Law 159, § 5.[3] Section 163-274(b)(1), enacted in 2007, makes it a misdemeanor for any person to knowingly disclose a voted ballot in violation of 163-165.1(e). N.C.G.S. § 163-274(b)(1); 2007 N.C. Sess. Law 391, § 9.(b)[4]. Finally, section 163-166.3(c), also enacted in 2007, prohibits photographing the image of a voted ballot for any purpose not otherwise permitted by law. *Id.*[3]

---

[1] In support of this Response, State Defendants reference and provide hyperlinks to several documents. This Court may take judicial notice of materials available through these hyperlinks, as each is an official government record that is publicly available on the State Board's or the North Carolina General Assembly's website. *Fauconier v. Clarke*, 652 F. App'x. 217, 220 (4th Cir. 2016); *Philips v. Pitt Cnty. Mem. Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of matters of public record"); *see also* Fed. R. Evid. 201.

[2] Available at https://www.ncleg.gov/Files/Library/sessionlaws/1921-1930/pubs_publiclawsresolu 1929.pdf, last visited Sept. 16, 2024.

[3] Available at https://www.ncleg.gov/Sessions/2001/Bills/Senate/PDF/S1217v6.pdf, last visited Sept. 16, 2024

[4] Available at https://www.ncleg.gov/Sessions/2007/Bills/House/PDF/H1743v8.pdf, last visited Sept. 16, 2024

### 2. Voting Enclosure Provision

Section 163-166.3(b), also enacted in 2007, prohibits photographing a voter within the voting enclosures, except with the permission of the voter and the chief judge of the voting site. N.C.G.S. § 163-166.3(b); 2007 N.C. Sess. Law 391, § 23.[3] It also prohibits candidates from photographing a voter within the voting enclosures, except with the permission of the voter. *Id.*

### B. The State Board's Role in Enforcing the Challenged Laws.

The State Board has "general supervision over the primaries and elections in the State, and it shall have authority to make such reasonable rules and regulations with respect to the conduct of primaries and elections as it may deem advisable so long as they do not conflict with any provisions of [Chapter 163]." N.C.G.S. § 163-22(a). The Board also has a duty to "compel observance of the requirements of the election laws by county boards of elections and other election officers"; to "investigate when necessary or advisable, the administration of election laws, frauds and irregularities in elections in any county and municipality and special district" and to "report violations of the election laws to the State Bureau of Investigation for further investigation and prosecution." *Id.* § 163-22(c) and (d).

The State Board has issued guidance on the challenged laws, both to voters and local election officials. The Board has, for example, reminded voters in past elections and upon receiving complaints that photographing voted ballots is illegal.[5] And it has instructed voters to remove such photographs from social media when it has learned of their existence.[6]

---

[5] *See e.g.*, Press Release available on the State Board's website, https://www.ncsbe.gov/news/press-releases/2020/10/02/state-board-reminds-voters-not-photograph-their-ballots, last visited Sept. 16, 2024.
[6] *See id.*

Specifically, as it concerns the violation of criminal laws related to elections contained in Article 22 of General Statutes Chapter 163, the State Board and the district attorneys have a duty "to investigate any [such] violations." N.C.G.S. § 163-278(a)." However, the State Board itself has no authority to prosecute election law violations. It is mandated by statute that "the State Board shall furnish the district attorney a copy of any investigations of violations of [Article 22]." *Id.* at § 163-278(c). It is then up to North Carolina's district attorneys, who retain broad discretion as to whether and how to proceed when charging any crime, to "initiate prosecution and prosecute any violations of this Article." *See id.*; *see, e.g.*, *State v. Diaz-Tomas*, 888 S.E.2d 368, 376 (N.C. 2022) ("[A] trial court may not invade the purview of the exclusive and discretionary power of a district attorney which was granted to the official through the provisions of the North Carolina Constitution and the statutory laws enacted by the General Assembly, absent a determination that the prosecutorial discretion was being applied in an unconstitutional manner." (cleaned up)).  The Attorney General is not referenced or given a role under this statute.  N.C.G.S. § 163-278.

## C.     Factual Allegations in Plaintiff's Complaint.

Plaintiff is a regular voter in Wake County, active in her political party, and a candidate for office in the November 2024 general election.  [D.E. 2, ¶¶ 9, 114-19].

On March 5, 2024, Plaintiff voted in person in the primary election.  *Id.*, ¶ 1. After completing her ballot, and while still standing within the voting enclosure and at her voting booth, Plaintiff took a photograph of herself, her completed ballot, and the sign in the voting booth that informs voters that photographs are prohibited inside the voting enclosure.  *Id.*, ¶¶ 1, 55-58. Plaintiff had her cell phone out for approximately 45 seconds to take this photograph.  *Id.*, ¶ 59. Plaintiff did not ask for permission to take a photograph in the voting enclosures.  *Id.*, ¶ 65. Plaintiff then shared the photograph on social media, voicing her disagreement with the prohibition on

5

photographing voted ballots, and endorsing other candidates for office. *Id.*, ¶ 1. Although not included in her posting to social media, Plaintiff also claims that a photograph of herself and her voted ballot encourages voting for third-party candidates, challenges the narrative that voters can only vote for major party candidates, encourages voting in general, commemorates her vote for herself and for posterity, and expresses her pride in participating. *Id.*, ¶ 51.

On March 13, 2024, State Board investigative staff sent a letter to Plaintiff informing her that the State Board was forwarded information that she took a photograph of her voted ballot and posted it on social media. The State Board described Plaintiff's actions as "a possible violation of N.C.G.S. § 163-166.3(c)," which prohibits photographing a voted ballot. *See* March 13, 2024 State Board Letter attached as Exhibit A to Plaintiff's Complaint [D.E. 2-1, p. 2]; *see also* Fed. R. Civ. P. 10(c).[7] The letter also informed Plaintiff of the State Board's duty to investigate violations of election laws in North Carolina and the fact that Plaintiff's alleged actions are prohibited and punishable as a Class I Misdemeanor. *Id.* Finally, the letter expressly stated that "[t]he purpose of this letter is to explain the law and request that you take the post down." *Id.*

Plaintiff does not allege in her Complaint that she has been charged with any election law violations.

## LEGAL STANDARD

A preliminary injunction constitutes "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008). The plaintiff has the burden to prove "that

---

[7] In Plaintiff's complaint and motion, Plaintiff mischaracterizes the content of the letter sent to her by the State Board. The letter itself is attached to both filings and is incorporated into the complaint pursuant to Fed. R. Civ. P. 10(c). The characterization of the letter above is based upon the letter itself, not the allegations in the complaint or the assertions in Plaintiff's motion.

he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. A plaintiff must show that success on the merits is likely regardless of whether the balance of hardships weighs in his favor. *The Real Truth About Obama, Inc. v. F.E.C.*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

## ARGUMENT

### I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.

#### A.    Plaintiff is Unlikely to Succeed on the Merits of Her First Amendment Claim Against the Ballot Photograph Provisions.

##### 1.    Sections 163-166.3(c), -273(a)(1), -165.1(e), and -274(b)(1) do not violate the First Amendment.

In Claim I, Plaintiff alleges that North Carolina's restrictions on taking and disseminating photographs of and information about voted ballots, N.C.G.S. §§ 163-166.3(c), -273(a)(1), -165.1(e), and -274(b)(1), what she refers to as the "Ballot Photograph Provisions," violate the First Amendment as applied to individuals taking and sharing "ballot selfies."[8] Plaintiff is not entitled to a preliminary injunction on Claim I because she cannot establish a likelihood of success on the merits.

---

[8] In Claim III, Plaintiff alleges the State Board's March 13, 2024 letter violates the First Amendment. [D.E. 2, ¶¶ 188-204]. It is unclear why Plaintiff brings this as a claim separate from Claim I. The letter reflects the enforcement and potential application of the Ballot Photograph Provisions Plaintiff challenges in Claim I. In any regard, for the reasons stated in Part. I above, to the extent the application of the Ballot Photograph Provision are reflected in the State Board's letter, it did not violate Plaintiff's First Amendment Rights. Accordingly, Plaintiff cannot establish a likelihood of success on Claim III either.

### a. The Ballot Photograph Provisions permissibly regulate speech in a non-public forum.

Plaintiff challenges longstanding state regulations of a course of conduct that begins at a polling place. A polling place is a non-public forum where a state may restrict speech as long as the restrictions are viewpoint neutral and reasonable.

A polling place is not a public forum for speech. *See Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018) (a polling place is "government-controlled property set aside for the sole purpose of voting" and therefore "qualifies as a nonpublic forum"); *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 230 (4th Cir. 2013); *Marlin v. D.C. Bd. of Elections & Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001).[9] Nor is a ballot a public forum. The U.S. Supreme Court has long concluded that "[b]allots serve primarily to elect candidates, not as forums for political expression." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) (rejecting the notion that there is "a right to use the ballot itself to send a particularized message"); *accord Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 452 (2008); *id.* at 461 (Roberts, C.J., concurring) ("[T]he State controls the content of the ballot, which [the Court] ha[s] never considered a public forum" for expression); *see also Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126-127 (2011) (providing that "the act of voting symbolizes nothing"); *Silberberg*, 272 F. Supp. 3d at 477-78 (concluding ballots are not public fora in a case challenging law prohibiting photographing ballots).

---

[9] Although the Supreme Court has divided "over whether the public sidewalks and streets *surrounding* a polling place qualify as a nonpublic forum," the Court has never "suggested that the interior of the building [is] anything but." *Mansky*, 585 U.S. at 12-13 (emphasis in original).

8

Because the regulations Plaintiff challenges in Claim I operate in a nonpublic forum, they are lawful as long as they are viewpoint neutral and reasonable. *Mansky*, 585 U.S. at 12. The laws that Plaintiff challenges here satisfy both requirements.

First, the laws are viewpoint neutral. The laws plainly do not "discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). The restrictions do not depend in any way on the viewpoint of Plaintiff's speech. The laws bar Plaintiff from taking photographs of her ballot regardless of which candidate she votes for or what political message she seeks to convey.

Second, the laws are reasonable. The laws reflect the State's longstanding bar on ballot-exposure and photography at the polls. They do not target ballot-selfies or any other type of technology. In addition, the laws in no way prohibit Plaintiff from disseminating information about and drawing attention to the candidates she voted for, her party, her candidacy, or her pride in and enthusiasm about her preferred candidates and voting in general. [*See* D.E. 11, pp. 1, 10]. Nor do they prevent her from encouraging others to vote, promoting third-party and down-ballot candidates, challenging the idea that people should only vote for major-party candidates or commemorating her vote for candidates that she endorsed or supported. *Id.* Stated differently, other than sharing a photograph of her voted official ballot, Plaintiff can say and do everything she claims she is seeking to accomplish with the present lawsuit. *See Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454, 480 (S.D.N.Y. 2017) ("The no photography policy leaves open ample alternative means by which voters can signal their support for a candidate. Voters can still post to social media (using messages that contain both words and images), attend rallies, donate to campaigns, volunteer, or express their views in a multitude of ways without taking photographs at polling sites."). In fact, personalized sample ballots are available for download through the Voter

Lookup feature on the State Board's website. [10]  Plaintiff can even print out her sample ballot, mark it as if she had voted it as an official ballot, take a ballot selfie, and post that selfie on social media without any criminal consequence.

To be sure, Plaintiff does allege that she uploaded her selfie "minutes *after leaving* the polling place. [D.E. 2, ¶ 14]. But, whether Plaintiff uploaded the photograph inside or outside a non-public forum, the violation of the laws challenged here is a continuous one, starting in the voting enclosure where the photograph was taken. *Cf. Silberberg*, 272 F. Supp. 3d at 477 ("[T]he posting of a photograph of a marked ballot to social media requires two steps: the taking of the photograph and the electronic transmission of that photograph. Because the first step must take place in a non-public forum and the second step may take place in a non-public forum, it is appropriate to assess the impact of the statute as a restriction of speech taking place in a non-public forum.").

Plaintiff also points out that the challenged regulations could theoretically "extend far outside the polling place," noting specifically that they would seem to apply even to photographs taken in one's own home if voting by absentee ballot. [D.E. 11, p. 13, n.6]. However, Plaintiff is bringing an as-applied challenge. She bases that challenge on her own past experiences, which are limited to voting at a polling place, either at early voting or on election day. [D.E. 2, ¶¶ 107-13]. Similarly, she alleges that in future elections she will also vote in person if able and intends to take a photograph of her ballot when voting in future elections. *Id.*, ¶¶ 109-10. She also alleges that in past elections she has voted both during early voting and on election day. *Id.*, ¶¶ 108-09.  She does note that she intends to vote in future elections by absentee ballot "if she is unable to appear" in

_____

[10] All sample ballots for the State are available on the State Board's website, https://dl.ncsbe.gov/ ?prefix=data/SampleBallots/2024-11-05/, last visited September 15, 2024.

person and will also take and share a photograph of her absentee ballot. *Id.*, ¶¶ 110, 112. But her allegations about absentee voting are too speculative to provide a basis for her to have standing to challenge the regulations as applied to taking photographs of a ballot at home. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (providing that plaintiffs lack standing when the claimed injury is "premised on a speculative chain of possibilities"). Thus, the only question here is how the challenged laws apply to an individual who takes ballot photographs at polling places. In that context, the laws permissibly regulate a non-public forum in a reasonable and viewpoint-neutral fashion for the reasons discussed above.

        **b.**     **In the alternative, the Ballot Photograph Provisions are permissible regulations of election procedure under *Anderson-Burdick*.**

In the alternative, the Court should review the challenged laws as regulations of election procedure under the Supreme Court's *Anderson-Burdick* balancing test. The laws have as their purpose, among other things, preventing and discouraging vote buying and social coercion, avoiding delays and distraction at polling places, maintaining the privacy of other voters, and preventing and discouraging voter intimidation. *See, e.g.*, *Crookston v. Johnson*, 841 F.3d 396, 400 (6th Cir. 2016). In light of the challenged regulations' purposes, they may be characterized as ones that "control the mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). And, accordingly, this Court could follow the "ordinary litigation" framework that the U.S. Supreme Court applies when litigants bring free-speech challenges to election regulations. *Id.*; *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142 (3d Cir. 2022) ("[S]peech that occurs on the ballot or within the voting process will typically trigger application of the *Anderson-Burdick* balancing test."). That framework is the *Anderson-Burdick* test, named after the U.S. Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick*, 504 U.S. at 434.

The Constitution affords the states "broad power" to regulate their elections. *See Tashjian v. Republican Party*, 479 U.S. 208, 217, (1986); *see* U.S. Const. art. I, § 4, cl. 1.

Under the *Anderson-Burdick* framework, to determine whether a state election law unconstitutionally burdens free-speech rights, courts must weigh: (1) the character and magnitude of the asserted injury to those rights, against (2) "the extent to which the regulations advance the state's interests in ensuring that order, rather than chaos, is to accompany the democratic processes." *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021); *Buscemi v. Bell*, 964 F.3d 252, 261-62 (4th Cir. 2020). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'" on First Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *See Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). The *Anderson-Burdick* test thus recognizes that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974) (quoted in *Anderson*, 460 U.S. at 788).

Applying *Anderson-Burdick* here shows that Plaintiff is not likely to succeed on the merits of her free-speech claim. The state regulations challenged in Claim I are reasonable, nondiscriminatory restrictions, imposing minimal burdens on Plaintiff's free-speech rights, for all the reasons discussed above.

Against the modest speech burden from these reasonable, nondiscriminatory restrictions, there can be no doubt that with the challenged regulations, the State advances legitimate—indeed compelling—interests in preventing and discouraging vote buying and social coercion, avoiding delays and distraction at polling places, maintaining the privacy of other voters, and preventing and discouraging voter intimidation. Photography in a polling place also has the potential to

infringe on the rights of other voters, in that it risks exposing others' ballots; causing delays in the voting process for others waiting to vote their ballotd; and causing intimidation or disruption. That Plaintiff was able to take her photograph without disruption, or so she claims, does not diminish the state's interest or prove that all voters will do the same.

The U.S. Supreme Court has confirmed that many of these are indeed compelling interests, holding specifically that states have "a compelling interest in ensuring that an individual's right to vote is not undermined" by fraud, undue influence, or intimidation. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citing *Anderson*). The Court did so in upholding a state law prohibiting electioneering within a certain number of feet from a polling place. *Id.* Although the specific law examined in *Burson* concerned a polling place buffer zone, that law was part of a larger reform scheme that also included secret ballots. *Id.* at 206. In fact, the Court in *Burson* detailed the history of voter fraud and intimidation and the states' responses, which included secret ballots and buffer zones. *Id.* at 201-06. According to the Supreme Court, it was in fact these two measures, secret ballots and buffer zones, working together, that "served the States' compelling interest in preventing voter intimidation and election fraud." *Id.*

The risk of voter intimidation has only become more acute, given the advances in technology that have occurred over the last few decades. As one district court observed:

> [T]he ubiquity and ease of smartphone technology plausibly increases the risk of one form of voter intimidation. Without the statute, employers, unions, and religious groups could encourage their members to upload images of their marked ballots to a single location to prove their commitment to the designated candidate. Those who declined to post a selfie could be swiftly outed and subjected to retaliation. This not-so-subtle form of voter intimidation is squarely within the zone of the [challenged statutes'] intended reach.

*Silberberg v. Bd. of Elections of N.Y.*, 216 F. Supp. 3d 411, 419 (S.D.N.Y. 2016) (denying PI motion seeking to enjoin state law that criminalized "show[ing a] ballot after it is prepared for

voting, to any person so as to reveal the contents, or solicit[ing] a voter to show the same" (quoting N.Y. Elec. Law § 17-130(10)); *see also* 272 F. Supp. at 471 (dismissing same case and concluding that "[t]here can be no doubt that the state's interest in preventing vote buying and voter intimidation through ensuring the secrecy of the ballot is a compelling one"). North Carolina has a compelling interest in preventing this kind of scenario from unfolding.

Plaintiff attempts to minimize the nature of the state interests implicated by the challenged statutes. She is particularly dismissive of the state's interest in preventing vote buying, pointing out that "since 2015, [the State Board] has referred only four 'vote buying' allegations to prosecutors." [D.E. 11 at 7].

But the state's interest in preventing vote buying remains compelling, whether or not there have been any recently reported instances that crime. As the Supreme Court noted in *Burson* when rejecting a similar argument, "[t]he fact that these laws have been in effect for a long period of time . . . makes it difficult for the States to put on witnesses who can testify as to what would happen without them." *Burson*, 504 U.S. at 208; *see also id.*, at 214-16 (Scalia, J., concurring). This point also distinguishes at least two of the cases Plaintiff relies upon, *Indiana Civil Liberties Union Found., Inc. v. Indiana Secretary of State*, 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017) (granting summary judgment), and *Rideout v. Gardner*, 123 F. Supp. 3d 218, 229 (D.N.H. 2015), *aff'd*, 838 F.3d 65 (1st Cir. 2016). In both cases, the courts rejected the states' reliance on the prevention of vote buying as a state interest, given the lack of recent incidences of vote buying in those states. But the laws challenged there had been recently enacted at the time the cases were decided, *see Indiana Civil Liberties*, 229 F. Supp. 3d at 820 (enacted in 2015), *and Rideout*, 838 F.3d at 68 (enacted in 2014), and the Indiana law targeted ballot selfies exclusively, see *Indiana*

*Civil Liberties*, 229 F. Supp. 3d at 820. Unlike in those cases, the laws challenged here are decades-old prohibitions on taking photographs and displaying marked ballots and disclosing their content.

Moreover, here, there is more than enough support for State Defendants' argument that the asserted state interests, including the prevention of vote-buying schemes, are compelling. This includes the detailed history in this country of election fraud and intimidation cited by the Supreme Court in *Burson* as providing compelling evidence to support buffer-zone laws. *See* 504 U.S. at 201-06. Assuredly, the connection between election fraud and intimidation and "the prohibition on ballot exposure are not some historical accident; they are 'common sense.' *Crookston v. Johnson*, 841 F.3d 396, 400 (6th Cir. 2016) (quoting *Burson*, 504 U.S. at 207). Also, the State Board has consistently maintained that one of the reasons North Carolina prohibits photographing marked ballots is "because such photographs could be used as proof of a vote for a candidate in a vote-buying scheme."[11] And, finally, State Defendants disagree with Plaintiff that the State Board referring four incidents of vote buying for prosecution since 2015 should not be considered by the Court as some evidence of there exists a compelling government interest in preventing those crimes.[12]

The Sixth Circuit in *Crookston v. Johnson*, 841 F.3d 396, emphasized the relevance of a law's breadth and recency in examining laws akin to the ones Plaintiff challenges in the present case. There, the court stayed a district court order enjoining a Michigan law that, similar to the laws Plaintiff challenges here, banned displaying ballots generally and photography at polling places. *Id.* at 398. The court in *Crookston* was clear that it was not deciding the merits of the case,

---

[11] *See, e.g.,* note 5 *supra.*

[12] A summary of the number and types of cases the State Board referred for prosecution between 2015 and 2022 is available on the State Board's website at https://s3.amazonaws.com/dl.ncsbe.gov/Investigations/NCSBE%20Referred%20Cases%202015-2022.pdf, last visited September 17, 2024.

as its primary basis for granting the stay was that the lawsuit there had been filed too close in time to the 2016 election. Nevertheless, the court recognized the important distinctions between the challenged Michigan law and those at issue in *Rideout* and *Indiana Civil Liberties*. *Crookston*, 841 F.3d at 400-01. Specifically, the circuit court pointed out that the laws examined in those two other cases "were targeted at ballot selfies, not general bans on ballot-exposure and photography at the polls," and that the lawsuits there "did not seek to enjoin longstanding statutes on the eve of a presidential election," with *Rideout* filed "728 days before the next major election[,]" and *Indiana Civil Liberties* "filed two months after the legislature enacted the law challenged." *Crookston*, 841 F.3d at 401 (citing *Rideout*, 123 F. Supp. 3d at 227, *and Indiana Civil Liberties*, 2015 U.S. Dist. LEXIS 182116, *1 (S.D. Ind. Oct. 19, 2015) (granting a preliminary injunction)). In light of these important distinctions, neither *Rideout* nor *Indiana Civil Liberties* should inform this Court's decision here.

In short, the challenged regulations readily pass the *Anderson-Burdick* test. The minimal burden imposed on Plaintiff is strongly outweighed by the compelling state interests that support these laws. Plaintiff is therefore unlikely to succeed on her free-speech claim.

  **c.**  **Even if intermediate or strict scrutiny applies, the Ballot-Photograph Provisions are constitutional.**

Plaintiff is unlikely to succeed even if the Court declines to analyze her claim under the legal standard that applies to a nonpublic forum or under the *Anderson-Burdick* framework.

First, the challenged laws are content-neutral regulations protecting the privacy interests of the voters, as well as the secrecy of the ballot. *See, e.g.*, *Crookston*, 841 F.3d at 399-400. Second, to the extent the Court may conclude that strict scrutiny applies, the challenged laws satisfy that level of review. The state interests are compelling, and the laws are narrowly tailored to protect

16

those interests. *See generally Reed v. Town of Gilbert*, 573 U.S. 957 (2014) (describing strict-scrutiny).

As noted above, the state interests here are compelling and supported by the evidence. For many of the same reasons the polling-place buffer zone survived strict scrutiny in *Burson*, the challenged laws survive it here. *See* 504 U.S. at 199. Moreover, the laws are narrowly tailored to further those governmental interests. They apply only to voted ballots. Voters can take other photographs and share photographs taken in the voting enclosure, as long as the photographs do not include other voters, and they can even do that with permission. They can also take photographs of a marked sample ballot. Nothing prevents them from promoting their preferred candidates or the act of voting in general.

Plaintiff argues the challenged laws are not narrowly tailored because they limit even the speech of voters who do not take selfies for nefarious purposes, such as vote buying or intimidation, which are criminalized by other laws. She also points out she was able to take her ballot selfie with no disruptions and that she captured only the image of herself with the ballot. But Plaintiff ignores the fact that if the State opens up new avenues for election fraud, by allowing ballot photographs, activities like vote buying and intimidation are more likely to occur. Also, requiring poll workers to monitor which voter-photographers are being disruptive in photographing their ballots and which ones are not will be an unnecessary distraction and disruption for those poll workers as they work to complete the tasks critical to administering elections. And, by the same token, it would be impossible for poll workers to distinguish between those taking photographs in furtherance of election fraud and those who are not. Although Plaintiff may have been able to take her ballot selfie without being disruptive, not everyone will do the same. "Some voters will require multiple photographs to capture their ballot along with themselves

in different poses, or repeated photographs where the original was inadequate due to deficient lighting, disheveled hair, or misplaced accessories. Some voters, unaccustomed to using the camera on their phones, will struggle to activate, and then use, the camera functionality." *Silberberg*, 272 F. Supp. 3d at 480. The state need not risk these outcomes in the name of narrow tailoring.

For these reasons, Plaintiff cannot establish a likelihood of success on Claim I, regardless of the level of scrutiny applied.

**B.      Plaintiff is Unlikely to Succeed on the Merits of Her First Amendment Claim Against the Voting Enclosure Provision.**

In Claim II, Plaintiff challenges the application of N.C.G.S. § 163-166.3(b) (what she terms the "Voting Enclosure Provision") to ballot selfies, arguing that that provision too violates the First Amendment. According to Plaintiff, this law is unconstitutional because it makes no exceptions for ballot selfies, and because it fails to provide "an 'objective, workable standard' to guide the chief judge in deciding whether to give a voter permission to take a selfie." [D.E.2, ¶ 173, 175 (citation omitted)]. Like with the Ballot Photography Provisions, Plaintiff cannot establish a likelihood of success with her challenge to section 163-166.3(b).

**1.      Plaintiff has no standing to raise an as-applied challenge to the Voting Enclosure Provision.**

Plaintiff has no standing to challenge N.C.G.S. § 163-166.3(b). To satisfy the standing requirement, a plaintiff must plausibly allege (1) an injury in fact, (2) that is fairly traceable to the defendant's challenged conduct, and (3) that is likely redressable by a favorable judicial decision. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). Article III standing exists only when a plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors*, 441 U.S. at 99. If a plaintiff has not suffered an

18

injury, there is no standing, and the matter is subject to dismissal for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *See Allen v. Wright*, 468 U.S. 737, 750-66 (1984).

Plaintiff cannot satisfy the Article III standing requirements for her claim alleging that the Voting Enclosure Provision, as applied to ballot selfies, violates the First Amendment. Simply stated, this is because that particular law does not apply to ballot selfies; they are prohibited by other laws. Section 163-166.3(b) prohibits photographing a voter within the voting enclosures, except with the permission of the voter being photographed and the chief judge of the voting site. If the person taking the photograph is a candidate, like Plaintiff will be in the November 2024 general election, [D.E. 2, ¶ 115], then the only person whose permission is required is the voter, N.C.G.S. § 163-166.3(b). This means a voter can take a selfie if she obtains permission from the chief judge, and a candidate can take a selfie without getting permission from anyone. *See id.* However, the law permits photography only where a voter or candidate seeks permission to take a photograph that is otherwise not prohibited by law. A chief judge cannot give permission for a voter (or a candidate, for that matter) to take a ballot selfie. It is other laws, not section 163-166.3(b), that apply to prohibit ballot selfies.

Section 163-166.3(b) itself puts no constraints on the taking of ballot selfies. For that reason, even if being barred from taking a ballot selfie can give rise to an Article III injury (and Defendants do not concede that it can), that injury is not traceable to the Voting Enclosure Provision.

### 2. The Voting Enclosure Provision does not violate the First Amendment.

Not only does Plaintiff lack standing to challenge the Voting Enclosure Provision, she also cannot establish that the application of the provision to her desired conduct violates the First Amendment.

Section 163-166.3(b), like the other provisions Plaintiff challenges, does not violate the First Amendment. The Voting Enclosure Provision regulates activity within the voting enclosure, "the room within the voting place that is used for voting," N.C.G.S. § 163-165(9), and thus operates in a nonpublic forum. The Voting Enclosure Provision is a viewpoint neutral, reasonable means to curb intimidation and disruption in the voting enclosure and to preserve the rights of other voters, including their right to anonymity when voting. These are compelling interests, *Burson*, 504 U.S. at 199, and it is perfectly reasonable to limit photography of a voter without their permission, or the permission of the chief judge, who has wide statutory authority to regulate voting-enclosure activity, *see* discussion *infra*.

For these same reasons, the Voting Enclosure Provision satisfies the *Anderson-Burdick* balancing test. Under either test, this provision, like the other laws Plaintiff challenges, is constitutional.

Plaintiff disagrees. She argues that, even assuming the voting enclosure is a nonpublic forum, the Voting Enclosure Provision violates the First Amendment because "nothing in its language, or anything else in North Carolina law, provides any standards to guide or otherwise limit officials in deciding when or whether to permit or prohibit speech." [D.E. 11, p. 21]. To support this argument, Plaintiff relies on *Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018). But Plaintiff ignores facts that distinguish *Mansky*. The law examined there banned all "political" apparel and accessories, allowing election officials to decide what was political, with the State providing guidance to election officials that "rais[ed] more questions than it answered." *Mansky*, 585 U.S. at 7-8, 18. The Supreme Court held that, owing to the nonpublic nature of polling places, a state could prohibit certain apparel in that space, but it must draw a "reasonable line," and must therefore "articulate some sensible basis for distinguishing what may come in from what must stay

out." *Id.* 16. The Court was clear that these standards need not be perfectly clear or precise. However, by simply banning political apparel and accessories broadly, with what the Court termed "haphazard" supplemental guidance issued by the governing state agency, Minnesota's ban was a bridge too far. *Id.* at 21-23.

As compared to the authority of the Minnesota election officials in *Mansky*, the authority of chief precinct judges in North Carolina to regulate activity within a polling place is significantly more well defined. These officials are provided with clear direction to guide their decisions generally and as they relate to the Voter Enclosure Provision more specifically. *See, e.g.,* N.C.G.S. § 163-47(a) (providing that the precinct judges at the polling sites are granted broad authority to "conduct [elections] fairly and impartially, and they shall enforce peace and good order in and about the place of registration and voting"); *see id.*, § 163-48 (requiring that they keep voting places "open and unobstructed"; "prevent and stop improper practices and attempts to obstruct, intimidate, or interfere with any person in registering or voting"; and "prevent riots, violence, tumult, or disorder"). Also, Plaintiff's contentions do not account for the training and guidance issued by the State Board to county boards of elections directors, which further guides the county boards' training of poll workers, including precinct judges. *See* Ex. A, Declaration of State Board Associate General Counsel Adam Steele ("Steele Decl."), with attached examples of training, Decl. Exs. 1 & 2. Other relevant guidance from the State Board to county boards includes two Numbered Memos,[13] Numbered Memo 2022-12, entitled "Maintaining Order at the Polls," and

---

[13] Numbered Memos are issued by the State Board's Executive Director to provide guidance on election administration and are publicly available on the State Board's website, including Numbered Memo 2022-12, https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-12%20Maintaining%20Order%20at%20the%20Polls.pdf, and Numbered Memo 2023-06, https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2023/Numbered%20Memo%202023-06%20Election%20Observers.pdf, last visited Sept. 16, 2024.

Numbered Memo 2023-06, entitled "Election Observers." Although the guidance in Numbered Memo 2023-06 is directed at election observer behavior, much of it is applicable to all voting enclosure activity. The guidance both of these Numbered Memos provide is thorough and emphasizes the role of the chief precinct judge in monitoring vote enclosure activity. The clarity that precinct judges have regarding their authority in North Carolina simply does not compare to the ambiguity surrounding the authority of the election officials in *Mansky*.

Plaintiff further argues that the Voting Enclosure Provision is unreasonable because it "lacks a legitimate basis for requiring permission from an election official to take a picture of oneself in a polling place—or for exempting candidates from the restriction." [D.E. 11, p. 23]. Plaintiff's view fails to recognize that taking a picture of oneself can still be disruptive to other voters, can risk violating their privacy, and can impede the voting process generally By way of example, the size of voting enclosures vary, and depending on the space, taking a picture of oneself could be disruptive and intimidating to some or all voters who are at the various stages of the process, including when they are checking in to vote, receiving their ballot, completing their ballot, or placing their ballot in the tabulator before leaving the voting place. *See* Numbered Memo 2023-06, p. 5 ("In many voting places, there is so little distance between the rows of voting booths that it is possible to see how a person is filling out their ballot from every location in the voting booth area"). Also, as discussed above, Plaintiff's experience in taking her photograph does not necessarily reflect the experience of all would-be voter-photographers.

Finally, there is nothing unreasonable about exempting candidates from the requirement that they seek permission from the chief judge to take photographs of themselves or other voters. It is reasonable to assume that candidates will be more familiar with the law governing voting-enclosure activities and that they have a higher stake than an average voter in maintaining proper

22

decorum. If a candidate violates any other laws or fails to maintain proper decorum, the chief precinct judge still has the authority to intervene. *See* statutes cited *supra*.

The Voting Enclosure Provision is constitutional, and Plaintiff is thus not likely to succeed with Claim II.

### C. Plaintiff is Unlikely to Succeed on Her Claim Against the Attorney General.

Finally, Plaintiff cannot succeed on her claims against the Attorney General because the Eleventh Amendment bars suits brought against States (including state officials in their official capacity) in federal court and the *Ex Parte Young* exception does not apply. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *see also Alden v. Maine*, 527 U.S. 706, 727-28 (1999); *Waste Mgmt. Holdings, Inc v. Gilmore*, 252 F.3d 316, 329 (4th Cir. 2001);, *Ex Parte Young,* 209 U.S. 123, 159-60 (1908); *Frew v. Hawkins*, 540 U.S. 431, 437 (2004). *Ex parte Young* requires that the state official "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Waste Mgmt.*, 252 F.3d at 331 (quotation omitted); *see also Ex parte Young*, 209 U.S. at 157 (If only being a law officer is required for testing constitutionality of a statute by injunction, every act passed could be tested by suing the attorney general.) (citation omitted).

Here, Plaintiff cannot demonstrate a sufficient connection between the Attorney General and prosecution or threat of prosecution under the challenged statutes. The Complaint lacks any allegation that the Attorney General has played any role whatsoever in the investigation or prosecution of any of the challenged laws. [D.E. 2, ¶¶ 21 and 202 (the only two paragraphs that refer to the Attorney General)]. The Complaint contains a single substantive allegation specific to

23

the Attorney General, which states, "the Attorney General has legal authority to prosecute ballot selfies cases upon district attorney request. N.C. Gen. Stat. § 114-11.6." *Id.*, ¶ 21]. Pursuant to section 114-11.6, there is a division within the Attorney General's office that may prosecute or assist in the prosecution of criminal cases, but only if requested to do so by a district attorney and after the Attorney General approves. There is no allegation that this occurred in Plaintiff's case or in any other case brought under the challenged statutes. [D.E. 2, ¶¶ 21 and 202].

Moreover, the statutes that do authorize prosecutions under sections 163-273 and 163-274 are controlled by N.C.G.S. § 163-278. That provision does not reference the Attorney General, but rather states that only "[t]he district attorney shall initiate prosecution and prosecute any violations of this Article." N.C.G.S. § 163-278(c). In fact, prior to 2014, the Attorney General had *some* express authority under this statute—to assist in investigations, but not prosecutions. *See* N.C.G.S. § 163-278 (2013). But the reference to the Attorney General was removed when the State Bureau of Investigations was reorganized and placed within the North Carolina Department of Public Safety. *See* 2014 N.C. Sess. Laws, ch. 100, sec. 17.1(g), (p).[14] The provisions governing prosecutions of election law violations, including violations of the laws Plaintiff challenges, are now entirely silent as to the Attorney General's role in enforcing those violations.

Accordingly, because Plaintiff cannot show a connection between the Attorney General's enforcement authority and the challenged statutes, the *Ex parte Young* exception to the Eleventh Amendment does not apply, and the State's immunity bars the claims against the Attorney General.

## II. PLAINTIFF HAS NOT DEMONSTRATED SHE WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED.

Under the second *Winter* factor, Plaintiff cannot make a clear showing that she will suffer

---

[14] Available at https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2013-2014/SL2014-100.pdf.

irreparable harm if an injunction is not issued. *Winter*, 555 U.S. at 20. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Here, Plaintiff claims two harms: a restriction on her speech and her potential prosecution for knowingly violating North Carolina election laws. [D.E. 2, ¶ 124].

Regarding speech, Plaintiff claims that posting the photo of herself and her voted ballot from within the voting enclosure on social media allows her to express important speech, including voicing her disagreement with the prohibition on photographing voted ballots, endorsing candidates for office, encouraging voting for third-party candidates, challenging the narrative that voters can only vote for major party candidates, encouraging voting in general, commemorating her vote for herself and for posterity, and expressing her pride in participating in the electoral process. *Id.*, ¶ 51. However, as discussed above, there is nothing in the laws challenged that prevents Plaintiff from engaging in this kind of speech. The challenged laws do not forbid any voter from making such statements. Plaintiff is free to issue public statements on social media encouraging others to vote, encouraging others to vote for third parties or for her preferred candidates, and announcing that she voted and who she voted for. She can take pictures of herself at the voting site, with her "I voted" sticker, and post those to social media. Plaintiff is only prohibited from taking a picture of her actual voted ballot and taking photographs inside the voting enclosure. In fact, Plaintiff can even go to the State Board's website and print out a copy of her sample ballot, fill it in, and take a photograph of herself holding the completed sample ballot. This is a minimal limit on how she communicates speech to the public, not irreparable harm.

25

### III. THE EQUITIES TO THE PARTIES AND THE PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION.

The final two *Winter* factors require plaintiffs to demonstrate that the equities tip in their favor and that an injunction is in the public interest. *Id.* at 20. In cases involving challenges to governmental action, courts typically consider the balance of the equities and the public interest factors together. *Taliaferro v. N.C. State Bd. of Elections*, No. 5:20-CV-411-BO, 2020 WL 5709252, at *3 (E.D.N.C. Sept. 24, 2020).

First, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Second, and more importantly, as noted above, laws prohibiting photography inside the voting enclosure serve the very important purpose of preventing voter intimidation, preventing vote-buying schemes, avoiding delays and distraction at polling places, and maintaining the privacy of other voters. *See generally Burson*, 504 U.S. at 201-06. In particular, the challenged laws, and the State Board's implementation of those laws, are directed at combatting the threat of voter intimidation—both intentional and otherwise. A voter who sees someone taking a photograph within the voting enclosure likely will not know why the photographer has her phone out or what the ultimate image being taken with the phone will include. It is the simple fact that a person has their phone out and is taking photographs in the voting enclosure that has the potential to intimidate others. That is why these laws exist.

The rationale behind these particular provisions—including voter privacy and election integrity—undergird training the State Board has provided to the county boards of elections, which further informs the county boards' training of their poll workers. *See* Ex. A, attached Steele Decl.

Exs. 1 & 2. Training also includes guidance on signage required in polling placing, including signs notifying voters that "[i]t is *illegal* to record a voted ballot . . ." *Id.*, Steele Decl. Ex. 2, "The Act of Voting in Person – Part II" PowerPoint, Slide 14, *and* Steele Decl. Ex. 3, "Electronics Notice Sign" (emphasis in original).

Finally, Plaintiff's delay in bringing this request for injunctive relief tips the balance of the equities against issuance of an injunction. *See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (holding that a plaintiff's "delay is thus quite relevant to balancing the parties' potential harms," since "a long delay in seeking relief indicates that speedy action is not required"); *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 138 (4th Cir. 2001) ("Our decision in *Quince Orchard* instructs that any delay attributable to plaintiffs in initiating a preliminary injunction request, coupled with prejudicial impact from the delay, should be considered when the question of irreparable harm to plaintiffs is balanced against harm to defendants."). The challenged statutes have been in effect for decades. One has been in effect for nearly a century, over the course of hundreds of elections. Thousands of poll workers have already been trained, and they would have to be retrained on what photograph is and is not allowed, which will become much more nuanced and difficult for the lay poll worker to enforce. Yet Plaintiff has only decided to bring suit now, on the eve of an election, with little notice or opportunity to develop a complete factual record. That Plaintiff waited until the eleventh hour to file her claims is reason enough to deny her a preliminary injunction.[15]

_____

[15]  Although Plaintiff has not explicitly requested any mandatory injunctive relief, a preliminary injunction will necessarily require affirmative actions by the State's elections administrators to educate the public, and issue new training and guidance to county board staff, poll workers, and poll observers. Such relief would run afoul of the U.S. Supreme Court's repeated admonishments that the federal courts should not issue injunctions on the eve of elections that could undermine the sensitive tasks of administering an ongoing election or lead to confusion among voters. *See*

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully submitted this the 17th day of September, 2024.

> **JOSHUA H. STEIN**
> **Attorney General**
>
> /s/ Mary Carla Babb
> Mary Carla Babb
> Special Deputy Attorney General
> N.C. State Bar No. 25713
> mcbabb@ncdoj.gov
>
> Terence Steed
> Special Deputy Attorney General
> N.C. State Bar No. 52809
> E-mail: tsteed@ncdoj.gov
>
> N.C. Department of Justice
> P.O. Box 629
> Raleigh, NC  27602-0629
> Telephone:  (919) 716-6567
> Facsimile:  (919) 716-6761
>
> *Attorneys for the State Board*

---

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).

28