IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:24-cv-481-FL

| | |
|---|---|
| SUSAN JANE HOGARTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **DEFENDANTS' MEMORANDUM** |
| | ) **OF LAW** |
| SAM HAYES, in his official capacity as | ) **IN SUPPORT OF** |
| Executive Director of the North Carolina State | ) **MOTION FOR JUDGMENT ON** |
| Board of Elections, et al., | ) **THE PLEADINGS** |
| | ) |
| Defendants. | ) |

Defendants Sam Hayes, State Board Executive Director, the members of the State Board,

Danielle Brinton, State Board Investigator ("State Board Defendants"), the Director and members

of the Wake County Board of Elections ("County Board Defendants"), and Wake County District

Attorney Lorrin Freeman ("DA Freeman"), all named in their official capacities only (collectively

"Defendants"), provide this memorandum of law in support of their joint motion for judgment on

the pleadings pursuant to Fed. R. Civ. P. 12(c).[1]

## NATURE OF THE CASE

This Court should grant Defendants' Rule 12(c) Motion because Plaintiff fails to state a

claim upon which relief can be granted. The facts admitted in the pleadings make clear that

Defendants are entitled to judgment as a matter of law. Plaintiff challenges five longstanding,

reasonable, viewpoint-neutral laws that are necessary to serve North Carolina's interests in

curtailing vote buying and voter intimidation. Four of these provisions restrict people's ability to

---

[1] Pursuant to the Consent Scheduling Order entered by the Court on October 15, 2024, this motion for judgment on the pleadings does not address lack of subject matter jurisdiction under Rule 12(b)(1) as the Court wanted those issues briefed and resolved separately. [D.E. 50, 74]

photograph and share images of a voted ballot. One of the provisions restricts people's ability to take photographs within the voting enclosure. Because these laws regulate conduct within the voting enclosure without favoring any viewpoint, the standard of review is whether these viewpoint-neutral laws are reasonable. Alternatively, the Court could consider whether the provisions in question are justified under the *Anderson-Burdick* balancing test that applies generally to most election regulations. Under either standard, Plaintiff lacks legally sufficient claims because the State's interests are significant and the laws' regulations on speech are limited. Furthermore, even if this Court were to adopt a strict scrutiny analysis, Plaintiff would not have legally sufficient claims because the State's interests are compelling.

Because Plaintiff has failed to state a claim upon which relief can be granted, this Court should determine that Defendants are entitled to Judgment on the Pleadings.

## PROCEDURAL HISTORY

After deliberately violating North Carolina election laws during the 2024 primary election cycle, Plaintiff, Susan Hogarth, filed suit in the United States District Court for the Eastern District of North Carolina on August 20, 2024. [D.E. 2] Plaintiff challenges the constitutionality of five statutes that govern elections in North Carolina, claiming that they violate her First Amendment rights as applied to her desire to take "ballot selfies." *Id.*

Plaintiff moved for a preliminary injunction on August 27, 2024. [D.E. 9, 14] After Defendants filed opposition [D.E. 40, 41, 42], the matter was brought before the Court for a hearing on October 7, 2024. [D.E. 47] In support of her opposition to the motion for preliminary injunction, DA Freeman proactively submitted a declaration affirming she would not prosecute Plaintiff for the conduct described in the complaint [D.E. 42-1], and, at the Court's request during the hearing, agreed to incorporate those assurances into a consent order. [D.E. 52, pp 28-29, 33-34] After the

2

hearing, the parties could not reach a consensus on the terms, the Court was required to intervene, and entered a limited preliminary injunction that memorialized the non-prosecution consistent with the assurances DA Freeman had already volunteered before the hearing. [D.E. 60] On November 6, 2024, Plaintiff filed a first verified supplemental complaint. [D.E. 65]

On October 18, 2024, all Defendants filed motions to dismiss pursuant to Rule 12(b)(1). [D.E. 53, 54, 55, 56, 58, 59] On March 28, 2025, the Court denied the motions to dismiss with the exception of the Attorney General. [D.E. 74]

All remaining Defendants filed answers to Plaintiff's verified complaint and first verified supplemental complaint on April 10 and 11, 2025. [D.E. 77, 78, 79]

In preparing the Rule 26(f) Joint Report, all parties agreed that the most efficient next step in this action would be for the parties to file cross-motions for judgment on the pleadings based, in part, on the primarily legal nature of the claims and defenses. [D.E 85]

STATEMENT OF FACTS

**A.      Statutes in Question.**

**1.      Ballot Photography Provisions**

Plaintiff challenges five interrelated North Carolina statutes, all of which are designed to protect the privacy of the ballot, prevent voter intimidation, and discourage vote-buying schemes, and all of which have existed for decades or longer. Section 163-273(a)(1), enacted in 1929, makes it a misdemeanor for a voter to allow their own voted ballot to be seen by another person. N.C.G.S. § 163-273(a)(1); 1929 Chap. 164, § 29.[2] Section 163-165.1(e), enacted in 2002, declares voted ballots to be confidential and prohibits access to voted ballots, other than by elections officials

---

[2] Available at https://www.ncleg.gov/Files/Library/sessionlaws/1921-1930/pubs_publiclawsresolu1929.pdf, *last visited* July 3, 2025.

3

performing their duties or by order of a court or board of elections. N.C.G.S. § 163-165.1(e); 2002 N.C. Sess. Law 159, § 55.(o).[3] Section 163-274(b)(1), enacted in 2007, makes it a misdemeanor for any person to knowingly disclose a voted ballot in violation of § 163-165.1(e). N.C.G.S. § 163-274(b)(1); 2007 N.C. Sess. Law 391, § 9.(b).[4] Finally, § 163-166.3(c), also enacted in 2007, prohibits photographing the image of a voted ballot for any purpose not otherwise permitted by law. 2007 N.C. Sess. Law 391 § 23.

### 2.    Voting Enclosure Provision

Section 163-166.3(b), enacted in 2007, prohibits photographing a voter within the voting enclosures, except with the permission of the voter and the chief judge of the voting site. N.C.G.S. § 163-166.3(b); 2007 N.C. Sess. Law 391, § 23.3. For candidates specifically, it prohibits them from photographing a voter within the voting enclosures, except with the permission of the voter. *Id.*

### B.    Factual Allegations in Plaintiff's Complaint.

Plaintiff is a regular voter in Wake County. [D.E. 2, ¶¶ 9, 114-19] On March 5, 2024, Plaintiff voted in person in the primary election. *Id.*, ¶ 1. After completing her ballot, and while standing within the voting enclosure, Plaintiff took a photograph of herself, her completed ballot, and the sign in the voting booth that informs voters that photographs are prohibited inside the voting enclosure. *Id.*, ¶¶ 1, 55-58. Plaintiff had her cell phone out for approximately 45 seconds to take this photograph. *Id.*, ¶ 59. Plaintiff did not ask for permission to take a photograph in the voting enclosures. *Id.*, ¶ 65. Plaintiff then shared the photograph on social media, voicing her

---

[3] Available at https://www.ncleg.gov/Sessions/2001/Bills/Senate/PDF/S1217v6.pdf, *last visited July 3, 2025.*
[4] Available at https://www.ncleg.gov/Sessions/2007/Bills/House/PDF/H1743v8.pdf, *last visited July 3, 2025.*

4

disagreement with the prohibition on photographing voted ballots, and endorsing candidates for office. *Id*., ¶ 1. Plaintiff now also claims that a photograph of herself and her voted ballot encourages voting for third-party candidates, challenges the narrative that voters can only vote for major party candidates, encourages voting, commemorates her vote, and expresses her pride in participating. *Id*., ¶ 51.

On March 13, 2024, State Board investigative staff sent a letter to Plaintiff informing her that the State Board was forwarded information that she took a photograph of her voted ballot and posted it on social media. The State Board described Plaintiff's actions as "a possible violation of N.C.G.S. § 163-166.3(c)," which prohibits photographing a voted ballot. *See* March 13, 2024 State Board Letter attached as Exhibit A to Plaintiff's Complaint [D.E. 2-1, p 2]; *see also* Fed. R. Civ. P. 10(c). The letter also informed Plaintiff of the State Board's duty to investigate violations of election laws in North Carolina and the fact that Plaintiff's alleged actions are prohibited and punishable as a Class I Misdemeanor. *Id.* Finally, the letter expressly stated that "[t]he purpose of this letter is to explain the law and request that you take the post down." *Id.*

In Plaintiff's Supplemental Verified Complaint, Plaintiff details her experience voting in the November 2024 general election. [D.E. 65] She voted early in-person at an early voting site in Wake County on October 26, 2024. *Id.*, ⫿ 5. After completing her ballot, while still in the voting booth, Plaintiff used her cell phone camera to take pictures of both sides of her ballot, herself with the no photos sign in the voting booth, and herself holding her voted ballot. *Id.*, ⫿ 11. An election official working inside the voting enclosure approached Plaintiff and accurately informed her of the prohibition against taking photos of a voted ballot. *Id.*, ⫿ 14. Plaintiff informed the official of the limited injunction from this Court, and after consulting with the Chief Judge of the polling site, the official returned and told Plaintiff, "you're good." *Id.*, ⫿⫿ 14-16, 19. Plaintiff completed the

voting process normally. *Id.*, ⁋ 21. Plaintiff described this experience, being approached by an election official after she purposefully violated a law in front of that official without first informing them that she had a court order allowing her to do so without fear of prosecution, as being accosted and stated it made her uncomfortable and anxious. *Id.*, ⁋⁋ 18, 28.

Plaintiff does not allege in her pleadings that she has been charged with any election law violations.

## QUESTIONS PRESENTED

1. Are longstanding laws barring voters from taking and sharing photographs of their completed official ballots in the voting enclosure reasonable restrictions on speech?

2. Is requiring a person to receive permission from the chief judge of a voting site to take a photograph within a voting enclosure a reasonable restriction on speech in a non-public forum?

## ARGUMENT

**Legal Standard**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "after the pleadings are closed but early enough not to delay trial, a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). For purposes of Rule 12(c), consideration may be given to the complaint, the answer, exhibits to the pleadings, matters of public record, and exhibits to the motion that are integral to the complaint and authentic. *Massey v. Ojaniit*, 759 F.3d 343, 347-48 (4th Cir. 2014) (citing Fed. R. Civ. P. 10(c); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

The same standard that the Court applies to a rule 12(b)(6) motion applies to a 12(c) motion. *See Massey*, 759 F.3d at 353. To the extent that allegations in the pleading of the non-moving party conflict with the allegations in the pleading of the moving party, the court should

6

assume the allegations in the non-moving party's pleading to be true. *Deutsche Bank Nat'l Tr. Co. v. Fegely*, 767 F. App'x 582, 583 (4th Cir. 2019). If the Complaint does not allege sufficient facts for the Court to reasonably infer that the statutes in question violate the law, the Court should grant a Motion for Judgment on the Pleadings. *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### THE CHALLENGED PROVISIONS ARE CONSTITUTIONAL, AND JUDGMENT SHOULD BE ENTERED FOR DEFENDANTS.

Plaintiff brings three as-applied challenges to the constitutionality of North Carolina election laws and Defendants' conduct enforcing those laws. Plaintiff's Complaint contains three claims for relief, alleging that each of the following violate the First Amendment: 1) N.C.G.S. §§ 163-166(c), -273(a), -165(e), and -274(b)(1), or what Plaintiff calls the "Ballot Photography Provisions"; 2) N.C.G.S. § 163-166.3(b), or what Plaintiff calls the "Voting Enclosure Provision"; and 3) the State Board's March 13, 2024 letter informing Plaintiff that her conduct violated the law and that Plaintiff faced potential criminal charges. Plaintiff seeks declaratory relief that each violates the First Amendment, and injunctive relief prohibiting Defendants from enforcing the Ballot Photography Provisions and the Voting Enclosure Provision. Because the Ballot Photography Provisions and the Voting Enclosure Provision do not violate the First Amendment, all of Plaintiff's claims fail, and the Court should enter judgment on the pleadings in favor of Defendants.

### A. Plaintiff's First Amendment Claim Against the Ballot Photography Provisions is Insufficient as a Matter of Law.

Though Plaintiff argues that § 163-273(a)(1), § 163-165.1(e), § 163-274(b)(1), and § 163-166.3(c) violate her First Amendment rights as applied to her desire to take and share ballot selfies because they restrict her ability to share political speech in the manner that she wishes, Plaintiff

7

has failed to state a claim upon which relief can be granted. Under the most appropriate First Amendment test, because the Ballot Photography Provisions regulate speech in a non-public forum, they need only be reasonable and viewpoint neutral. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Alternatively, even if the more restrictive *Anderson-Burdick* test were employed, these laws would still survive scrutiny. The State has several compelling interests, including preventing vote buying and voter intimidation, as well as reducing social coercion which can occur when voters feel pressured by social, familial, religious, or other groups they belong to which seek to require they vote in accordance with the groups' particular political preferences. The State also has a compelling interest in avoiding delays and distraction at polling places, maintaining and protecting the privacy of other voters, and preventing voter intimidation, which outweigh any inconvenience on speech that may occur by prohibiting photos of the voted ballot or in the ballot enclosure.

Because the Ballot Photography Provisions are reasonable under the First Amendment, Plaintiff fails to state a claim upon which relief can be granted as to the ballot photograph provisions. Plaintiff has not pleaded sufficient factual content because the ballot photograph provisions are reasonable restrictions on speech that are necessary to prevent vote-buying and voter intimidation, as well as prevent social coercion, delays, and distractions, and maintain privacy.

1.      **The Ballot Photography Provisions permissibly regulate speech in a non-public forum.**

The Ballot Photography Provisions are longstanding lawful regulations that govern conduct that begins at a polling place. It is well-established that a polling place is not a public forum for speech. *See Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018) (a polling place is "government-controlled property set aside for the sole purpose of voting" and therefore

8

"qualifies as a nonpublic forum"); *Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 230 (4th Cir. 2013); *Marlin v. D.C. Bd. of Elections & Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001). "The space is a 'special enclave, subject to greater restriction.'" *Mansky*, 585 U.S. at 12 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992)). In a nonpublic forum, the government has flexibility to craft rules that limit speech. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983).

A nonpublic forum may be reserved "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id*. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc*., 473 U. S. 788, 799-800 (1985). Because the Ballot Photography Provisions operate in a nonpublic forum, they are lawful as long as they are viewpoint neutral and reasonable. *Mansky*, 585 U.S. at 12. The Ballot Photography Provisions satisfy both requirements.

First, the Ballot Photography Provisions are viewpoint-neutral. Their application here does not "discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). The Ballot Photography Provisions do not depend in any way on the viewpoint of Plaintiff's speech. The laws barring photography of the voted ballot or disclosure of its contents (N.C.G.S. §§ 163-273(a)(1), -165.1(e), -166.3(c), -274(b)(1)) prohibit Plaintiff from photographing her voted ballot regardless of her chosen candidate or what political message she seeks to convey. Similarly, the general restrictions on photography within the polling place (N.C.G.S. § 163-166.3(b)) do not depend on what substantive message may be captured and

9

conveyed in a photograph of the voting site. The laws apply in the same manner no matter what viewpoint appears on the official voted ballot or in the frame of a picture taken within the voting place.

Second, the laws are reasonable. They reflect the State's longstanding restrictions on photography at polling sites and the public disclosure of voted ballots. These rules reflect the State's focus on ensuring orderly elections by limiting disruption at the polls, which would result from permitting photography in the voting enclosure. These laws also restrict the use of an official completed ballot to its intended purpose–conveying a voter's official candidate selection to election officials. They prevent the use of the image of the official voted ballot to be used as proof of compliance with vote-buying schemes or other forms of vote coercion.

Regarding coercion, prohibiting the photography of a voted ballot protects ballot secrecy for voters who, unlike Plaintiff, would prefer to keep their vote secret. Such voters may face pressure from social, familial, religious, or other groups they belong to which seek to enforce their leaders' preferred political choices through the proof of a voted ballot.

The laws, however, do not prohibit Plaintiff from disseminating information about the candidates she voted for, her political party, her own candidacy, or her pride in and enthusiasm for voting in general—outside the voting place, of course. [*See* D.E. 11, pp 1, 10] Nor do they prevent her from encouraging others to vote, promoting third-party and down-ballot candidates, challenging the idea that people should only vote for major-party candidates, or commemorating her vote for candidates that she endorsed or supported—again, outside the voting place. *Id.*

Stated differently, aside from photographing and sharing her official voted ballot captured within the voting enclosure, Plaintiff remains free to engage in all the expressive activities she claims are at issue in this lawsuit. *See Silberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454,

10

480 (S.D.N.Y. 2017) ("The no photography policy leaves open ample alternative means by which voters can signal their support for a candidate. Voters can still post to social media (using messages that contain both words and images), attend rallies, donate to campaigns, volunteer, or express their views in a multitude of ways without taking photographs at polling sites.").

In fact, voters can download personalized sample ballots from the Voter Lookup feature on the State Board's website.[5] Plaintiff can even print out her sample ballot, mark it as if she had voted it as an official ballot, take a ballot selfie, and post that selfie on social media, effectively engaging in the exact same expressive conduct without any criminal consequences. "[T]he First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984). The challenged provisions merely regulate expressive activity using an official voted ballot in a nonpublic forum, the voting place. They in no way restrict any other ways voters may wish to promote their views and the candidates they support. Voters continue to have a plethora of methods of communication available to them, and the provisions make no attempt to regulate the content of a person's ballot or speech.

Plaintiff alleges she uploaded her selfie "minutes" after leaving the polling place. [D.E. 2, ¶ 14] But whether Plaintiff uploaded the photograph inside or outside a non-public forum, the legal violation here is a continuous one, beginning in the voting enclosure, a nonpublic forum. *Cf. Silberberg*, 272 F. Supp. 3d at 477 ("[T]he posting of a photograph of a marked ballot to social media requires two steps: the taking of the photograph and the electronic transmission of that

---

[5] All sample ballots for the State are available on the State Board's website, https://dl.ncsbe.gov/?prefix=data/SampleBallots/2024-11-05/, *last visited June 26, 2025*.

photograph. Because the first step must take place in a non-public forum . . . it is appropriate to assess the impact of the statute as a restriction of speech taking place in a non-public forum.").

Though Plaintiff alleges that the challenged provisions may apply to absentee ballots photographed at home, that issue is irrelevant here. [D.E. 2, ⁋ 144] Plaintiff brings an as-applied challenge based on her own past voting experiences, which are limited to voting in person at a polling place during early voting or on election day. [D.E. 2, ¶¶ 107-13] Similarly, she alleges that in future elections she will vote in person if able and intends to take a photograph of her official voted ballot when voting in future elections. *Id.*, ¶¶ 109-10. She also alleges that in past elections she has voted both during early voting and on election day*, id.*, ¶¶ 108-09, and voted in-person in November 2024. [D.E. 65, ⁋ 5].

While Plaintiff does note that she may vote by absentee ballot in the future "if she is unable to appear" in person and will also take and share a photograph of her absentee ballot, such allegations are speculative. [D.E. 2, ¶¶ 110, 112] They do not establish standing to challenge the regulations as applied to taking photographs of an official voted absentee ballot at home. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (providing that plaintiffs lack standing when the claimed injury is "premised on a speculative chain of possibilities").

Thus, the only question here is how the challenged laws apply to Plaintiff who takes ballot photographs at polling places. In that context, the laws permissibly regulate speech in a non-public forum in a reasonable and viewpoint-neutral fashion for the reasons discussed above.

> **2.      In the alternative, the provisions are permissible regulations of election procedure under *Anderson-Burdick*.**

Alternatively, if the Court reviews the challenged laws as regulations of election procedure under the Supreme Court's *Anderson-Burdick* balancing framework, established by the U.S.

Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434, (1992*)*, the laws should still be upheld. These provisions serve important purposes, including preventing and discouraging vote buying and social coercion, avoiding delays and distraction at polling places, maintaining the privacy of other voters, and preventing and discouraging voter intimidation. *See, e.g., Crookston v. Johnson*, 841 F.3d 396, 400 (6th Cir. 2016).

In light of the challenged regulations' purposes, they may properly be characterized as regulations that "control the mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995). Accordingly, this Court may apply the "ordinary litigation" framework the U.S. Supreme Court applies when evaluating free-speech challenges to election regulations. *Id.*; *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 142 (3d Cir. 2022) ("[S]peech that occurs on the ballot or within the voting process will typically trigger application of the *Anderson-Burdick* balancing test.").

Under the *Anderson-Burdick* framework, to determine whether a state election law unconstitutionally burdens free-speech rights, courts must weigh: (1) the character and magnitude of the asserted injury to those rights, against (2) "the extent to which the regulations advance the state's interests in ensuring that order, rather than chaos, is to accompany the democratic processes." *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021); *Buscemi v. Bell*, 964 F.3d 252, 261-62 (4th Cir. 2020). "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'" on First Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *See Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). The *Anderson-Burdick* test thus reflects the Supreme Court's recognition that "as a practical matter, there must be a substantial regulation of elections if they

13

are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974) (quoted in *Anderson*, 460 U.S. at 788).

Applying *Anderson-Burdick* here confirms that Plaintiff's free-speech claim fails as a matter of law. The challenged regulations impose only minimal, reasonable, and non-discriminatory restrictions on Plaintiff's speech for the reasons already discussed.

Against these modest speech restrictions, the State advances legitimate—indeed, compelling—interests in preventing and discouraging vote buying and social coercion, avoiding delays and distraction at polling places, maintaining the privacy of voters, and protecting against voter intimidation. Photography in a polling place also has the potential to infringe on the rights of other voters, in that it risks exposing others' ballots; causing delays in the voting process; and causing intimidation or disruption. That Plaintiff claims she was able to take her photograph without disruption does not diminish the state's interest, prove that all voters can do so without disruption, or establish that other less civic-minded voters will not be disruptive.

The challenged regulations enable fair elections "where everybody would know that they were fair." Oliver Max Gardner, *Public Papers of Oliver Max Gardner: Governor of North Carolina, 1929-1933*, 77 (Edwin Maurice Gill ed. 1937). By restricting photography in the voting place, the challenged laws make it harder to provide proof of compliance with a vote buying scheme, thus making such schemes less successful and therefore less attractive to would-be schemers. They also protect voters from feeling social pressure to offer proof of how they voted to any social, religious, familial or other group that may seek to enforce strict adherence to the political choices of the groups' leaders. By curtailing the potential for vote-buying and ensuring that voters feel sufficiently empowered to vote freely, these statutes ensure not only that North

14

Carolina's elections are free of corruption but also that voters trust that North Carolina's elections are conducted fairly. If the State were to allow for the photographing in voting enclosures and sharing of official voted ballots, it would, at the very least, risk the loss of public confidence in secure elections.

The U.S. Supreme Court has confirmed that many of these interests are indeed compelling, a higher standard than is necessary for *Anderson-Burdick.* The Supreme Court held specifically that states have "a compelling interest in ensuring that an individual's right to vote is not undermined" by fraud, undue influence, or intimidation. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citing *Anderson*). The Court did so in upholding a state law prohibiting electioneering within a certain number of feet from a polling place. *Id.* Although the specific law examined in *Burson* concerned a polling place buffer zone, that law was part of a larger reform scheme that also included secret ballots. *Id.* at 206. In fact, the Court in *Burson* detailed the history of voter fraud and intimidation and the states' responses, which included secret ballots and buffer zones. *Id.* at 201-06. According to the Supreme Court, it was in fact these two measures, secret ballots and buffer zones, working together, that "served the States' compelling interest in preventing voter intimidation and election fraud." *Id.*

Plaintiff has attempted to minimize the nature of the State interests implicated by the challenged statutes. She is particularly dismissive of the state's interest in preventing vote buying, pointing out that "since 2015, [the State Board] has referred only four 'vote buying' allegations to prosecutors." [D.E. 11 at 7] But the State's interest in preventing vote buying remains compelling, regardless of the frequency of prosecutions. As the Supreme Court emphasized in *Burson* when rejecting a similar argument, "[t]he fact that these laws have been in effect for a long period of

time . . . makes it difficult for the States to put on witnesses who can testify as to what would happen without them." *Burson*, 504 U.S. at 208; *see also id*., at 214-16 (Scalia, J., concurring).

This point also distinguishes at least two of the cases Plaintiff relies upon, *Indiana Civil Liberties Union Found., Inc. v. Indiana Secretary of State*, 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017) (granting summary judgment), and *Rideout v. Gardner*, 123 F. Supp. 3d 218, 229 (D.N.H. 2015), aff'd, 838 F.3d 65 (1st Cir. 2016). In both cases, the courts rejected the states' reliance on the prevention of vote buying as a state interest because the laws at issue were newly enacted and lacked historical context. *See Indiana Civil Liberties*, 229 F. Supp. 3d at 820 (enacted in 2015); *Rideout*, 838 F.3d at 68 (enacted in 2014). The Indiana law targeted ballot selfies exclusively. *See Indiana Civil Liberties*, 229 F. Supp. 3d at 820. Unlike in those cases, the laws challenged here are decades-old prohibitions on photographing and displaying marked ballots and disclosing their content in any manner.

Moreover, here, there is more than enough support for Defendants' position that the State's interests, including the prevention of vote-buying and vote-coercion schemes, are compelling. This includes the detailed history in this country of election fraud and intimidation cited by the Supreme Court in *Burson* as providing compelling evidence to support buffer-zone laws. *See* 504 U.S. at 201-06 (describing the historical need for restrictions in and around the voting site based upon the uncomfortable and aggressive electioneering done in the service of political speech that voters were forced to navigate in order to vote). As the Sixth Circuit noted, the connection between election fraud and intimidation and "the prohibition on ballot exposure are not some historical accident; they are 'common sense.'" *Crookston v. Johnson*, 841 F.3d 396, 400 (6th Cir. 2016) (quoting *Burson*, 504 U.S. at 207).

16

Also, the State Board has consistently maintained that North Carolina's prohibition on photographing marked ballots is grounded in concerns that "such photographs could be used as proof of a vote for a candidate in a vote-buying scheme."[6] And, while Plaintiff questions the significance of only four referrals for prosecution, these instances confirm that such schemes are still a concern for North Carolina.

In sum, the challenged regulations readily satisfy the *Anderson-Burdick* test. The minimal burden on Plaintiff's speech is strongly outweighed by the State's compelling interests that support these laws. Plaintiff therefore has not alleged sufficient facts to support a reasonable inference that the statutes in question violate her free speech rights.

### 3. Even if a higher level of scrutiny applied, the Ballot Photograph Provisions are constitutional.

Plaintiff alleges that the Ballot Photography Provisions do not survive strict scrutiny. As explained above, strict scrutiny does not apply. However, even if the Court were to apply strict scrutiny, Plaintiff still fails to state a claim upon which relief can be granted. The State's interests are compelling, and the challenged laws are narrowly tailored to protect those interests. *See generally Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) (describing strict scrutiny).

The State interests here are both compelling and well-supported by evidence. For many of the same reasons the Supreme Court upheld polling-place buffer zone under strict scrutiny in *Burson*, the challenged laws survive strict scrutiny review here. *See* 504 U.S. at 199. Moreover, the laws are narrowly tailored to further those governmental interests. They apply only to voted ballots. Voters can take and share other photographs taken in the voting enclosure, so long as the photographs do not include voted ballots, other voters, and they obtain permission. Voters can also

---

[6] *See, e.g.*, note 4, *supra*.

take and share photographs of a marked sample ballot. Nothing in the statutes prevents voters from promoting their preferred candidates or expressing pride in voting in any myriad of ways, some of which are indistinguishable from Plaintiff's "ballot selfie."

Plaintiff has argued the challenged laws are not narrowly tailored because they limit the speech of voters who do not take selfies for nefarious purposes, such as vote buying or intimidation, which are criminalized by other laws. She also contends that she was able to take her ballot selfie with no disruptions and that she captured only the image of herself with her ballot.

But this position ignores the fact that if the State opens up new avenues for election fraud by allowing ballot photographs, activities like vote buying and intimidation are more likely to occur. Even if most voters intend to act lawfully, allowing ballot selfies would make it easier for bad actors to exploit the practice. By the same token, it would be impossible for poll workers to distinguish between those taking photographs in furtherance of election fraud and those who are not. Also, requiring poll workers to monitor which voter-photographers are being disruptive in photographing their ballots and which ones are not will be an unnecessary distraction and disruption for poll workers focused on completing the tasks critical to administering elections.

Moreover, Plaintiffs own allegations undermine her claim. Although Plaintiff may have been able to take her ballot selfie without being disruptive in the 2024 primary election (though not in the 2024 general election, based on the allegations in Plaintiff's own amended complaint), not everyone will do the same. "Some voters will require multiple photographs to capture their ballot along with themselves in different poses, or repeated photographs where the original was inadequate due to deficient lighting, disheveled hair, or misplaced accessories. Some voters, unaccustomed to using the camera on their phones, will struggle to activate, and then use, the camera functionality." *Silberberg*, 272 F. Supp. 3d at 480. The risk of intimidation to other voters

18

or the risk of questions regarding the integrity of the process from other voters in the voting enclosure who do not know why their neighbor is photographing ballots is obvious. The State need not risk these outcomes in the name of narrow tailoring.

For these reasons, Plaintiff has failed to state a claim upon which relief can be granted on Claim I, regardless of the level of scrutiny applied. As such, the Court should enter judgment in favor of Defendants.

### B.   Plaintiff's First Amendment Claim Against the Voting Enclosure Provision is Insufficient as a Matter of Law.

Plaintiff's claim that the Voting Enclosure Provision violates the First Amendment fails as a matter of law. In Claim II, Plaintiff challenges N.C.G.S. § 163-166.3(b), the Voting Enclosure Provision, specifically alleging that the statute's application to ballot selfies is unconstitutional. According to Plaintiff, that provision violates the First Amendment because it makes no explicit exception for ballot selfies. She further argues that it fails to provide "an 'objective, workable standard' to guide the chief judge in deciding whether to give a voter permission to take a selfie." [D.E. 2, ¶¶ 173, 175 (citation omitted)] Like with the Ballot Photography Provisions, this claim fails as a matter of law.

Like the other challenged statutes, Section 163-166.3(b), does not violate the First Amendment. The Voting Enclosure Provision regulates conduct within the voting enclosure, defined as "the room within the voting place that is used for voting." N.C.G.S. § 163-165(9), and thus governs conduct in a nonpublic forum. It exists to protect the rights of other voters, including their right not to be intimidated by being recorded in a nonpublic forum while voting, and it is viewpoint neutral as it remains silent regarding "speech based on . . . ideas or opinions." *Iancu*, 588 U.S. at 393. These are compelling government interests, *Burson*, 504 U.S. at 199, and it is

perfectly reasonable to limit photography of a voter without their permission, or the permission of the chief judge, who has wide statutory authority to regulate voting-enclosure activity to ensure order in the voting place, *see* discussion *infra* and N.C.G.S. § 163-48.[7]

For these same reasons, the Voting Enclosure Provision satisfies the *Anderson-Burdick* test. Again, by preventing photography in the voting enclosure, the statute here provides a nonintrusive method of ensuring order in the democratic process, and it preserves the rights of the millions of other voters who use voting enclosures. Under either test, this provision, like the other laws Plaintiff challenges, is constitutional.

Plaintiff disagrees. She has argued that, even assuming the voting enclosure is a nonpublic forum, the Voting Enclosure Provision is unconstitutionally vague as there is "nothing in its language, or anything else in North Carolina law" that "provides any standards to guide or otherwise limit officials in deciding when or whether to permit or prohibit speech." [D.E. 11, p 21] To support this argument, Plaintiff relied on *Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018). But Plaintiff ignores facts that distinguish *Mansky,* most notably the clear guidance that *is* provided to election officials in North Carolina that is *not* provided to those in Minnesota.

In *Mansky*, the law banned all "political" apparel and accessories, allowing election officials to decide what was political, with the State providing guidance to election officials that "rais[ed] more questions than it answered." *Mansky*, 585 U.S. at 7-8, 18. The Supreme Court held

---

[7] That statute reads: "The chief judge and judges of election shall enforce peace and good order in and about the place of registration and voting. They shall especially keep open and unobstructed the place at which voters or persons seeking to register or vote have access to the place of registration and voting. They shall prevent and stop improper practices and attempts to obstruct, intimidate, or interfere with any person in registering or voting. They shall protect challenger and witnesses against molestation and violence in the performance of their duties, and they may eject from the place of registration or voting any challenger or witness for violation of any provisions of the election laws. They shall prevent riots, violence, tumult, or disorder."

that, owing to the nonpublic nature of polling places, a state could prohibit certain apparel in that space, but it must draw a "reasonable line," and must therefore "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16. The Court was clear that these standards need not be perfectly clear or precise. However, by simply banning political apparel and accessories broadly, with what the Court termed "haphazard" supplemental guidance issued by the governing state agency, Minnesota's ban was a bridge too far. *Id.* at 21-23.

As compared to the authority of the Minnesota election officials in *Mansky*, the authority of chief precinct judges in North Carolina to regulate activity within a polling place is significantly more well defined. These officials are provided with clear direction to guide their decisions generally and as they relate to the Voter Enclosure Provision more specifically. *See, e.g.*, N.C.G.S. § 163-47(a) (providing that the precinct judges at the polling sites are granted broad authority to "conduct [elections] fairly and impartially, and they shall enforce peace and good order in and about the place of registration and voting"); *see id.*, § 163-48 (requiring that they keep voting places "open and unobstructed"; "prevent and stop improper practices and attempts to obstruct, intimidate, or interfere with any person in registering or voting"; and "prevent riots, violence, tumult, or disorder").

Also, Plaintiff's contentions do not account for the training and guidance issued by the State Board to the county boards of elections, which further guides the county boards' training of poll workers, including precinct judges. [D.E. 41-1, Declaration of State Board Associate General Counsel Adam Steele ("Steele Decl.")], with attached examples of training, Decl. Exs. 1 & 2. Other relevant guidance from the State Board to county boards includes two official directives to

the county boards,[8] Numbered Memo 2022-12, entitled "Maintaining Order at the Polls," and Numbered Memo 2023-06, entitled "Election Observers." Although the guidance in Numbered Memo 2023-06 is directed at election observer behavior, much of it is applicable to all voting enclosure activity.

The guidance that both of these Numbered Memos provide is thorough and emphasizes the role of the precinct judge in monitoring voting enclosure activity. The clarity that precinct judges have regarding their authority in North Carolina simply does not compare to the ambiguity surrounding the authority of election officials in *Mansky*.

Plaintiff further argues that the Voting Enclosure Provision is unreasonable because it "lacks a legitimate basis for requiring permission from an election official to take a picture of oneself in a polling place—or for exempting candidates from the restriction." [D.E. 11, p 23] Plaintiff's view fails to recognize that taking a picture of oneself can still be disruptive to other voters, can risk violating their privacy, and can impede the voting process generally. *See Burson*, 504 U.S. at 201-06. By way of example, the size of voting enclosures vary (with some sites offering only a handful of voting booths), and depending on the space, taking a picture of oneself could be disruptive and intimidating to some or all voters who are at the various stages of the process, including when they are checking in to vote, receiving their ballot, completing their ballot, or placing their ballot in the tabulator before leaving the voting place. See Numbered Memo 2023-

---

[8] "Numbered Memos" have historically been issued by the State Board's Executive Director since the 1990s to provide guidance on election administration and are publicly available on the State Board's website, including Numbered Memo 2022-12, https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2022/Numbered%20Memo%202022-12%20Maintaining%20Order%20at%20the%20Polls.pdf, and Numbered Memo 2023-06, https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2023/Numbered%20Memo%202023-06%20Election%20Observers.pdf, *last visited June 26, 2025.*

06, p 5 ("In many voting places, there is so little distance between the rows of voting booths that it is possible to see how a person is filling out their ballot from every location in the . . . area"). Also, as discussed above, Plaintiff's individual experience in taking her photograph does not necessarily reflect the experience of all would-be voter-photographers.

Finally, there is nothing unreasonable about exempting candidates from the requirement that they seek permission from the chief judge to take photographs of themselves or other voters. It is reasonable to assume that candidates will be more familiar with applicable laws, and have a higher stake than an average voter in maintaining proper decorum. Additionally, the North Carolina General Assembly apparently drew the conclusion that candidates, who of course are much fewer in number than voters writ large, should be relatively freer to capture photographs of their participation in the election as an effort to promote their own candidacy. And still, if a candidate violates any other laws or fails to maintain proper decorum, the chief precinct judge has the authority to intervene. *See* statutes cited *supra*.

Accordingly, the Voting Enclosure Provision is constitutional and does not violate the First Amendment under any applicable standard.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion for Judgment on the Pleadings. The alleged restrictions on Plaintiff's speech result from viewpoint-neutral laws that apply in a nonpublic forum. The laws are reasonable and are therefore constitutional. Although strict scrutiny does not apply, the State's interests are indeed compelling and the laws narrowly tailored. Thus, Defendants are entitled to judgement on the pleadings because Plaintiff's claims fail on the merits.

[Signature Page Follows]

23

Respectfully submitted this the 11th day of July, 2025.

<table>
<tr>
<td>

/s/ Roger A. Askew
Roger A. Askew, NCSB # 18081
Senior Deputy County Attorney
E-mail: Roger.Askew@wake.gov

/s/ Allison P. Cooper
Allison P. Cooper, NCSB # 34160
Senior Deputy County Attorney
E-mail: Allison.Cooper@wake.gov

Wake County Attorney's Office
Post Office Box 550
Raleigh, North Carolina 27602
Telephone: (919) 856-5500

*Attorneys for County Board Defendants*

</td>
<td>

**JEFF JACKSON**
**Attorney General**

/s/ Ryan C. Grover
Ryan C. Grover
Special Deputy Attorney General
N.C. State Bar No. 53703
E-mail: rgrover@ncdoj.gov

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
E-mail: tsteed@ncdoj.gov

/s/ Mary L. Lucasse
Mary L. Lucasse
Special Deputy Attorney General
N.C. State Bar No. 39153
E-mail: mlucasse@ncdoj.gov

*Attorneys for State Board Defendants*

/s/Elizabeth Curran O'Brien
Special Deputy Attorney General
N.C. State Bar No. 28885
E-mail: eobrien@ncdoj.gov

*Counsel for Defendant Freeman*

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6400

</td>
</tr>
</table>

24