# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

SUSAN HOGARTH,

*Plaintiff,*

v.

SAM HAYES, *et al.,*

*Defendants.*

Case No.: 5:24-cv-00481

Hon. Louise W. Flanagan

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND SUMMARY OF THE CASE ................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    Susan Hogarth Takes Ballot Selfies to Share Her Political Beliefs. ...... 2

    B.    North Carolina Law Bans Ballot Selfies. ................................................. 4

    C.    The State Board Warns the Public Not to Take Ballot Selfies and Investigates Individuals Who Take and Share Ballot Selfies. .............. 5

    D.    Hogarth Challenges North Carolina's Ballot Selfie Ban. ...................... 7

ARGUMENT .................................................................................................................... 9

I.    Ballot Selfies Are Political Speech That Lies at the Heart of First Amendment Protection. ........................................................................................ 9

II.    The Ballot Photography Provisions Fail Strict Scrutiny As Applied to Ballot Selfies. ............................................................................................................ 11

    A.    The Ballot Photography Provisions are "presumptively unconstitutional" content-based restrictions. ...................................... 11

    B.    North Carolina does not have a compelling government interest in banning voters from photographing their own ballots. ........................ 14

    C.    Banning voters from taking and sharing ballot selfies is not narrowly tailored to achieve Defendants' purported ends. .................. 18

III.    The Voting Enclosure Provision Is an Unreasonable Restriction on Speech. ...................................................................................................................... 22

CONCLUSION ............................................................................................................... 26

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

**Cases**

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
   564 U.S. 721 (2011) ................................................................................................. 1, 10

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001) ................................................................................................. 20, 21

*Brooklyn Branch of NAACP v. Kosinski,*
   No. 21 CIV. 7667 (KPF), 2024 WL 2846687 (S.D.N.Y. May 30, 2024) ..................... 19

*Brown v. Ent. Merchants Ass'n,*
   564 U.S. 786 (2011) ................................................................................................. 15

*Cantwell v. Connecticut,*
   310 U.S. 296 (1940) ................................................................................................. 21

*City of Laude v. Gilleo,*
   512 U.S. 43 (1994) ................................................................................................... 16

*Coal. for Good Governance v. Kemp,*
   558 F. Supp. 3d 1370 (N.D. Ga. 2021) ............................................................. 10, 13, 21

*Edwards v. City of Goldsboro,*
   178 F.3d 231 (4th Cir.1999) ..................................................................................... 9

*First Nat'l Bank of Bos. v. Bellotti,*
   435 U.S. 765 (1978) ................................................................................................. 9

*Hall v. Virginia,*
   385 F.3d 421 (4th Cir. 2004) .................................................................................... 5

*Hill v. Williams,*
   No. 16-CV-02627-CMA, 2016 WL 8667798 (D. Colo. Nov. 4, 2016) ................... 13, 16

*Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State,*
   229 F. Supp. 3d 817 (S.D. Ind. 2017) ............................................................... passim

*Massey v. Ojaniit,*
   759 F.3d 343 (4th Cir. 2014) .................................................................................... 3, 5

*McCullen v. Coakley,*
   573 U.S. 464 (2014) ................................................................................................. 18, 19

*Meyer v. Grant,*

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

    486 U.S. 414 (1988) ................................................................................................ 10

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ...................................................................................... 12, 23, 24

*Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*,
    991 F.2d 154 (4th Cir. 1993) ................................................................................ 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) .............................................................................................. 14

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
    597 F.3d 570 (4th Cir. 2010) ................................................................................ 25

*PETA v. N.C. Farm Bureau Fed'n, Inc.*,
    60 F.4th 815 (4th Cir. 2023) ................................................................................ 10

*Police Dep't of City of Chi. v. Mosley*,
    408 U.S. 92 (1972) ................................................................................................ 12

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ................................................................................ 22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................... 1, 12, 14

*Regan v. Time, Inc.*,
    468 U.S. 641 (1984) .............................................................................................. 12

*Rideout v. Gardner*,
    123 F. Supp. 3d 218 (D.N.H. 2015) ............................................................... 10, 13

*Rideout v. Gardner*,
    838 F.3d 65 (1st Cir. 2016) ............................................................................ passim

*Riley v. National Fed'n of Blind of N.C., Inc.*,
    487 U.S. 781 (1988) .............................................................................................. 18

*Rogers v. Madison County Clerk*,
    No. 2016-SC-3147, 2017 WL 3475008 (Ill. Cir. Ct. July 20, 2017) ..................... 17, 21

*Ross v. Early*,
    746 F.3d 546 (4th Cir. 2014) ................................................................................ 14

*Sable Commc'ns of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989) .............................................................................................. 20

*Schneider v. New Jersey,*
    308 U.S. 147 (1939) ............................................................. 21

*Silberberg v. Bd. of Elections,*
    272 F. Supp. 3d 454 (S.D.N.Y. 2017) .......................... 10, 13, 17

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ................................................... 2, 15, 18

*United States v. Playboy Ent. Grp., Inc.,*
    529 U.S. 803 (2000) ........................................................ 18, 20

*Vill. of Schaumburg v. Citizens for a Better Env't,*
    444 U.S. 620 (1980) ............................................................. 21

*Wash. Post v. McManus,*
    944 F.3d 506 (4th Cir. 2019) ........................................... passim

*White Coat Waste Project v. Greater Richmond Transit Co.,*
    35 F.4th 179 (4th Cir. 2022) ...................................... 2, 23, 24

*Williamson v. Prime Sports Mktg., LLC,*
    No. 1:19-CV-593, 2021 WL 201255 (M.D.N.C. Jan. 20, 2021). ........... 9

*Wisconsin v. Buzzell,*
    No. 2022-cv-000361 (Wis. Ct. App. Nov. 27, 2023) ...................... 17

## Statutes

18 U.S.C. § 597 .................................................................... 19

Ala. Code § 17-9-50.1 (2019) ...................................................... 17

Ariz. Rev. Stat. § 16-1018(4) (2018) .............................................. 17

Cal. Elec. Code § 14291 (2016) .................................................... 17

Colo. Rev. Stat. § 1-13-712 (2017) ................................................ 17

Haw. Rev. Stat. § 11-121 (2016) ................................................... 17

Iowa Code § 49.88 (2017) .......................................................... 17

N.C. Gen Stat. § 163-275(2) ....................................................... 19

N.C. Gen. Stat. § 163-165.1(e) ............................................. 4, 13, 22

N.C. Gen. Stat. § 163-166.2 ....................................................... 19

iv

Case 5:24-cv-00481-FL    Document 91    Filed 07/11/25    Page 5 of 34
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

N.C. Gen. Stat. § 163-166.3(b) ................................................................ 5, 24

N.C. Gen. Stat. § 163-166.3(c) ............................................................ 4, 13, 22

N.C. Gen. Stat. § 163-273 ......................................................................... 19

N.C. Gen. Stat. § 163-273(a)(1) .......................................................... 4, 13, 22

N.C. Gen. Stat. § 163-274 ......................................................................... 19

N.C. Gen. Stat. § 163-274(b)(1) .......................................................... 4, 13, 22

N.C. Gen. Stat. § 163-48 ........................................................................... 19

N.M. Stat. § 1-12-59 (2019) ...................................................................... 17

Neb. Rev. Stat. § 32-1527 (2016) .............................................................. 17

Okla. Stat. tit. 26 § 7-109 (2019) .............................................................. 17

Utah Code § 20A-3a-504 (2015) ................................................................ 17

**Rules**

Fed. R. Civ. P. 10(c) ................................................................................. 3

Fed. R. Civ. P. 12(c) ................................................................................. 9

**Other Authorities**

Federal Elections Commission, Federal Elections 2020: Election Results for the
U.S. President, the U.S. Senate and the U.S. House of Representatives (Oct.
2022) ................................................................................................... 17

*Phone Usage at Polls*, N.C. State Bd. of Elections ........................................... 5

*Public Data*, NCSBE ......................................................................... 6, 7, 15

*Reminder: Photographing a Voted Ballot Is Against the Law*, N.C. State Bd. of
Elections (Feb. 25, 2020) .................................................................. 5, 6, 7

*Upcoming Election Information*, Wake Cnty. N.C. ......................................... 5

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

## INTRODUCTION AND SUMMARY OF THE CASE

"One person, one vote" is the foundation of our republic, yet in North Carolina it is a crime to celebrate democracy with a photograph of yourself and your vote— that is, to take and share a "ballot selfie." Ballot selfies help voters uniquely show support for political parties, candidates, and the act of voting by depicting for whom they actually voted. Ballot selfies are accordingly core political speech to which the First Amendment "has its fullest and most urgent application," *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (internal citation omitted), which the state censors based on content. There is no justification Defendants can offer to render that violation of voters' First Amendment rights constitutional. But that did not stop North Carolina and Wake County officials from trying to bar Plaintiff Susan Hogarth from taking and sharing ballot selfies in the 2024 primary and general elections by demanding she delete her photos and threatening her with criminal prosecution.

Four North Carolina statutes ban taking photographs of a voted ballot and criminalize sharing them (the "Ballot Photography Provisions"), while a fifth grants elections officials unbridled discretion to stop voters from photographing themselves in the polling place (the "Voting Enclosure Provision"). These laws (collectively, the "Ballot Selfie Ban") are content-based restrictions of protected speech that single out ballot selfies for disfavored treatment. The Ballot Photography Provisions are thus "presumptively unconstitutional" and must survive strict scrutiny, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and the Voting Enclosure Provision must pass a "reasonableness" test for public fora "akin to … intermediate scrutiny." *White Coat*

*Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 198 (4th Cir. 2022). But the Ballot Selfie Ban fails these tests, and the Court should hold it unconstitutional—just as has virtually every court to consider similar bans in other states.

The undisputed facts provide no support for Defendants' assertions that ballot selfies in North Carolina facilitate "vote buying," "social coercion," "delays," "distraction," or "voter intimidation," or that they violate other voters' privacy. These justifications are, at best, "merely conjectural" and cannot serve as lawful reasons to prohibit protected speech. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994). Defendants therefore cannot show the Ballot Selfie Ban furthers either a compelling interest under strict scrutiny or a "valid interest" under the "reasonableness" test. Nor can Defendants explain why the state could not achieve its ends through less restrictive means by enforcing existing statutes that directly address their asserted harms, a failure that dooms the Ban under any test. This Court should thus hold that the Ban violates the First Amendment and permanently enjoin Defendants from enforcing it against ballot selfies.

## STATEMENT OF FACTS

### A. Susan Hogarth Takes Ballot Selfies to Share Her Political Beliefs.

Susan Hogarth is a resident of and registered voter in Wake County, North Carolina. (Verified Compl. ¶ 9, ECF No. 2.) On March 5, 2024, she went to her polling place to vote in the North Carolina primary election. (*Id.* ¶ 53.) From the time she arrived until she left, no more than three other voters entered the "voting enclosure," the room where voting takes place. (*Id.* ¶¶ 46, 54, 61.)

After she filled out her ballot, she took about 45 seconds to take a photograph of herself in the voting booth that showed her voted ballot and the "no photos" sign affixed to the booth. (*Id.* ¶¶ 57–59.) Hogarth then exited the polling place and just minutes later posted her ballot selfie to X (the social network formerly known as Twitter) (*Id.* ¶¶ 1, 60–66):



Her post included a caption endorsing the candidates for whom she had voted and protesting that "Laws against #ballotselfie are bullshit." (*Id.* ¶¶ 66–70.) With that one photo, Hogarth promoted her favored candidates, spread awareness that voters can and do vote for third-party candidates, helped encourage others to vote, expressed her enthusiasm for participating in the electoral process, and voiced disagreement with North Carolina's statutory Ballot Selfie Ban. (*Id.* ¶ 134.)

Two weeks later, Hogarth received a letter from the North Carolina State Board of Elections threatening prosecution for her ballot selfie. (*Id.* ¶ 72, Ex. A.[1]) In

---

[1] Courts may consider exhibits to pleadings for Rule 12(c) motions, the same as with motions under Rule 12(b)(6). *See* Fed. R. Civ. P. 10(c); *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

the letter, State Board Investigator Danielle Brinton informed Hogarth she was investigating Hogarth's ballot selfie as a "violation[] of election laws," and warned her four times that taking and sharing ballot selfies is illegal in North Carolina. (*Id.* ¶¶ 72–73, 80, Ex. A.) Investigator Brinton threatened Hogarth with a "Class 1 Misdemeanor" and demanded she "take the post down." (*Id.* ¶¶ 72, 81, 83, Ex. A).

Hogarth's March 5, 2024, ballot selfie post remains public, and she does not intend to take it down. (*Id.* ¶ 105–106.) This was not Hogarth's first time taking and sharing a ballot selfie, and it will not be her last. (*Id.* ¶¶ 49–50, 107–13; Verified Suppl. Compl., ¶¶ 5, 8–12, ECF No. 65.) Hogarth intends to vote in future elections, either in person or absentee, and to take and share ballot selfies when she does. (Verified Compl. ¶¶ 107–13.)

### B. North Carolina Law Bans Ballot Selfies.

Five provisions of North Carolina law ban different aspects of taking and sharing ballot selfies. Four provisions ban taking or sharing photographs of a voted ballot (the "Ballot Photography Provisions") with no exception for voters photographing their own ballot. First, N.C. Gen. Stat. § 163-166.3(c) prohibits photographing a voted ballot anywhere, whether in-person or absentee. Second, N.C. Gen. Stat. § 163-273(a)(1) makes it a Class 2 misdemeanor for a voter to show their own voted ballot to anyone else, including photographic copies. Third, N.C. Gen. Stat. § 163-165.1(e) makes it a Class 1 misdemeanor for anyone with access to an electronic record of a voter's voted ballot to disclose how they voted. And fourth, N.C. Gen. Stat. § 163-274(b)(1) specifies, in a list of elections law crimes, that it is a Class 1

misdemeanor to disclose how a voter voted—even one's own vote—in violation of § 163-165.1(e).

A fifth statutory provision (the "Voting Enclosure Provision") requires a county election official to give permission before any individual may photograph any voter, including oneself, in the voting enclosure—the room at the polling place where voting occurs. N.C. Gen. Stat. § 163-166.3(b). The statute exempts, however, photographs of a candidate, which require only that the candidate grant permission. *See* N.C. Gen. Stat. § 163-166.3(b).

### C.  The State Board Warns the Public Not to Take Ballot Selfies and Investigates Individuals Who Take and Share Ballot Selfies.

The State Board of Elections regularly publicizes North Carolina's ballot selfie ban and enforces the law against those who take ballot selfies. It issues public statements warning voters not to take ballot selfies (Verified Compl. ¶¶ 86–89; *see, e.g.*, *Reminder: Photographing a Voted Ballot Is Against the Law*, N.C. State Bd. of Elections (Feb. 25, 2020), https://perma.cc/9HCN-B8YA[2]), and both its website and the County Board's underscore that photographing a voted ballot is illegal (Verified Compl. ¶¶ 88–89, 98–99; *see, e.g.*, *Phone Usage at Polls*, N.C. State Bd. of Elections, https://perma.cc/5ZNV-979V (last visited June 18, 2025); *Upcoming Election Information*, Wake Cnty. N.C., https://perma.cc/LKM5-6PH7 (archived August 19, 2024).

The State Board enforces the Ballot Selfie Ban despite explicitly recognizing the photos are expressive. As former Executive Director Brinson Bell explained in a

---

[2]  In considering Rule 12(c) motions, courts "may properly take judicial notice of matters of public record." *Massey*, 759 F.3d at 353. Publicly available information on state government websites is properly subject to judicial notice. *See Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004).

press release before the March 2020 primary: "We understand wanting to photograph yourself voting, especially with the popularity of selfies … However, there are legal ways to display your voting pride, such as wearing your 'I Voted' sticker or taking a picture outside of the precinct." (Verified Compl. ¶ 85; *Reminder: Photographing a Voted Ballot Is Against the Law*, *supra*.) But this recognition has not prevented the State Board from investigating and threatening voters with criminal prosecution for posting ballot selfies to express that pride. (Verified Compl. ¶¶ 72–83, 90–97; *Public Data*, NCSBE https://dl.ncsbe.gov/?prefix=Investigations (last visited July 10, 2025), https://perma.cc/E37U-D8CL.[3])

The State Board routinely investigates reports of ballot selfies, including reports from the Board of Elections of Wake County, where Hogarth lives and votes. State Board investigators investigate ballot selfies on social media and reports of ballot selfies from individuals and county elections officials. (Verified Compl. ¶¶ 9, 90–97, 100–104, 107; *Public Data*, *supra*.) The State Board has received and investigated nearly 50 reports of voters photographing voted ballots since March 2016. (Verified Compl. ¶ 91; *Public Data*, *supra*.) Since 2020, the State Board has referred two "photographing voted ballot" cases for prosecution, most recently in November 2023. (*Public Data*, *supra*.)

The State Board tells the public that it enforces the ban on ballot selfies because ballot selfies facilitate illegal vote-buying schemes. (*See, e.g.*, *Reminder: Photographing a Voted Ballot Is Against the Law*, *supra*.) But since 2015, it has

---

[3] The "Investigations" page of the State Board website contains download links to documents detailing the history of State Board referrals and investigations.

referred only four "vote buying" allegations to prosecutors, with no indication those referrals involved ballot selfies. (*Public Data*, *supra*.)

### D.    Hogarth Challenges North Carolina's Ballot Selfie Ban.

On August 22, 2024, Hogarth filed her Verified Complaint against State Board and County Board officials, the Wake County District Attorney, and the North Carolina Attorney General seeking declaratory and injunctive relief against the Ballot Selfie Ban. (Verified Compl. ¶¶ 11–23, 124–134.) Hogarth brings three declaratory and injunctive relief claims: (1) a challenge to the Ballot Photography Provisions, as applied to ballot selfies, against all Defendants (*id.* ¶¶ 135–69); (2) a challenge to the Voting Enclosure Provision, as applied to ballot selfies, against all Defendants (*id.* ¶¶ 170–187); and (3) an as-applied challenge to the threat of prosecution in the State Board's March 13, 2024, letter against the State Defendants and District Attorney Freeman (*id.* ¶¶ 188–204, Ex. A).

On August 27, 2024, Hogarth filed a Motion for Preliminary Injunction (Mot. for Prelim. Inj., ECF No. 9), which Defendants opposed (Resps. to Mot. for Prelim. Inj., ECF Nos. 40, 41, 42.) The Court heard oral argument on the motion on October 7, 2024, and District Attorney Freeman agreed to a limited preliminary injunction against her prosecution of Hogarth for taking or sharing ballot selfies while this case is pending (Mot. Hr'g Tr. 33:13–34:9, ECF No. 52), which the Court entered on October 21, 2024 (Order, ECF No. 60[4]). Responding to Defendants' stated intent to seek dismissal for lack of subject matter jurisdiction and failure to state a claim, the

---

[4]  The Court clarified the injunction via text-only order on October 25, 2024.

Court ordered bifurcated briefing, commencing with standing. (Mot. Hr'g Tr. 35:15–35:24, 43:8–44:24.) Defendants filed Rule 12(b)(1) motions to dismiss on October 18, 2024, and Plaintiff opposed. (Defs. Mots. to Dismiss, ECF Nos. 53, 55, 58; Pl. Resp. Br., ECF No. 66.)

On October 26, 2024, the day after the Court clarified its limited injunction order, Hogarth voted at an early voting polling place in Wake County. (Verified Suppl. Compl. ¶ 5, ECF No. 65.) Hogarth filled out her ballot then took a ballot selfie with a "no photos" sign in the background. (*Id.* ¶¶ 8–12.) While she took her ballot selfie, a County elections official yelled to Hogarth from across the room, "you cannot take a picture of your ballot, you need to delete that, please." (*Id.* ¶¶ 13–14.) Hogarth told the elections official that the Court's Order protected her ability to take ballot selfies without fear of prosecution. (*Id.* ¶ 15.) Hogarth waited while the elections official conferred with the precinct's chief judge. (*Id.* ¶ 16.) Only after the chief judge received permission from "the Board of Elections" did the elections official allow Hogarth to submit her ballot and leave without deleting her ballot selfie. (*Id.* ¶¶ 16–21.) On November 6, 2024, Hogarth filed a Verified Supplemental Complaint alleging the facts of the elections officials' efforts to stop her from taking and sharing a ballot selfie when she voted on October 26, 2024. (*Id.*)

On March 28, 2025, holding Hogarth has standing to challenge North Carolina's Ballot Selfie Ban, the Court denied Defendants' Rule 12(b)(1) motions to dismiss except as to the North Carolina Attorney General, who is no longer a party to this case. (Order, ECF No. 74.) On April 10 and 11, the remaining Defendants

forwent 12(b)(6) motions and answered Hogarth's Verified Complaints. (Answers, ECF Nos. 77, 78, 79.) Counsel for all parties then met on May 5, 2025, agreed the Court could resolve this case on the pleadings, and stipulated to a briefing schedule for cross motions under Rule 12(c). (Rule 26(f) Report, ECF No. 85.)

## ARGUMENT

The five statutory provisions comprising North Carolina's Ballot Selfie Ban violate the First Amendment on their face as applied to ballot selfies. The parties agree on the facts but not the law. Hogarth thus seeks judgment on the pleadings under Rule 12(c), which the Court evaluates under same standard as motions under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(c); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Hogarth is entitled to judgment on the pleadings because the undisputed facts demonstrate the Ballot Selfie Ban fails strict scrutiny under the First Amendment and the Voting Enclosure Provision is not a "reasonable" restriction on speech. *See Williamson v. Prime Sports Mktg., LLC*, No. 1:19-CV-593, 2021 WL 201255, at *4 (M.D.N.C. Jan. 20, 2021).

## I. Ballot Selfies Are Political Speech That Lies at the Heart of First Amendment Protection.

The First Amendment limits North Carolina's authority to ban ballot selfies because taking and sharing photos of how you voted is protected political speech that lies at "the heart of the First Amendment's protection." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776–77 (1978) (holding expression regarding ballot referendum "is the type of speech indispensable to decisionmaking in a democracy" and protected). The First Amendment protects the "creation of information," *e.g.*, taking a photo, just

"as much … as its dissemination," *e.g.*, sharing a photo. *PETA v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)).[5] And First Amendment protections are at their "zenith" as applied to political speech. *Wash. Post v. McManus*, 944 F.3d 506, 513–14 (4th Cir. 2019) (enjoining regulations of speech about candidates and ballot questions) (quoting *Meyer v. Grant*, 486 U.S. 414, 425 (1988)). In sum, the First Amendment "has its fullest and most urgent application" to speech related to "campaign[s] for political office," *Bennett*, 564 U.S. at 734 (internal citation omitted), like photographs of one's own exercise of the franchise.

These principles mean ballot selfies are protected speech—as every court that has considered challenges to ballot selfie bans has agreed. *See Rideout v. Gardner*, 838 F.3d 65, 75 (1st Cir. 2016).[6] As the First Circuit explained in *Rideout*, ballot selfies have "special communicative value," allowing voters to "express support for a candidate and communicate that the voter has in fact given his or her vote to that candidate." *Id.* at 75–76. Ballot selfies uniquely express for whom or what one

---

[5] In *PETA*, the Fourth Circuit invalidated a North Carolina law that criminalized taking undercover slaughterhouse videos to expose animal cruelty because "the right to publish a recording would be largely ineffective, if the antecedent act of *making* the recording is wholly unprotected." *Id.* at 829, 841 (internal quotation marks omitted).

[6] *See also Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 & n.11 (N.D. Ga. 2021) (noting the "right to photograph or videotape is protected by the First Amendment" and holding a ballot selfie ban that "prohibits any photography or recording of any voted ballot in public and nonpublic forums alike" violates the First Amendment); *Silberberg v. Bd. of Elections*, 272 F. Supp. 3d 454, 475 (S.D.N.Y. 2017) (explaining that New York's ballot selfie ban "prohibit[s] individuals from using the medium of a marked ballot for expressive conduct"); *Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State,* 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017) (holding Indiana's ballot selfie ban "embodies a content-based restriction on speech that cannot survive strict or intermediate scrutiny"); *Rideout v. Gardner*, 123 F. Supp. 3d 218, 230 (D.N.H. 2015) (noting that New Hampshire's ban "deprive[d] voters of one of their most powerful means of letting the world know how they voted"), *aff'd*, 838 F.3d 65.

actually voted, embodying the well-known aphorism "a picture is worth a thousand words." *Id.* at 76. Hogarth's ballot selfies exemplify that aphorism: With just one photograph, she succinctly communicates multiple campaign-related political messages.

For example, Hogarth's March 5, 2024, ballot selfie:

- Drew attention to down-ballot or third-party candidates;
- Encouraged potential voters to vote;
- Invited voters to consider voting for a third-party candidate;
- Challenged notions that voters should vote for only major party candidates;
- Expressed her pride in having participated in the electoral process and voted for third-party candidates;
- Commemorated her vote for candidates she endorses and supports; and
- Contested North Carolina's laws banning ballot selfies.

(Verified Compl. ¶¶ 51, 134.) This is all political speech about candidates, campaigns, and participation in the political process that receives maximum constitutional protection. *McManus*, 944 F.3d at 513–14. Hogarth's ballot selfies are imbued with "special communicative value" because they "express support for [] candidate[s] and communicate" that she voted for them. *Rideout*, 838 F.3d at 75. The First Amendment thus protects Hogarth's expression from restrictions on political speech like North Carolina's Ballot Selfie Ban.

## II.    The Ballot Photography Provisions Fail Strict Scrutiny As Applied to Ballot Selfies.

### A.    The Ballot Photography Provisions are "presumptively unconstitutional" content-based restrictions.

The Ballot Photography Provisions are subject to strict scrutiny because they apply only to photos that contain an image of a voted ballot, including ballot selfies. Laws that target a category of speech "because of the topic discussed or the idea or

message expressed," as these ones do, are "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

The Ballot Photography Provisions are content based because whether their restrictions apply depends "entirely on the communicative content" of the images they regulate.[7] *Id.* at 164. In *Reed*, the Supreme Court addressed an outdoor sign ordinance which, among other restrictions, limited signs directing people to events to 6 square feet in size, political campaign signs to 16 square feet, and "ideological signs" conveying neither directional nor political messages to 20 square feet. *Id.* at 159–61. Enforcing the ordinance required differentiating signs based on what they said, rendering the law content based and subject to strict scrutiny. *Id.* at 164; *see also Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (holding picketing ordinance content based because the "operative distinction is the message on a picket sign"); *Regan v. Time, Inc.*, 468 U.S. 641, 648 (1984) (holding statute regulating photos of U.S. currency content based).

Here, the Ballot Photography Provisions single out images of voted ballots for disparate treatment. N.C. Gen. Stat. § 163-166.3(c) prohibits taking a photo only if it is of a "voted ballot." N.C. Gen. Stat. § 163-273(a)(1) criminalizes allowing "any person" to see the contents of a voted ballot. And N.C. Gen. Stat. §§ 163-165.1(e) and 163-274(b)(1) make it a misdemeanor to possess "electronic records of individual

---

[7] The Voting Enclosure Provision is likewise content based. However, because it restricts photography only in the voting enclosure, it is analyzed separately below on the assumption for the sake of argument that it applies in a nonpublic forum where content-based restrictions on speech are permitted so long as they are viewpoint neutral and reasonable in light of the purpose of the forum. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018). The Voting Enclosure Provision is unreasonable and thus unconstitutional as applied to ballot selfies. *See infra* § III.

voted ballots" if they disclose "how an individual has voted."[8] Criminalizing images of voted ballots but not, for example, unvoted ballots[9] differentiates photos based on content.

That is why every court that has examined whether ballot selfie bans are content based has held that they are.[10] The Southern District of Indiana held the state's ballot selfie ban was content based because "[a] voter remains free … to take photographs of anything and everything other than her ballot" and "[n]ot until after her photographs are examined as to their content will the government know whether" the photograph is illegal. *Ind. C.L. Union Found., Inc.*, 229 F. Supp. 3d at 823. The District of New Hampshire similarly held ballot selfie bans are content based because they restrict only "images of marked ballots that are intended to disclose how a voter has voted. Images of unmarked ballots … may be shared with others without restriction." *Rideout*, 123 F. Supp. at 229; *see also Coal. for Good Governance*, 558 F. Supp. 3d at 1386 (holding Georgia's ballot-selfie restrictions content based because they "regulate what type of ballot information a person may record").[11] Here too, to

---

[8] The Ballot Photography Provisions extend far outside the polling place. For instance, they apply to a ballot selfie with an absentee ballot taken in the comfort of one's own home or shared "far away from the polling place." *Rideout*, 123 F. Supp. at 230.

[9] Or, to use the Court's own example, photos of a pen pointing at a candidate on an unvoted ballot. (Mot. Hr'g Tr. 29:21–30:9.)

[10] Because the First Circuit and the District of Colorado both determined the ballot selfie laws they reviewed would have failed at least intermediate scrutiny, they decided to forgo ruling on whether the laws were content based. *Rideout*, 838 F.3d at 72; *Hill v. Williams*, No. 16-CV-02627-CMA, 2016 WL 8667798, at *9 (D. Colo. Nov. 4, 2016).

[11] The Southern District of New York likewise held that New York's ban on sharing ballot selfies was content based because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Silberberg*, 272 F. Supp. 3d at 474. The court ultimately upheld New York's ballot selfie ban because of the state's unique history, up to the present, of vote buying and voter intimidation, which is absent in this case. *See infra* § II.B.

know whether Hogarth's or another voter's ballot selfies are illegal, State officials must "examin[e] … their content." *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 823.

Because the Ballot Photography Provisions are content based, they are subject to strict scrutiny. *See Reed*, 576 U.S. at 173 (applying strict scrutiny to content-based ordinance); *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 824 (applying strict scrutiny to evaluate ballot selfie ban). This is a "stringent standard," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018), that the Fourth Circuit has described as "in practice, [] virtually impossible to satisfy," *McManus*, 944 F.3d at 520, as proves true here for the reasons that follow.

### B. North Carolina does not have a compelling government interest in banning voters from photographing their own ballots.

The state cannot overcome strict scrutiny because Defendants cannot show the Ballot Photography Provisions are "narrowly tailored to serve [a] compelling state interest" as applied to ballot selfies. *Reed*, 576 U.S. at 163. The Ballot Photography Provisions fail at the threshold because banning photographs of voted ballots does not further a "compelling state interest." *Id.* Defendants profess interest in preventing "vote buying," "social coercion," "delays," "distraction," "voter intimidation," and the violation of other voters' privacy (State Defs.' Resp. to Mot. for Prelim. Inj. at 12–13, ECF No. 41), but they default on their obligation to show "the recited harms are real, not merely conjectural," *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014) (requiring government to show more than "merely conjectural" interests even under intermediate scrutiny).

Defendants must do more than "posit the existence of the disease sought to be cured." *Turner Broad. Sys.*, 512 U.S. at 664. Instead, the Fourth Circuit requires assertion of a compelling government interest to "meaningfully demonstrate" speech-restrictive regulations are "impelled by the facts on the ground." *McManus*, 944 F.3d at 521. That means, at minimum, Defendants must show the harms they identify actually exist. *Id.*

But the undisputed facts of this case demonstrate Defendants cannot meet their burden to show a compelling interest in banning ballot selfies. Defendants cannot point to even a single vote-buying prosecution, much less one involving ballot selfies. In defense of the Ban, they cited eight years of public investigative record (*Public Data*, *supra*) that includes only four stale, never-prosecuted vote-buying *allegations*, with no indication any involved ballot selfies. (State Defs.' Resp. to Mot. for Prelim. Inj. at 14–15.) Nor have Defendants offered anything to demonstrate their other posited harms exist. (*Id.*) This complete lack of support means that not only do the Ballot Photography Provisions fail to satisfy strict scrutiny, *see Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 799–800 (2011) (regulation failed strict scrutiny absent evidence of "direct causal link" between speech regulated and the asserted harm), they cannot satisfy even the more forgiving intermediate scrutiny, *see Turner Broad. Sys.*, 512 U.S. at 664 (speech regulation failed intermediate scrutiny absent evidence it would alleviate asserted harms "in a direct and material way").

This is hardly surprising given that federal courts have repeatedly held ballot selfie bans unconstitutional when states fail to establish a compelling or even

important government interest. In *Rideout*, the First Circuit explained that even though "[d]igital photography, the internet, and social media" had been "ubiquitous for several election cycles," New Hampshire's failure to show ballot selfies had "the effect of furthering vote buying or voter intimidation" doomed its ban under either strict or intermediate scrutiny. 838 F.3d at 73.[12] The Southern District of Indiana likewise noted that even though "a large percentage of Americans own and use smartphones to take and share digital images," the state failed "to produce a single instance of their having been used to facilitate vote buying or voter coercion." *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 825. And in *Hill v. Williams*, the District of Colorado enjoined the state's ballot selfie ban because, in part, Colorado's expert witness conceded "vote buying and voter intimidation largely disappeared during the twentieth century and there is currently no record of extensive vote buying." No. 16-CV-02627-CMA, 2016 WL 8667798, at *10 (D. Colo. Nov. 4, 2016).

North Carolina likewise comes to the Court with empty hands. Since *Rideout*, the number of states in which ballot selfies are legal has nearly doubled, to thirty-one.[13] By 2020, fifteen states had either passed laws permitting ballot selfies[14] or had

---

[12] The Ballot Photography Provisions here would likewise fail intermediate scrutiny not only for all the reasons they fail strict scrutiny (*see supra* § II.A; *infra* §§ II.B & C) but also because they impermissibly "foreclose an entire … important and distinct medium of expression." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (striking down a ban on yard signs and noting laws banning whole mediums of expression pose a "readily apparent" danger to free speech and risk suppressing too much speech "by eliminating a common means of speaking").

[13] Ballot selfies are legal in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Utah, Vermont, Virginia, Washington, Wisconsin, and Wyoming.

[14] *See* Ala. Code § 17-9-50.1 (2019); Ariz. Rev. Stat. § 16-1018(4) (2018); Cal. Elec. Code § 14291 (2017); Colo. Rev. Stat. § 1-13-712 (2022); Haw. Rev. Stat. § 11-121 (2016); Iowa Code § 49.88 (2021);

---

their bans struck down in court,[15] leading to tens of millions of citizens voting in states where ballot selfies had been affirmatively legalized by the time of the general election.[16] Yet in challenges to ballot selfie bans across the country, no state has produced even a single real-world example of a ballot selfie used in a vote-buying scheme.

The only decision upholding a ballot selfie ban, *Silberberg v. Board of Elections*, is distinguishable in two key ways. 272 F. Supp. 3d at 471, 481. First, unlike in North Carolina, there was "ample evidence" of (non-ballot selfie) "vote buying and voter intimidation in New York, both historic and contemporary." *Id.* at 471. Second, even that evidence would fall short of the Fourth Circuit's requirement that states show speech restrictions are "impelled by the facts on the ground," *McManus*, 944 F.3d at 521–22, as New York did not provide evidence of any instances of ballot selfies in vote-buying schemes. *Silberberg*, 272 F. Supp. 3d at 471. Here, conversely, Defendants' failure to show ballot selfies cause their asserted harms renders the state's interests merely "hypothetical," not compelling, *McManus*, 944 F.3d at 521–

---

Neb. Rev. Stat. § 32-1527 (2016); N.M. Stat. § 1-12-59 (2019); Okla. Stat. tit. 26 § 7-109 (2019); and Utah Code § 20A-3a-504 (2020).

[15] *See supra* n. 2. *See also Rogers v. Madison County Clerk*, No. 2016-SC-3147, 2017 WL 3475008, at *2 (Ill. Cir. Ct. July 20, 2017) (striking down an Illinois ballot selfie law); *Wisconsin v. Buzzell,* No. 2022-cv-000361 (Wis. Ct. App. Nov. 27, 2023) (dismissing criminal charges and declaring that a law prohibiting ballot selfies was unconstitutional).

[16] The total number of 2020 voters in Alabama, Arizona, California, Colorado, Georgia, Hawaii, Iowa, Illinois, Indiana, Nebraska, New Hampshire, New Mexico, Oklahoma, Utah, and Wisconsin is over 50 million. *See* Federal Elections Commission, Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives at 7. (Oct. 2022) (showing how many people voted in each state in the 2020 presidential election).

22, and its concerns about ballot selfies "merely conjectural." *Turner Broad. Sys.*, 512 U.S. at 664.

### C. Banning voters from taking and sharing ballot selfies is not narrowly tailored to achieve Defendants' purported ends.

Even if the Defendants could show their purported interests are compelling, the Ballot Photography Provisions still fail strict scrutiny because they are not narrowly tailored to further those interests. Content-discriminatory laws must be narrowly tailored because the "government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). The First Amendment does not permit censorship as a "path of least resistance," so the narrow tailoring requirement "prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* (quoting *Riley v. National Fed'n of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Under strict scrutiny, narrow tailoring requires that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative," *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). North Carolina has not done so here.

The Ballot Photography Provisions fail narrow tailoring because the state could impose less speech-restrictive alternatives to achieve its purported interests in preventing "vote buying," "social coercion," "delays," "distraction," "voter intimidation," and the violation of other voters' privacy. (State Defs.' Resp. to Mot. for Prelim. Inj. at 12–13.) In fact, North Carolina *already* has statutes at its disposal preventing all of Defendants' purported interests *without* banning ballot selfies:

- Vote buying or selling is a Class 1 felony in North Carolina, punishable by up to 10 months in prison. N.C. Gen Stat. § 163-275(2). Federal law also punishes buying or selling votes, with up to two years in prison. 18 U.S.C. § 597.

- Coercing or intimidating voters is a Class 2 misdemeanor in North Carolina, N.C. Gen. Stat. § 163-274(a)(7), and chief judges are statutorily required to prevent intimidation at polling places. N.C. Gen. Stat. § 163-48. The federal Voting Rights Act also prohibits intimidating or coercing voters. 52 U.S.C. § 10307(b).

- Delaying an election by remaining in the voting booth longer than allowed, if forewarned, is a Class 2 misdemeanor. N.C. Gen Stat. § 163-273(a)(5).

- Interfering, or attempting to interfere with other voters in the voting enclosure, or when marking their ballots, are Class 2 misdemeanors. N.C. Gen Stat. §§ 163-273(a)(3)–(4).

- Voter privacy in North Carolina is protected by the requirement that elections officials to organize voting enclosures to ensure voters can vote in secret. N.C. Gen. Stat. § 163-166.2.

These laws prohibit the conduct Defendants describe *without* encroaching on First Amendment freedoms. *See Rideout*, 838 F.3d at 74 (holding New Hampshire failed to prove "other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified"). Defendants therefore cannot meet their burden to prove these existing criminal statutes, or any other, "plausible, less restrictive alternative[s] … will be ineffective to achieve its goals." *Id.* at 816; *see also Brooklyn Branch of NAACP v. Kosinski*, 735 F.Supp. 421, 448 (S.D.N.Y. May 30, 2024) (A law "is not the least restrictive means of achieving the state's goal if the only conduct it legitimately proscribes is already criminalized by other state laws.") (citing *McCullen*, 573 U.S. at 490–92).

In *Playboy Entertainment Group*, the Supreme Court held a law requiring cable channels to either limit the broadcast hours of adult content or to scramble it was not narrowly tailored because the government failed to show a plausible alternative—blocking it in individual households upon request—would be ineffective. 529 U.S. at 825–26. Likewise, in *Sable Communications of California, Inc. v. FCC*, the Court invalidated a ban on "dial-a-porn" services because the government failed to prove more-limited screening requirements would not prevent inappropriate access. 492 U.S. 115, 129 (1989). Notably, in both cases, the Court required the government to use less restrictive alternatives that did not yet exist in law, whereas here Defendants may rely on the existing statutes above.

Defendants cannot explain, let alone demonstrate, how those direct regulations not implicating speech—the "normal method of deterring unlawful conduct," *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001)—are insufficient to achieve the Ballot Photography Provisions' purported interests. As the Supreme Court has time and again held, criminal laws precisely targeting unlawful conduct are less restrictive alternatives to those that seek to achieve a governmental interest by broadly suppressing protected expression. In striking down an ordinance banning public handbilling in *Schneider v. New Jersey*, the Court explained:

> Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech[.]

308 U.S. 147, 164 (1939); *see also Bartnicki*, 532 U.S. at 529 (holding government could punish interception of private information but not suppress "speech by a law-abiding possessor of information"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invalidating ban on charitable solicitation because the government's "interest in preventing fraud" could be "better served by measures less intrusive," like "penal laws" that punish fraud directly); *Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940) (holding "penal laws are available to punish" fraudulent conduct in lieu of restrictions on protected speech).

Applying these core principles, courts have held ballot selfie bans insufficiently tailored. For example, Indiana's ban on taking and sharing pictures of voted ballots was not narrowly tailored because it "dr[ew] into its ambit voters who may choose to take photos for entirely legitimate and legally innocuous reasons," and the state provided no evidence that laws targeting only ballot selfies used in vote-buying schemes would be "much more difficult to enforce." *Ind. C.L. Union Found., Inc.,* 229 F. Supp. 3d at 826–27. Likewise, Georgia's ban, even assuming a compelling interest, restricted more speech than necessary—particularly when compared with an Alabama statute that prohibited ballot photography only in the voting booth and made an allowance for photos of a voter's own ballot. *Coal. for Good Governance,* 558 F.Supp.3d at 1386; *see also Rogers v. Madison Cnty. Clerk*, No. 2016-SC-3147, 2017 WL 3475008, at *2 (Ill. Cir. Ct. July 20, 2017) (invalidating Illinois ballot selfie ban as not narrowly tailored).

The Ballot Photography Provisions similarly restrict more speech than necessary by banning ballot selfies—like Hogarth's—that neither facilitate vote buying, nor delay voting, nor cause any other of the harms Defendants posit. N.C. Gen. Stat. § 163-166.3(c) prohibits photographing a voted ballot anytime, anywhere, for any purpose. Section 163-273(a)(1) bans sharing a ballot selfie with anyone *in perpetuity*, even long after the election ends, and/or the candidates on that ballot no longer hold or seek office. And sections 163-165.1(e) and 163-274(b)(1) bar telling anyone truthful information about how you voted, just because you possess a ballot selfie. All these provisions—individually, and in combination—sweep far broader than necessary to achieve any of the state's purported interests.

Ultimately, the Ballot Selfie Provisions force innocent voters across North Carolina to "self-censor or risk prosecution," a choice the Fourth Circuit has held the First Amendment prohibits. *PSINet, Inc. v. Chapman,* 362 F.3d 227, 235 (4th Cir. 2004). Indeed, that is the choice the State Board put to Hogarth in its March 13, 2024, letter telling her to take down her ballot selfie or face prosecution. (Verified Compl. Ex. A.) Yet the State cannot explain how forcing her to remove her photo from the internet more than a week after the election furthers any of its stated interests. Because North Carolina's Ballot Photography Provisions are not narrowly tailored to further the State's asserted interests, they cannot satisfy strict scrutiny.

## III. The Voting Enclosure Provision Is an Unreasonable Restriction on Speech.

The Voting Enclosure Provision violates the First Amendment as applied to ballot selfies by giving election officials unbridled power to censor political expression.

The parties agree regarding the nature of the voting enclosure (*see* State Resp. at 20; Mot. Hr'g Tr., 21:22–23),[17] where any regulation of speech must be "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13, 23 (2018) (invalidating standardless ban on "political" apparel as incapable of reasoned application). And singling out photographs of voters for special treatment means the Voting Enclosure Provision is, like the Ballot Photography Provisions, a content-based restriction on speech. (*See supra* § II.A.[18]) The Supreme Court and Fourth Circuit have both made clear content-based restrictions, whether in limited or nonpublic forums, must be reasonable, but the Voting Enclosure Provision is not.

The provision requires anyone who wants to photograph a voter in the voting enclosure, including oneself, to first obtain approval from an elections official, yet provides no standards to guide officials in granting or denying approval or to prevent arbitrary enforcement. N.C. Gen. Stat. § 163-166.3(b). That makes it unreasonable under either of the tests for regulation of protected expression in even nonpublic forums.

---

[17] As to characterization of the voting enclosure itself, the parties have referred to it as a "nonpublic forum," within the framework of the Fourth Circuit's recognition of the "considerable confusion" that exists over whether a "nonpublic forum" is synonymous or distinct from what the Supreme Court has called a "limited public forum." *White Coat Waste Project*, 35 F.4th at 196 n.13. Whatever the nomenclature, the parties agree expression takes place in the voting enclosure and that any restrictions on speech therein must be viewpoint neutral and reasonable. (State Resp. at 9, 17 (citing *Mansky*, 585 U.S. at 12).)

However, should this case proceed past the Rule 12(c) stage—though the parties agree it need not (*see* Rule 26(f) Report, ECF No. 85, 2)—and further facts develop in support of it, Hogarth reserves the right to argue both that her polling place is a designated public forum and that the Voting Enclosure Provision is a content-based restriction on speech that fails strict scrutiny. (*See supra* § II.)

[18] The Voting Enclosure Provision is content based not only because it regulates based on subject matter (photos in voting enclosures) but also because it treats photos in voting enclosures of candidates differently from those of all other voters.

First, the Voting Enclosure Provision fails the test articulated in *Mansky*, in which the Supreme Court allowed content-based regulations of speech as reasonable only if they contain an "objective, workable standard," providing "some sensible basis for distinguishing what [speech] may come in from what must stay out." 585 U.S. at 21, 16. As with the bare descriptor in Minnesota's ban on "political" apparel in polling places in *Mansky* that imbued officials with subjective, "arbitrary discretion" not "capable of reasoned application," *id.* at 21, 23, the Voting Enclosure Provision grants election officials total discretion to grant or deny voters permission to photograph themselves. Nothing in the provision's language—or any other North Carolina law—provides any standards to guide or otherwise limit that authority. In fact, the state fails to provide *any* guidance—let alone a bare descriptor—to limit officials' discretion to censor voters under the Voting Enclosure Provision.

The Voting Enclosure Provision is also unreasonable under the Fourth Circuit balancing test, which gives "special solicitude" to First Amendment activity, "even in [a] nonpublic forum." *Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). Both before *Mansky*, *id.*, and after, the Fourth Circuit has required the government to show "more than a rational basis" for speech restrictions even in a nonpublic forum, under a test that is "akin to … intermediate scrutiny." *White Coat Waste Project*, 35 F.4th at 198. This requires the "degree and character of the impairment of protected expression involved" to outweigh the "validity of any asserted justification for the impairment." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 577 (4th Cir.

2010) (quoting *Multimedia Publ'g Co. of S.C.*, 991 F.2d at 159). In *News & Observer*, the Fourth Circuit held a total ban on newspaper racks inside airport terminals failed the reasonableness test. *Id.* at 581. The airport authority asserted interests in aesthetics, loss of revenue, avoiding congestion in the terminal, and security, but the ban was unreasonable as it "significantly restricted" expression and the government offered insufficient evidence to show the validity of its asserted justifications. *Id.* at 578–81.

The Voting Enclosure Provision similarly significantly "impair[s] … protected expression," *id.* at 577, by empowering elections officials to deny—for any reason, or no reason at all—noncandidate voter requests to take ballot selfies. That unbridled discretion to censor speech easily outweighs Defendants' claim that banning ballot selfies preserves other voters' anonymity from incidental photography (State Defs.' Resp. to Mot. for Prelim. Inj. at 20, 22), because voters can lawfully shoot virtually anything else in the voting enclosure, as the State Board concedes. (*Id.* at 17 ("Voters can take other photographs and share photographs taken in the voting enclosure, as long as the photographs do not include other voters" or other voters' ballots.).) That poses just a much a risk to anonymity from incidental photography as ballot selfies assertedly do, leaving Defendants' expressed justification without grounding in either "common sense or logic." *News & Observer*, 597 F.3d at 579.

Hogarth does not want to take photographs of other voters or their ballots. She asks this Court only to declare unconstitutional and enjoin enforcement of the Voting Enclosure Provision as applied to ballot selfies—photographs of voters' selves with

their own voted ballots (*see* Verified Compl. 32–33)—because it is an unreasonable restriction on speech that violates the First Amendment.

## CONCLUSION

North Carolina's Ballot Selfie Ban prohibits and criminalizes political expression of voters photographing themselves participating in our country's core democratic function. The state cannot justify abridging that First Amendment freedom where it serves no compelling interest and more narrowly tailored alternatives already exist that do not restrict protected speech. For these reasons, this Court should grant Plaintiff's Motion for Judgment on the Pleadings.

Dated: July 11, 2025.

Respectfully submitted,

/s/ James M. Dedman IV
JAMES M. DEDMAN IV
  (NC Bar # 37415)
GALLIVAN WHITE & BOYD P.A.
6805 Carnegie Blvd, Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

ERIC SPENGLER
  (NC Bar # 47165)
SPENGLER + AGANS PLLC
352 N. Caswell Rd.
Charlotte, NC 28204
(704) 999-8733
eric@sab.law

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN*
  (Pa. Bar No. 328570)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@thefire.org

DANIEL A. ZAHN*
  (DC Bar No. 90027403)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
daniel.zahn@thefire.org

*Special Appearance pursuant to Local
Rule 83.1(e)

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.2(f)(3), I hereby certify this brief contains 7,400 words, as calculated by Microsoft Word version 16.98, and therefore falls within the L.R. 7.2(f)(3)(A) word limit of 8,400 words for a memorandum filed in support of a motion.

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

**CERTIFICATE OF SERVICE**

I, Jeffrey D. Zeman, hereby certify that on July 11, 2025, I submitted the foregoing to the Clerk of the Court via the District Court's CM/ECF system.

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION