# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

SUSAN JANE HOGARTH,

        *Plaintiff,*

  v.

SAM HAYES, et al.,

        *Defendants.*

Case No.: 5:24-cv-00481-LF

Hon. Louise W. Flanagan

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

INTRODUCTION AND SUMMARY OF THE CASE ................................. 1

STATEMENT OF FACTS ............................................................ 3

ARGUMENT ........................................................................ 5

I.     The Ballot Photography Provisions Fail Any First Amendment Test As Applied to Ballot Selfies.................................................................... 6

     A.     The Ballot Photography Provisions do not survive strict or intermediate scrutiny.............................................................. 7

          1.     Defendants cannot avoid standard First Amendment review because the Ballot Photography Provisions ban "pure speech" everywhere, based on its content. .......................... 8

          2.     The Ballot Photography Provisions fail both strict and intermediate scrutiny because Defendants cannot show a compelling or even significant governmental interest. .............. 11

          3.     The Ballot Photography Provisions are not narrowly tailored under strict or intermediate scrutiny. ......................... 14

     B.     The Ballot Photography Provisions would fail even the Fourth Circuit nonpublic forum and *Anderson-Burdick* tests. ....................... 16

     C.     Defendants cannot avoid standard First Amendment scrutiny by trying to remove absentee ballots from the analysis of Hogarth's challenge to the Ballot Photography Provisions.................................. 18

II.    The Voting Enclosure Provision Violates the First Amendment As Applied to Ballot Selfies.................................................................. 21

CONCLUSION...................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ..........................................................................................20, 21

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786 (2011) ...................................................................................13

*Burson v. Freeman,*
  504 U.S. 191 (1992) ...................................................................................13

*Cent. Radio Co. Inc. v. City of Norfolk,*
  811 F.3d 625 (4th Cir. 2016) ...................................................................15

*Christianson v. Colt Indus. Operating Corp.,*
  486 U.S. 800 (1988) ...................................................................................19

*City of Laude v. Gilleo,*
  512 U.S. 43 (1994) ......................................................................................10

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................................20

*Crookston v. Johnson,*
  841 F.3d 396 (6th Cir. 2016) ...................................................................14

*Crookston v. Johnson,*
  854 F.3d 852 (6th Cir. 2016) ...................................................................14

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir.1999) .......................................................................6

*FCC v. League of Women Voters of California,*
  468 U.S. 364 (1984) ...................................................................................16

*Goldfarb v. Mayor and City Council of Baltimore,*
  791 F.3d 500 (4th Cit. 2015) ...................................................................20

*Kendall v. Balcerzak,*
  650 F.3d 515 (4th Cir. 2011) .........................................................9, 10, 23

*Massey v. Ojaniit,*
  759 F.3d 343 (4th Cir. 2014) .......................................................................4

Case 5:24-cv-00481-FL    Document 93    Filed 08/01/25    Page 3 of 31

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................11, 15, 16

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ..................................................................8, 9, 23

*McLaughlin v. N.C. Bd. of Elections,*
    65 F.3d 1215 (4th Cir. 1995) .............................................9, 10, 18, 23

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018) ........................................................................passim

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.,*
    597 F.3d 570 (4th Cir. 2010) ......................................................passim

*Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,*
    460 U. S. 37 (1983) ...........................................................................17

*PETA v. N.C. Farm Bureau Fed'n, Inc.,*
    60 F.4th 815 (4th Cir. 2023) ...............................................................9

*Police Dep't of City of Chicago v. Mosley,*
    408 U.S. 92 (1972) ............................................................................10

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ....................................................................passim

*Regan v. Time, Inc.,*
    468 U.S. 641 (1984) ..........................................................................10

*Rideout v. Gardner,*
    123 F. Supp. 3d 218 (D.N.H. 2015)................................................2, 8

*Rideout v. Gardner,*
    838 F.3d 65 (1st Cir. 2016).........................................................passim

Se. Promotions, Ltd. v. Conrad,
    420 U.S. 546 (1975) ..........................................................................10

*Silberberg v. Board of Elections of New York,*
    272 F. Supp. 3d 454 (S.D.N.Y. 2017).............................................8, 9, 13

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ...................................................................2, 7, 12

*United States v. Aramony,*
    166 F.3d 655 (4th Cir. 1999) ............................................................19

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ................................................................15

*White Coat Waste Project v. Greater Richmond Transit Co.,*
   35 F.4th 179 (4th Cir. 2022) ...........................................17, 22

*Williamson v. Prime Sports Mktg., LLC,*
   No. 1:19-CV-593, 2021 WL 201255 (M.D.N.C. Jan. 20, 2021) ....................6

*Women's Health Link, Inc. v. Ft. Wayne Pub. Transp. Corp.,*
   826 F.3d 947 (7th Cir. 2016) ..........................................9

**Statutes**

N.C. Gen. Stat. § 163-165.1(e) ................................................4

N.C. Gen. Stat. § 163-166.3(b) ................................................4

N.C. Gen. Stat. § 163-166.3(c) ................................................4

N.C. Gen. Stat. § 163-273(a)(1) ..............................................4

N.C. Gen. Stat. § 163-274(b)(1) ..............................................4

**Rules**

Fed. R. Civ. P. 10(c)........................................................4

**Other Authorities**

*Michigan secretary of state settles 'ballot selfie' case,*
   Michigan Department of State (May 8, 2019) ...............................14

## INTRODUCTION AND SUMMARY OF THE CASE

No act is more central to a citizen's role in American democracy than voting. America's promise since the founding is that the people, not an omnipotent king, choose our leaders and the direction of our Nation by casting a ballot. North Carolina, however, remains one of a dwindling number of states which threatens its citizens with jail time if they share a picture of themselves performing their civic duty. To justify criminalizing political speech about democratic participation, one would expect North Carolina to come armed with fact-based, substantiated justifications. Indeed, Supreme Court precedent requires it. Yet Defendants cite *nothing*: not a single instance of ballot selfies causing any of their asserted harms in North Carolina (or anywhere else). The First Amendment does not permit this draconian censorship.

Four North Carolina statutes operate to ban taking photographs of voted ballots and criminalize sharing them (the "Ballot Photography Provisions"), while a fifth grants elections officials unbridled discretion to stop voters from photographing themselves in any polling place (the "Voting Enclosure Provision"). These laws, referred to collectively as the "Ballot Selfie Ban," are content-based restrictions of protected speech, which trigger—and fail—the rigorous constitutional scrutiny such laws must survive.

Content-based speech restrictions that target speech for disfavored treatment based on subject, like the Ballot Photography Provisions, are "presumptively unconstitutional," and the government must overcome strict scrutiny by showing the law is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see Rideout v. Gardner*, 123 F. Supp. 3d 218, 229 (D.N.H.

2015) (applying strict scrutiny to, and invalidating, New Hampshire's ballot selfie law), *aff'd* 838 F.3d 65 (1st Cir. 2016). But the undisputed facts show the asserted interests in banning ballot selfies—stated as preventing election fraud, voter intimidation, and vote buying, avoiding delays and distraction, and protecting privacy—are nothing more than "merely conjectural" concerns, *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994), because Defendants provide only unsubstantiated worry that ballot selfies *might* cause those harms. That is not enough to survive intermediate let alone strict scrutiny. *See Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016).

To defend a content-discriminatory law, the government must also prove it has used the least restrictive means of achieving a compelling state interest. Here again, Defendants cannot explain why North Carolina's existing statutes against, *e.g.*, vote buying and election fraud are insufficient to guard against the perils cited. That again dooms the Ballot Photography Provisions. *See, e.g.*, *Rideout*, 838 F.3d at 74 (holding New Hampshire failed to prove "other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified").

The Voting Enclosure Provision, meanwhile, fails the Supreme Court's test for speech regulations in a nonpublic forum because North Carolina law gives elections officials no guidance to limit their discretion to prohibit ballot selfies. Enforcement is left entirely to the whims, prejudices, and mood of each election official. The Supreme Court has made clear that such polling place speech restrictions which give officials such subjective, "arbitrary discretion" do not pass constitutional muster. *Minn. Voters*

*All. v. Mansky*, 585 U.S. 1, 21 (2018). The law also fails the Fourth Circuit reasonableness test because the Defendants have not shown their purported need to prohibit polling place ballot selfies outweighs a total ban on a type of core political speech. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 581 (4th Cir. 2010) (striking down ban on airport newspaper racks because the government offered insufficient evidence to justify a "significant restriction" on expression).

Under *Reed*, *Mansky*, and *News & Observer*, every provision of the Ballot Selfie Ban fails the First Amendment's strict tests for restrictions on political speech. This Court should follow the First Circuit in *Rideout* and the bevy of other courts invalidating ballot selfie bans on First Amendment grounds and permanently enjoin North Carolina's Ballot Selfie Ban.

## STATEMENT OF FACTS

Plaintiff Hogarth's brief in support of her motion for judgment on the pleadings sets forth the full factual background of this case. (ECF No. 91, Pl.'s Mem. Supp. Mot. J. Pleadings, 2–9.) In the interest of brevity, Hogarth will not repeat it here and incorporates that section by reference. Critically, as described in the parties' Rule 26(f) Report, the operative facts in this case are undisputed. (*See* ECF No. 85 at 2.) Here, Hogarth sets forth a limited recitation to contextualize this opposition brief:

Susan Hogarth is a resident of and registered voter in Wake County, North Carolina. (Verified Compl. ¶ 9.) On March 5, 2024, she went to her polling place to vote in the North Carolina primary election. (*Id.* ¶ 53.) From the time she arrived until she left, no more than three other voters entered the "voting enclosure," the room where voting takes place. (*Id.* ¶¶ 46, 54, 61.)

After she filled out her ballot, she took about 45 seconds to take a photograph of herself in the voting booth that showed her voted ballot and the "no photos" sign affixed to the booth. (*Id.* ¶¶ 57–59.) Hogarth then exited the polling place and minutes later posted her ballot selfie to X (formerly known as Twitter). (*Id.* ¶¶ 1, 60–66.) Her post included a caption endorsing the candidates for whom she had voted and protesting that "Laws against #ballotselfie are bullshit." (*Id.* ¶¶ 66–70.) Two weeks later, Hogarth received a letter from the North Carolina State Board of Elections threatening prosecution for her ballot selfie. (*Id.* ¶ 72, Ex. A.[1]) Hogarth's March 5, 2024, ballot selfie post remains public, and she does not intend to take it down. (*Id.* ¶¶ 105–106.) Hogarth intends to vote in future elections, either in person or absentee, and to take and share ballot selfies when she does. (*Id.* ¶¶ 107–13.)

Five provisions of North Carolina law ban different aspects of taking and sharing ballot selfies. The four Ballot Photography Provisions ban and criminalize taking or sharing photographs of a voted ballot with no exception for voters photographing their own ballot. *See* N.C. Gen. Stat. §§ 163-166.3(c), 163-273(a)(1), 163-165.1(e), 163-274(b)(1). The Voting Enclosure Provision requires voters to obtain permission from a county elections official before photographing any voter, including oneself, in the voting enclosure—the room at the polling place where voting occurs. *See* N.C. Gen. Stat. § 163-166.3(b).

---

[1] Courts may consider exhibits to pleadings for Rule 12(c) motions, the same as with motions under Rule 12(b)(6). *See* Fed. R. Civ. P. 10(c); *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

On August 22, 2024, Hogarth filed her Verified Complaint seeking declaratory and injunctive relief against the Ballot Selfie Ban. (Verified Compl. ¶¶ 11–23, 124–134, ECF No. 2.) Defendants filed Rule 12(b)(1) motions to dismiss on October 18, 2024, and Plaintiff opposed. (Defs.' Mots. to Dismiss, ECF Nos. 53, 55, 58; Pl. Resp. Br., ECF No. 66.) On November 6, 2024, after the Court ordered Hogarth not be prosecuted for taking or sharing ballot selfies during this case, Hogarth filed a Verified Supplemental Complaint describing County officials attempt to stop her from taking ballot selfies in the 2024 general election. (ECF No. 65.) On March 28, 2025, holding Hogarth has standing to challenge North Carolina's Ballot Selfie Ban, the Court denied Defendants' Rule 12(b)(1) motions to dismiss except as to the North Carolina Attorney General, who is no longer a party to this case. (Order, ECF No. 74.) On April 10 and 11, the remaining Defendants answered Hogarth's Verified Complaints. (Answers, ECF Nos. 77, 78, 79.) Agreeing the Court could resolve this case on the pleadings, the parties then stipulated to a briefing schedule for cross motions under Rule 12(c), which the Court ordered on June 23, 2025. (Rule 26(f) Report, ECF No. 85; Case Management Order, ECF No. 86.)[2]

## ARGUMENT

The Court should deny Defendants judgment on the pleadings under Rule 12(c) because North Carolina's Ballot Selfie Ban violates the First Amendment on its face as applied to ballot selfies. Under the applicable standard, which is the same as that

---

[2] When the parties filed their cross motions on July 11, 2025, the Defendants all filed as one. (Defs.' Mot. J. Pleadings, ECF No. 88.)

for motions under Rule 12(b)(6), *see Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999), Hogarth, not the Defendants, is entitled to judgment on the pleadings (*See* Pl.'s Mot. J. on the Pleadings Mem. ECF No. 91) because the undisputed facts show the Ballot Selfie Ban cannot survive any level of judicial scrutiny that might properly apply. *See Williamson v. Prime Sports Mktg., LLC*, No. 1:19-CV-593, 2021 WL 201255, at *4 (M.D.N.C. Jan. 20, 2021).

The Ballot Photography Provisions, which ban taking and sharing ballot selfies anywhere based on their content, must survive—not the nonpublic forum or *Anderson Burdick* tests as Defendants propose—but strict scrutiny. But Defendants' failure to demonstrate the Provisions are "narrowly tailored to serve [a] compelling state interest" means they do not. *Reed*, 576 U.S. at 163. And whether the Voting Enclosure Provision benefits poll workers as Defendants claim, doing so through a grant of unbridled discretion to censor ballot selfies is not a "reasonable" restriction on speech. *See Mansky*, 585 U.S. at 21; *News & Observer*, 597 F.3d at 581. Accordingly, Defendants are not entitled to judgment on the pleadings.

## I.     The Ballot Photography Provisions Fail Any First Amendment Test As Applied to Ballot Selfies.

The Ballot Photography Provisions facially violate the First Amendment as applied to ballot selfies by effectuating a ban on political speech that Defendants cannot justify under any properly or arguably applicable standard of review the Court might apply. The Provisions fail strict and intermediate scrutiny because Defendants cannot show the laws as applied to ballot selfies "will *in fact* alleviate" the State's asserted interests "in a direct and material way," or that they are narrowly tailored.

*Turner Broad. Sys.*, 512 U.S. at 662, 664 (emphasis added). The nonpublic forum and *Anderson-Burdick* frameworks to which Defendants turn because of this do not apply—and even if they did, the same inability to show banning ballot selfies furthers the State's interests means the Ballot Photography Provisions flunk both tests. The Defendants' effort to avoid these conclusions by attempting to use standing principles to subdivide Hogarth's constitutional challenge between polling-place and absentee-ballot selfies similarly fails—the Ballot Photography Provisions apply no matter where voters take or share photos of their own voted ballots and they violate the First Amendment in all such uses.

### A. The Ballot Photography Provisions do not survive strict or intermediate scrutiny.

The Ballot Photography Provisions violate the First Amendment as applied to ballot selfies because they cannot survive strict or even intermediate scrutiny. The Ballot Photography Provisions' reach regulates speech far from voting enclosure based on content, meaning standard First Amendment tests apply and not, as Defendants urge, nonpublic forum analysis or the *Anderson-Burdick* test. That means strict scrutiny applies to the Ballot Photography Provisions, because they are content based. *See Reed*, 576 U.S. at 164, 173. And Defendants' failure to show that ballot selfies cause any of the harms they allege, or that a total ban on ballot selfies is narrowly tailored to alleviate those harms, means the Provisions violate voters' free speech rights under either level of First Amendment scrutiny.

7

1. **Defendants cannot avoid standard First Amendment review because the Ballot Photography Provisions ban "pure speech" everywhere, based on its content.**

The Court should reject Defendants' attempt to avoid standard First Amendment review—*i.e.*, strict or intermediate scrutiny—because the Ballot Photography Provisions regulate ballot selfies no matter where voters create or disseminate that speech. Neither the nonpublic forum test nor the *Anderon-Burdick* test that Defendants advance (ECF No. 89 at 8–17) has any application, as the Ballet Photography Provisions do not merely regulate voting enclosure or election mechanics. *See Mansky*, 585 U.S. at 16 (applying nonpublic forum analysis to ban on "political" attire inside polling place); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–46 (1995) (holding *Anderson-Burdick* test applies only to elections mechanics). Rather, they reach far beyond that.

As both a general and threshold matter, ballot selfies—no matter where voters take them—are almost always shared "far away from the polling place," so bans on ballot photography are not "merely a restriction on speech in a nonpublic forum." *Rideout*, 123 F. Supp. 3d at 230. That alone triggers standard First Amendment review. Further, voters can fill out absentee ballots in a park, at their kitchen table, or in any number of areas "far away from the polling place." *Id.* Defendants' reliance on the one case that allowed a selfie ban to stand[3]—for the proposition that the Court

---

[3] As Hogarth explained in support of her own motion, the history of election fraud that supported New York's ballot selfie ban surviving in *Silberberg v. Board of Elections of New York*, 272 F. Supp. 3d 454 (S.D.N.Y. 2017), where all others failed, is simply not present in North Carolina. (*See* ECF No. 91 at 15–18.)

should evaluate speech created inside but shared outside the polling place under nonpublic forum analysis (*see* ECF No. 89 at 11–12 (citing *Silberberg*, 272 F. Supp. 3d at 477))—is therefore unavailing, especially here in the Fourth Circuit, where the creation of speech, even on private property, is protected from content-based regulations by strict scrutiny. *See PETA v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829–30 (4th Cir. 2023). Nonpublic forum analysis is thus irrelevant here. *Cf. Women's Health Link, Inc. v. Ft. Wayne Pub. Transp. Corp.*, 826 F.3d 947, 951 (7th Cir. 2016) ("Indeed it is rather difficult to see what work 'forum analysis' in general does.") (Posner, J.).

The *Anderson-Burdick* test Defendants invoke (*see* ECF No. 89 at 12–17) is likewise inapposite, as it does not apply to challenged election-related laws in a wide range of circumstances, including those here. It does not, for example, apply to direct regulations of "pure" speech rather than of "the mechanics of the electoral process" like filing deadlines, voter eligibility, ballot access, or the ability to vote by mail. *McIntyre*, 514 U.S. at 344–46. It also does not apply to regulations that impose "'severe' burdens" on protected speech. *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995). Nor does it apply to speech regulations that are not "content neutral." *Kendall v. Balcerzak*, 650 F.3d 515, 525 (4th Cir. 2011). Defendants ignore these controlling tests, and the Ballot Photography Provisions fail all of them.

First, like *McIntyre*'s ban on anonymous leafletting, the Ballot Photography Provisions regulate "pure speech," not election "mechanics." *McIntyre*, 514 US. at 344–45. Second, the Ballot Photography Provisions severely burden ballot selfies by

enacting a *total* ban,[4] which is even more intrusive than the regulation the Fourth Circuit invalidated in *McLaughlin* as too "severe" because it made ballot access "extremely difficult." 65 F.3d at 1220–21 (applying strict scrutiny). And as already shown (*see* ECF No. 91 at 11–14; *see also infra* § I.A.1), the Ballot Photography Provisions are content-based. *See Kendall*, 650 F.3d at 525. There is a reason no court reviewing ballot selfie bans has applied *Anderson-Burdick* (*see* ECF No. 89 at 10 n.6. (listing cases)): standard First Amendment analysis for restrictions of "pure speech" applies.

The Court should, in conducting that standard analysis, apply strict scrutiny because the Ballot Photography Provisions regulate speech based "entirely on [its] communicative content." *Reed*, 576 U.S. at 164, 173. Like the content-based ordinance in *Reed* that set different rules for signs depending on whether they had "directional," "political," or "ideological" messages, *id.* at 159–61,[5] Defendants concede the Ballot Photography Provisions "bar[] photography *of the voted ballot* or disclosure of its contents" and "photographing and displaying *marked ballots* and disclosing their

---

[4] Defendants' proposed substitute, photographing a sample ballot (ECF No. 89 at 11), merely amounts to "say something else" because it cannot show how Hogarth actually voted. *See City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (holding the ability to pass handbills does not deprive homeowners of the First Amendment right to put up yard signs and noting laws banning whole mediums of expression pose a "readily apparent" danger to free speech); *cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (holding freedom of speech "in appropriate places" cannot be limited "on the plea it may be exercised in some other place" [citation omitted]).

[5] *See also*, *e.g.*, *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (holding picketing ordinance content based because the "operative distinction is the message on a picket sign"); *Regan v. Time, Inc.*, 468 U.S. 641, 648 (1984) (holding statute regulating photos of U.S. currency content based).

10

content." (ECF No. 89 at 9, 16 (emphases added.) The Provisions do not, conversely, ban voters from taking or sharing photos, for example, of a pen pointing at a candidate on an unvoted ballot (Mot. Hr'g Tr. 29:21–30:9, ECF No. 52) or, as Defendants offer, photos of voted sample ballots. (*See* ECF No. 89 at 11.) The Ballot Photography Provisions are thus content-based and, consequently, "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

Even if, as Defendants summarily contend, the Ballot Photography Provisions did not regulate voters' speech based on content (*see* ECF No. 89 at 11), intermediate scrutiny would still apply. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Regulations that burden speech, even facially content-neutral ones like *McCullen*'s abortion-clinic buffer zones, must still survive heightened First Amendment scrutiny to ensure the government has not "too readily forgone options that could serve its interests just as well, without substantially burdening" speech. *Id.* at 490. And no matter which level of scrutiny the Court applies, the Ballot Photography Provisions are unconstitutional.

> **2. The Ballot Photography Provisions fail both strict and intermediate scrutiny because Defendants cannot show a compelling or even significant governmental interest.**

The Ballot Photography Provisions cannot overcome the first prong of standard First Amendment scrutiny because Defendants merely assert interests in a ballot selfie ban without substantiating them. Under strict scrutiny, Defendants must show the Ballot Photography Provisions are "narrowly tailored to serve [a] compelling state interest." *Reed*, 576 U.S. at 163. Intermediate scrutiny still requires they be narrowly tailored to serve a "significant" governmental interest. *McCullen*, 573 U.S. at 486. Either way, the Defendants' failure to show that their "recited harms are real, not

merely conjectural," and that the Ballot Photography provisions "will in fact alleviate" those harms "in a direct and material way," *Turner Broad. Sys.*, 512 U.S. at 664, means the Provisions fail to satisfy the "governmental interest" requirement. *Cf. Rideout*, 838 F.3d at 72 (declining to resolve whether ballot selfie ban was subject to strict scrutiny because the ban failed even intermediate scrutiny).

In *Turner*, the FCC argued that, if it could not force cable television providers to carry local broadcast stations, those stations would fail. 512 U.S. at 666. The Supreme Court held that, even though that interest was "important in the abstract," and even *assuming* cable operators would drop local stations without a must-carry rule, the government's failure to demonstrate that that would harm local stations meant the rule could not overcome even intermediate scrutiny. *Id.* at 664–66. Here, Defendants argue that operation of the Ballot Photography Provisions to ban ballot selfies targets vote buying, voter intimidation, social coercion, privacy invasion, and delays and distraction at polling places. (ECF No. 89 at 1, 8, 14–16.) But they offer no showing that any of their asserted harms have ever occurred in North Carolina, let alone that ballot selfies are their cause.[6]

---

[6] Defendants do circularly argue they need not show how ballot selfies' affect their stated interest because the "longstanding" ban deprives them of historical data (ECF No. 89 at 15–16), but *Turner* precludes that argument. In *Turner*, the Court held that, even where "complete empirical support may be unavailable," the government must still show its interests are not "merely conjectural" but arise from "reasonable inferences based on substantial evidence." *Turner Broad. Sys.*, 512 U.S. at 664–65. As Hogarth described in support of her own motion, ballot selfies have been allowed elsewhere for years, and Defendants still come to the Court without even anecdotal extra-jurisdictional proof. (*See* ECF No. 91 at 16–17.)

At most, Defendants cite only the State Board's referral of four vote-buying allegations *without* alleging ballot selfies were involved. (ECF No. 89 at 17.) They offer nothing at all in support of their other asserted interests. The same types of failures doomed nearly every other ballot selfie ban, and the same outcome should follow here. (*See* ECF 11 at 9 n.2 (listing cases).) Meanwhile, the *only* case to uphold a ballot selfie ban relied on "ample evidence" of "vote buying and voter intimidation in New York, both historic and contemporary," *Silberberg*, 272 F. Supp. 3d at 471, whereas Defendants show nothing of the sort here. The Ballot Photography Provisions therefore fail even intermediate scrutiny.

That Defendants cannot meet even that lesser burden also means the Provisions do not survive strict scrutiny. *See Rideout*, 838 F.3d at 72. In *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), the Court held a ban on violent video games failed strict scrutiny because the government could not show they *caused* aggression in children more than anything else, even if correlation existed. *Id.* at 799–02. As in *Brown*, Defendants fail to draw a "direct causal link" between ballot selfies and any of their asserted harms, as they must under strict scrutiny. *Id.*

Faced with inability to show their asserted interests are "actual problem[s] in need of solving" in North Carolina, *see id.* at 799, Defendants turn to the historical analysis in *Burson v. Freeman*, 504 U.S. 191 (1992) (ECF No. 89 at 16). But that case does not establish or even suggest ballot selfies cause voter fraud, or any other harm. *Burson* is "obviously distinguishable" because its "discussion … of the long history of regulating polling places" made clear "the interest at stake … centered on the

protection of physical election spaces," *Rideout*, 838 F.3d at 73, while here, as noted, the Ballot Photography Provisions have a far greater reach. (*See supra* § I.A.1.)

Nor may Defendants' claim a ballot selfie ban is "common sense" based on dicta from *Crookston v. Johnson* (ECF No. 89 at 16), which stayed a preliminary injunction the district court had entered on constitutional grounds against enforcement of Michigan's ballot selfie law. 841 F.3d 396, 400 (6th Cir. 2016). Neither the Sixth Circuit nor the lower court ever reached the merits. *See* 841 F.3d at 401; *Crookston v. Johnson*, 854 F.3d 852 (6th Cir. 2016). Rather, Michigan later voluntarily abandoned its ban on photographs of voted ballots.[7] Ultimately, all Defendants have done here is name their asserted interests, without any support, which cannot suffice under either strict or intermediate scrutiny.

### 3. The Ballot Photography Provisions are not narrowly tailored under strict or intermediate scrutiny.

The Ballot Photography Provisions also fail both strict and intermediate scrutiny because Defendants cannot show they are narrowly tailored. (*See* ECF No. 91 at 18–22.) At either level of review, any claim that allowing voters to photograph their own ballots would make it "easier for bad actors to exploit the practice," or harder for poll workers to identify those using photography to disrupt elections or engage in fraud (ECF No. 89 at 19), run directly counter to how narrow tailoring exists *precisely* to "prevent[] the government from too readily 'sacrific[ing] speech for

---

[7] *Michigan secretary of state settles 'ballot selfie' case*, Michigan Department of State (May 8, 2019) https://www.michigan.gov/sos/resources/news/2019/05/08/michigan-secretary-of-state-settles-ballot-selfie-case.

efficiency'" in this way. *McCullen*, 573 U.S. at 486. And Defendants effectively concede they cannot satisfy strict scrutiny, because it requires "the government to prove that no 'less restrictive alternative' would serve its purpose," *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (quoting *United States v. Playboy Ent. Grp., Inc.,* 529 U.S. 803, 813 (2000)), and they make no showing toward that end, let alone attempt to factually support it.

The Ballot Photography provisions also fail strict scrutiny's narrow tailoring requirement because they are both overinclusive and underinclusive in pursuing Defendants' asserted interests. *See id.* They are fatally overinclusive because they "unnecessarily circumscrib[e] protected expression," *id.*, sacrificing voters' political speech *everywhere* in the name of lessening elections officials' burdens *at polling places*. And the fact that the Ballot Photography Provisions "apply only to voted ballots" does not, as Defendants argue, narrow their scope (ECF No. 89 at 17–18) but rather prove Hogarth's case: voted ballots are precisely what she wants to share images of, and the Provisions ban that everywhere for any reason.

The Ballot Photography Provisions are also fatally underinclusive because they "leav[e] appreciable damage to [the government's] interest unprohibited," *Cent. Radio*, 811 F.3d at 633 (internal citations omitted), by permitting voters, by Defendants' own admission, to "take and share other photographs taken in the voting enclosure, so long as the photographs do not include voted ballots, other voters, and they obtain permission." (ECF No. 89 at 17.) Just like the sign ordinance in *Reed*, the Ballot Photography Provisions are "hopelessly underinclusive" in banning

photographs of voted ballots in the name of protecting privacy and preventing disruption at the polling place while "allowing unlimited numbers of other types" of photographs "that create the same problem." 576 U.S. at 171–72. The Provisions' over- and under-inclusiveness "undermine[] the likelihood of a genuine [governmental] interest" by laying bare that the regulations "far exceed[] what is necessary" to achieve the state's asserted interest. *FCC v. League of Women Voters of California*, 468 U.S. 364, 395–96 (1984).

Even under the more forgiving intermediate scrutiny standard, which requires the government to still consider "less intrusive" and "more targeted" means than broad speech bans, *McCullen*, 573 U.S. at 492–93 (applying intermediate scrutiny); *see Rideout*, 838 F.3d 65 (same), the Ballot Photography Provisions are unconstitutional. Defendants do not even claim, much less establish, that existing laws that directly criminalize vote buying and alleviate any of their other asserted harms are inadequate. (*See* ECF No. 89.) As Hogarth showed in her own Motion for Judgment on the Pleadings, North Carolina has a variety of statutes available *right now* that prevent vote buying, voter intimidation, social coercion, privacy invasion, and delays and distraction at polling places—all *without* banning ballot selfies. (*See* ECF No. 91 at 18, 19 (describing statutes).)

### B. The Ballot Photography Provisions would fail even the Fourth Circuit nonpublic forum and *Anderson-Burdick* tests.

There is no basis for the Court to depart from applying strict or intermediate First Amendment scrutiny to the Ballot Photography Provisions, but even if it did, they would be unconstitutional under the alternate tests Defendants advocate. The

same lack of support for the proffered interests in banning ballot selfies, or for how the statutes advance them, means the Provisions fail both the Fourth Circuit's nonpublic forum reasonableness test and the *Anderson-Burdick* standard.

Regarding the former, the Fourth Circuit requires content-based restrictions like the Ballot Photography provisions to satisfy a reasonableness test "akin to … intermediate scrutiny" when regulating speech in a nonpublic forum. *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 198 (4th Cir. 2022). And the Ballot Photography Provisions fail for all the same reasons identified above under intermediate scrutiny. (*See supra* §§ I.A.2–3.)

For example, in *News & Observer*, the Fourth Circuit held a total ban on newspaper racks inside airport terminals failed the reasonableness test because the airport authority failed to support its asserted interests in aesthetics, loss of revenue, avoiding congestion, and security in the terminal. 597 F.3d at 578–81. Similarly, Defendants here not only fail to support their asserted interests in banning ballot selfies everywhere (*see supra* § I.A.2), but their argument that voters can lawfully shoot virtually anything else in the voting enclosure (ECF No. 89 at 17) concedes that their justifications for protecting the enclosures by banning ballot selfies are ungrounded in "common sense or logic." *News & Observer*, 597 F.3d at 579. And Defendants' claimed interest in preventing vote buying is not one aimed at reserving the voting enclosure "for its intended purposes," so it cannot justify content-based speech restrictions in a nonpublic forum. *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U. S. 37, 46 (1983).

The Ballot Photography Provisions likewise fail under *Anderson-Burdick*, which requires the Court to weigh "the character and magnitude" of the burden on the plaintiff's rights against the extent to which the government's interest in ensuring "order, rather than chaos" in administering elections makes it "necessary to burden the plaintiff's rights." *McLaughlin*, 65 F.3d at 1220–21. Here, on one side of the scale, "the character and magnitude" of the regulation on ballot selfies is severe: a total ban. On the other, … *nothing*. As discussed in Section I.A.2, *supra*, Defendants cite no support for the proposition that a voter photographing her own voted ballot causes any of the Defendants' asserted harms, let alone produces "chaos" at the polling place as *Anderson-Burdick* requires. *McLaughlin*, 65 F.3d at 1221. For these reasons, the Ballot Photography Provisions are unconstitutional even under nonpublic forum or *Anderson-Burdick* analyses.

## C. Defendants cannot avoid standard First Amendment scrutiny by trying to remove absentee ballots from the analysis of Hogarth's challenge to the Ballot Photography Provisions.

The Court should also reject Defendants' attempt to have nonpublic forum analysis apply through a gambit based on standing doctrine, by isolating application of the Ballot Photography Provisions to absentee ballots. (ECF No. 89 at 12.) That effort fails out of the gate because Defendants do not explain, nor can they, how a plaintiff with standing to challenge generally applicable statutes, as this Court held Hogarth has for the Ballot Photography Provisions (Order, ECF No. 74), could be prevented from challenging all aspects of their application. The Provisions apply anywhere a voter takes or shares a ballot selfie, not just in voting enclosures—which Defendants do not dispute—and there is no legal or logical basis for separating out

selfies of absentee ballots. Standard First Amendment analyses for speech-restrictive laws therefore apply, *see Rideout*, 838 F.3d at 72–73 (applying intermediate scrutiny to ballot selfie ban that extended beyond polling places), which, as shown, should mean strict scrutiny, or at a minimum, intermediate scrutiny, either of which the Ballot Photography Provisions fail. (*See*, *supra*, § I.A.)

The Defendants' "creative" standing analysis cannot support its own weight in any event, for both procedural/jurisprudential reasons, and substantive ones. As to the first of those, the law of the case doctrine provides that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988)). This Court, as alluded to immediately above, previously denied Defendants' motions to dismiss for standing. (Order, ECF No. 74.) In doing so, it necessarily rejected the State's argument that Hogarth "should also not be permitted to rely upon what might happen with absentee voting when she voted in-person." (State Mot. Dismiss. Mem., ECF No. 67, 7.) Defendants cite no changes in fact or law that should alter that prior ruling, which therefore must stand to bar this repackaged argument. *See Aramony*, 166 F.3d at 661.

Substantively, Hogarth has standing to bring standard First Amendment challenges to the Ballot Photography Provisions, as the Court correctly held, and that remains so even zooming in on absentee ballot selfies. Sharing ballot selfies—even just absentee ballot selfies—is equally (if not more) likely to occur away from a voting

enclosure than in it (*see*, *supra*, § I.A.1), and that sharing element should by itself bar subdividing Hogarth's challenge based on forum concepts. Moreover, Hogarth can take absentee ballot selfies in the future, and establishing standing as to absentee ballot selfies alone does not require her to plead a specific future timeline for doing so but only, as she has, that she may do so. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 583 (2023).

In *303 Creative*, the Supreme Court held a plaintiff who had never created a wedding website, but "envision[ed]" doing so in the future, had standing to bring a First Amendment challenge to a law prohibiting her denial of expressive goods and services to some customers based her religious beliefs. *Id.* at 579. Hogarth easily clears that low bar, as her intent to take and share absentee ballot selfies is not "speculative" (ECF No. 89 at 12 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013))), especially given she has voted absentee before,[8] may do so again whenever she chooses,[9] and will take ballot selfies each time she votes. (Verified Compl. ¶¶ 107–13.) That is a far cry from *Clapper*'s "speculative chain" of *five* intervening events outside the parties' control, *see* 568 U.S. at 410, and more certain even than in *303*

---

[8] *See* ECF No. 43, Ex. A (voting record for Susan Jane Hogarth accessed from the North Carolina Board of Election's voter search website showing she voted absentee in 2004). Voters' records are public, showing whether voters voted absentee or not. The Court may therefore take judicial notice of Hogarth's voter record. *See Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). ("[A] court may properly take judicial notice of 'matters of public record'[.]" (citations omitted)).

[9] North Carolina permits voters to vote absentee without an excuse, *see* N.C. Gen. Stat. § 163-226, so Hogarth may choose to vote absentee without any intervening reason. She cannot—and need not—know in advance when an unexpected event may prevent her from voting in person.

*Creative*, where the plaintiff's speech first required clients to seek her services. *See* 600 U.S. at 582–83. Defendants accordingly cannot avoid standard First Amendment scrutiny with arguments sounding in Hogarth's standing.

## II. The Voting Enclosure Provision Violates the First Amendment As Applied to Ballot Selfies.

The Voting Enclosure Provision is an unconstitutional restriction on speech in a nonpublic forum as applied to ballot selfies,[10] because it is not "reasonable" under either Supreme Court or Fourth Circuit precedent. *See, e.g.*, *Mansky*, 585 U.S. at 16; *News & Observer*, 597 F.3d at 577. The Provision is unreasonable because it gives elections officials unbridled discretion to deny or permit voters to photograph themselves in the voting enclosure. *See Mansky*, 585 U.S. at 21. In *Mansky*, the Court invalidated a ban on "political" apparel in polling places as unreasonable because elections officials could define "political" any way they wanted and thereby prohibit apparel for "virtually" any reason. *Id.* at 21–22. Here, nothing in North Carolina law or any state guidance prevents officials from prohibiting, for literally any reason, voters from photographing themselves in voting enclosures.

There is, in particular, no foundation for Defendants' assurance that "officials are provided with clear direction to guide their decisions" enforcing the Voter Enclosure Provision. (ECF No. 89 at 21.) That supposed guidance rests solely on statutes that describe unrelated duties of elections officials (*id.*) and training documents that

---

[10] As explained in support of Hogarth's own motion, the parties agree that expression takes place in voting enclosures—whether they are a "nonpublic" or "limited public" forum—and that any restrictions on speech therefore must be viewpoint neutral and reasonable. (*See* ECF No. 91 at 23 n.17.)

in no way limit elections officials' discretion to permit or deny ballot selfies.[11] (*Id.*; ECF No. 41-1 at 18, 94.) That is a far cry from providing "objective, workable standards" to limit discretion as *Mansky* requires. 585 U.S. at 21. For that reason alone, the Voting Enclosure Provision is unreasonable in violation of the First Amendment.

And that is so without even considering the Fourth Circuit's more stringent reasonableness test for nonpublic forums, which Defendants ignore and, as Hogarth described in support of her own motion, the Voting Enclosure Provision fails. (*See* ECF No. 91 at 24–25.) That test, which is "akin to … intermediate scrutiny," *White Coat Waste Project*, 35 F.4th at 198, weighs the "degree and character of the impairment of protected expression involved" against the "validity of any asserted justification for the impairment." *News & Observer*, 597 F.3d at 577. Here, the intrusion on speech arising from elections officials' unbridled discretion easily outweighs Defendants' claim that singling out ballot selfies prevents disruption or protects privacy (ECF No. 89 at 22) because, as Defendants concede, "[v]oters can take and share other photographs taken in the voting enclosure." (ECF No. 89 at 17.) Defendants' justifications therefore defy "common sense or logic," rendering the Voting Enclosure

---

[11] Outside of merely reciting the text of the Ballot Photography Provision, the only mention of photographing voters in any of this "guidance" Defendants offer is a suggestion that elections officials *may* stop election observers from photographing voters if it comes off as intimidating. (ECF No. 89 at 22 n.8.) But that in no way prevents officials from stopping elections observers—let alone voters—from taking photos for any reason the election official wishes, or even no reason at all.

Provision an unreasonable restriction on speech in a nonpublic forum under the Fourth Circuit test. *News & Observer*, 597 F.3d at 579.

Nor may Defendants avoid invalidation by resorting to the *Anderson-Burdick* test (ECF No. 89 at 20) because, like the Ballot Photography Provisions, the Voting Enclosure Provision is a content-based ban on pure speech outside *Anderson-Burdick*'s limited scope. (*See supra* § I.A.1.) Photos of oneself do not involve the elections "mechanics" that *Anderson-Burdick* encompasses, such as filing deadlines, voter eligibility, ballot access, or the ability to vote by mail. *McIntyre*, 514 U.S. at 344–46. The Provision also enacts a total ban on ballot selfies at the whim of elections officials, thereby imposing a "'severe' burden" on speech, *McLaughlin*, 65 F.3d at 1220, and it does so based on content—each of which additionally renders *Anderson-Burdick* inapplicable. *Kendall*, 650 F.3d at 524.

Even if the *Anderson-Burdick* test did apply, the Voting Enclosure Provision still fails for the same reason the Ballot Photography Provisions do (*see supra* § I.B): Defendants provide no factual support for the proposition that a voter photographing herself causes any of the Defendants' asserted harms, let alone "chaos" at the polling place, as *Anderson-Burdick* requires. *McLaughlin*, 65 F.3d at 1221. Once again, "the character and magnitude" of the regulation, *id.*, is a severe total ban at elections' officials' whim, while the other side of the scale is empty. (*See supra* § I.B.) So even under Defendants' preferred tests, the Voting Enclosure Provision is an unreasonable and therefore unconstitutional restriction on political speech.

# CONCLUSION

For the foregoing reasons, Hogarth asks the Court to deny the Defendants' motion for judgment on the pleadings.

Respectfully submitted,

/s/ James M. Dedman IV
JAMES M. DEDMAN IV
  (NC Bar # 37415)
GALLIVAN WHITE & BOYD P.A.
6805 Carnegie Blvd, Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

ERIC SPENGLER
  (NC Bar # 47165)
SPENGLER + AGANS PLLC
352 N. Caswell Rd.
Charlotte, NC 28204
(704) 999-8733
eric@sab.law

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN*
  (PA Bar No. 328570)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@thefire.org

DANIEL A. ZAHN*
  (D.C. Bar No. 90027403)
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
daniel.zahn@thefire.org

*Special Appearance pursuant to Local Rule 83.1(e)

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.2(f)(3), I hereby certify this brief contains 6,489 words, as calculated by Microsoft Word version 16.98, and therefore falls within the L.R. 7.2(f)(3)(A) word limit of 8,400 words for a memorandum filed in opposition to a motion.

/s/ Jeffrey D. Zeman
JEFFREY D. ZEMAN
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2025, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Jeffrey D. Zeman
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION